# No. 26-1213

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Metropolitan Transportation Authority, Triborough Bridge and Tunnel Authority,

Plaintiffs-Appellees,

Riders Alliance, Sierra Club, New York State Department of Transportation, New York City Department of Transportation,

Intervenor-Plaintiffs-Appellees,

v.

Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Sean McMaster, in his official capacity as Administrator of the Federal Highway Administration, United States Department of Transportation, Federal Highway Administration,

Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of New York

**OPENING BRIEF**

GREGORY ZERZAN
*General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

ERIN D. HENDRIXSON
*Attorney*

*U.S. Department of Transportation*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
CHARLES E.T. ROBERTS
Attorneys
*Civil Division, Room 3617*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1141*
charles.roberts2@usdoj.gov

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. STATUTORY BACKGROUND ........ 5

B. FACTUAL BACKGROUND ........ 6

C. PRIOR PROCEEDINGS ........ 9

SUMMARY OF ARGUMENT ........ 12

STANDARD OF REVIEW ........ 14

ARGUMENT ........ 14

I. THE TUCKER ACT PRECLUDED JURISDICTION IN THE DISTRICT COURT ........ 14

A. The Contract Is the Source of Plaintiffs' Asserted Rights ........ 19

B. Plaintiffs Sought and the District Court Inappropriately Ordered Specific Performance of the Contract ........ 22

C. The Contract Is Money-Mandating ........ 27

D. Intervenors' Presence Does Not Change the Outcome ........ 31

II. EVEN IF APA JURISDICTION WERE PROPER, THE AGENCY MUST BE PERMITTED TO RECONSIDER APPROVAL OF THIS "PILOT PROGRAM." ........ 33

A. The Agency Has Authority to Reconsider the VPPP Agreement ........ 34

B. The District Court's Remedy Was Overbroad ........ 38

CONCLUSION ........ 41

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Albertson v. FCC*,
182 F.2d 397 (D.C. Cir. 1950) .......... 34, 35

*Belville Mining Co. v. United States*,
999 F.2d 989 (6th Cir. 1993) .......... 35

*B.K. Instrument, Inc. v. United States*,
715 F.2d 713 (2d Cir. 1983) .......... 17

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .......... 32

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .......... 28

*Calcutt v. FDIC*,
598 U.S. 623 (2023) .......... 38

*California Sea Urchin Comm'n v. Bean*,
883 F.3d 1173 (9th Cir. 2018) .......... 35

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) .......... 18

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) .......... 14, 25

*Department of Educ. v. California*,
604 U.S. 650 (2025) .......... 2, 12, 16

*Dun & Bradstreet Corp. Found. v. USPS*,
946 F.2d 189 (2d Cir. 1991) .......... 34, 35

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) .......... 32

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .............................................................................. 32

*Gonzales v. Thomas*,
547 U.S. 183 (2006) ........................................................................................ 38

*Holmes v. United States*,
657 F.3d 1303 (Fed. Cir. 2011) ................................................................. 28, 29

*Ideal Basic Indus., Inc. v. Morton*,
542 F.2d 1364 (9th Cir. 1976) ........................................................................ 35

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) .......................................................................... 22

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) .......................................................................... 34

*Kidwell v. Department of the Army, Bd. for Corr. of Mil. Recs.*,
56 F.3d 279 (D.C. Cir. 1995) ..................................................................... 24, 25

*Last Best Beef, LLC v. Dudas*,
506 F.3d 333 (4th Cir. 2007) .......................................................................... 35

*Macktal v. Chao*,
286 F.3d 822 (5th Cir. 2002) .......................................................................... 35

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ................................................................................... 14, 32

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ............................................................. 13, 15, 25

*MTA v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025) ............................................................. 18

*Mulgrew v. U.S. Dep't of Transp.*,
750 F. Supp. 3d 171 (S.D.N.Y. 2024) ........................................................... 6, 7

*National Insts. of Health v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 2, 12, 16, 30

*Pennsylvania v. Lynn*,
501 F.2d 848 (D.C. Cir. 1974) .......... 35

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .......... 38

*Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132 (2d Cir. 1999) .......... 17, 23-24

*Rick's Mushroom Service, Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) .......... 29

*Rudometkin v. Wormuth*, No. 23-5088,
2024 WL 5165697 (D.C. Cir. Dec. 19, 2024) .......... 25

*Sanchez-Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) .......... 40

*Sullivan-Mestecky v. Verizon Commc'ns Inc.*,
961 F.3d 91 (2d Cir. 2020) .......... 14

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) .......... 26

*Thakur v. Trump*, No. 25-4249,
2026 WL 1466303 (9th Cir. May 26, 2026) .......... 31, 32

*Trujillo v. General Elec. Co.*,
621 F.2d 1084 (10th Cir. 1980) .......... 35

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .......... 28, 37

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) .......... 3, 13, 15, 16-17, 21, 22, 23

*Watson's Est. v. Blumenthal*,
586 F.2d 925 (2d Cir. 1978) .......... 17

**Statutes:**

Federal Highway Act, ch. 119, 42 Stat. 212 (1921) .......... 5

Intermodal Surface Transportation Efficiency Act of 1991,
Pub. L. No. 102-240, 105 Stat. 1914
§ 1012(b), 105 Stat. at 1938 .......... 3

Transportation Equity Act for the 21st Century, Pub. L. No. 105-178,
112 Stat. 107 (1998)
§ 1216(a), 112 Stat. at 211 .......... 3

5 U.S.C. § 702 .......... 14-15, 19, 23

23 U.S.C. § 149 note .......... 3
§ 1 .......... 5, 36
§ 2 .......... 6, 30
§ 3 .......... 6
§ 4 .......... 5
§ 5 .......... 6
§ 7 .......... 6

23 U.S.C. § 301 .......... 5

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 4

28 U.S.C. § 1491(a)(1) .......... 15, 23, 24, 30

28 U.S.C. § 1491(b) .......... 30

NY Veh. & Traf. Law § 1701 .......... 7

NY Veh. & Traf. Law § 1704-A .......... 7

**Regulations:**

2 C.F.R. § 200.340 .......... 22, 39

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .......... 4

Fed. R. App. P. 43(c) .......... 4

**Other Authorities:**

*Hart and Wechsler's The Federal Courts and the Federal System* (2d rev. ed. Supp. 1981) .......... 17

*Pilot*, Black's Law Dictionary (12th ed. 2024) .......... 36

*Pilot*, The American Heritage Dictionary .......... 36

## INTRODUCTION

This case hinges on a federal contract. Plaintiffs brought this case on the premise that the Value Pricing Pilot Program (VPPP) Agreement (VPPP Agreement or Agreement) they executed with federal agencies "is a valid agreement, currently in effect, supported by consideration." JA344; *see* JA1185–93. Ordinarily, disputes over such a federal agreement must be brought in the Court of Federal Claims. Ordinarily, specific performance would be unavailable as a remedy against the federal government. And ordinarily, third parties would have no business suing over a federal contract they did not sign.

But this case has proven to be anything but ordinary. The government sought to terminate a VPPP Agreement (executed just three months prior, by an outgoing presidential Administration) concerning a tolling program for lower Manhattan below 60th Street, and plaintiffs argued that the termination was not authorized. Litigation ensued in the district court, which temporarily and then preliminarily enjoined defendants from terminating the VPPP Agreement, thereby ordering defendants to continue performing on the contract, at least so long as the government cannot satisfy conditions suggested by the district court. At summary judgment, the court

not only "restored" the Agreement and "reinstated" the pilot project, but further declared that the Secretary of Transportation may not terminate the Agreement under virtually any circumstances. JA1805; JA1797–98. And it entered this relief to the benefit not just of contractual counterparties but also to intervenors entirely unconnected to the Agreement. Such relief effectively freezes the Agreement in place indefinitely, requires the equivalent of specific performance by the government, and invites enforcement of those obligations by the court, counterparties, and third parties alike.

The district court's rulings should be reversed. By conducting searching Administrative Procedure Act (APA) review of defendants' actions regarding this federal contract, the court overstepped its jurisdictional bounds. The Tucker Act both impliedly precludes APA review of and vests exclusive jurisdiction for federal contract claims in the specialized Court of Federal Claims. The Supreme Court has upheld this rule in two recent cases—rejecting pleas to adopt positions similar to plaintiffs' and the district court's here. *National Insts. of Health v. American Pub. Health Ass'n* (*NIH*), 145 S. Ct. 2658, 2660 (2025); *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam). This Court's longstanding precedents

uphold this rule too. *E.g.*, *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 373 (2d Cir. 1999) (per curiam).

Even if APA review were somehow appropriate for the contractual claims here, the district court's remedy—declaring that defendants cannot terminate the Agreement under virtually any circumstances—was inappropriate. The Agreement came into being based on a statute permitting the Secretary of Transportation to grant tolling authorization as part of experimental "pilot projects," thereby creating an exception to the general prohibition on tolling federal highways.[1] Nothing in that statute suggests that the government is compelled to continue pilot projects indefinitely unless the counterparty ends the Agreement, and indeed the very nature of a pilot project strongly suggests otherwise. The court's contrary conclusion was premised on an effort to enforce the court's understanding of the Agreement itself, which highlights the error of the court's Tucker Act analysis and is in any event mistaken on its own terms.

---

[1] Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1012(b), 105 Stat. 1914, 1938 (ISTEA) (amended by Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1216(a), 112 Stat. 107, 211 (1998)) (codified as amended at 23 U.S.C. § 149 note (VPPP Statute)). The VPPP Statute is reproduced in full in the attached statutory addendum.

If upheld, the district court's decision would permit one presidential Administration to indefinitely bind its successors to maintain a favored policy come what may, simply by signing an agreement. Reversal is required to avoid that untenable result.

## STATEMENT OF JURISDICTION

Plaintiffs and intervenors purported to invoke the district court's jurisdiction under 28 U.S.C. § 1331. *See* JA268; JA53. The district court entered judgment on March 5, 2026. JA1807. Defendants filed a timely notice of appeal on May 1, 2026. JA1809–10; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.[2]

## STATEMENT OF THE ISSUES

1. Whether the district court properly exercised jurisdiction notwithstanding the Tucker Act's vesting of exclusive jurisdiction over claims founded on government contracts in the Court of Federal Claims.

2. Whether, even assuming jurisdiction, the district court properly concluded that the federal government had no right to terminate the Agreement in the absence of a breach by its contractual counterparties.

[2] Under Federal Rule of Appellate Procedure 43(c), Sean McMaster, in his official capacity, is substituted for his predecessor.

## STATEMENT OF THE CASE

### A. Statutory Background

For over a century, states and localities have been prohibited from charging tolls on federally funded highways, subject to limited exceptions. 23 U.S.C. § 301 ("Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds.") (enacted by Federal Highway Act, ch. 119, 42 Stat. 212 (1921). One of those exceptions is at issue here.

In 1991, Congress enacted the "Congestion Pricing Pilot Program" as part of the ISTEA and renamed it in 1998 as the "Value Pricing Pilot Program." *See supra* Note 1. Under the VPPP Statute, the Secretary of Transportation may, at his discretion, enter into cooperative agreements that permit certain tolls as part of "value pricing pilot programs" (a term the statute does not define). VPPP Statute §§ 1, 4. The statute also provides that the "the Federal share payable . . . shall be 80 percent" and requires the Secretary to

> fund all preimplementation costs and project design, and all of the development and other start up costs of such projects, including salaries and expenses, for a period of at least 1 year, and thereafter until such time that sufficient revenues are being

> generated by the program to fund its operating costs without Federal participation, except that the Secretary may not fund the preimplementation or implementation costs of any project for more than 3 years.

*Id.* § 2. The Secretary also must "monitor the effect of such programs," including on low-income drivers, and report to Congress the programs' effects. *Id.* §§ 5, 7. For their part, project sponsors must apply any tolling revenues "to projects eligible under [Title 23]." *Id.* § 3.

### B. Factual Background

In April 2019, the New York State Legislature enacted the MTA Reform and Traffic Mobility Act, which directed the Triborough Bridge and Tunnel Authority (TBTA) to establish certain "congestion pricing" projects in lower Manhattan. *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 188 (S.D.N.Y. 2024). Despite public pushback and despite prior congestion pricing proposals failing due to lack of political support, TBTA set out to implement a cordon pricing project in Manhattan called the Central Business District Tolling Program (CBDTP or Tolling Program). In general, cordon pricing charges drivers a fee to enter or drive within a defined, cordoned area, typically a city center. In this case, New York aimed to charge drivers a fee to enter the central business district, which is primarily defined as the southern part of Manhattan, inclusive of 60th Street. Tolling is active at all

times, with rates that vary based on whether a driver enters during the "peak period" or "overnight period" and based on the type of vehicle.

Because the Tolling Program involved tolling highways constructed with federal aid, several of the plaintiffs, including TBTA, New York State Department of Transportation (NYSDOT), and New York City Department of Transportation (NYCDOT) (together, the project sponsors or sponsors) sought federal authorization. *Mulgrew*, 750 F. Supp. 3d at 188, 191. The proposal garnered considerable controversy (including vocal opposition by then-candidate Trump) and provoked litigation in state and federal courts. *Id.* at 188, 198; *see, e.g.*, *id.* at 187 (addressing three separate lawsuits challenging the Tolling Program and the environmental assessment).

In November 2024—after the presidential election but before the change in Administration—the project sponsors and the government entered into the Agreement at issue to allow sponsors to collect tolls on vehicles entering the Central Business District as part of a "value pricing pilot project." *See* JA1186–87 (§§ (1), (5), (8)).[3] In addition to granting that

[3] Metropolitan Transportation Authority (MTA) was not a project sponsor or counterparty to the Agreement, but TBTA is an affiliate of MTA. JA46. The sponsors intended for tolling rates to be set and tolling revenues to be used to help fund MTA's capital projects. *See* NY Veh. & Traf. Law §§ 1701, 1704-A.

federal permission, the Agreement provides that the federal agencies (the Department of Transportation (Department) and its subcomponent the Federal Highway Administration (FHWA)) must monitor and report on the Tolling Program and cooperate with project sponsors. JA1187–88 (§§ (8), (11)). In exchange, the counterparties agreed to use revenues for other projects eligible under title 23, set particular toll rates, provide FHWA with annual audit results, adequately maintain the federally funded roads, make their records available for federal audits, "cooperate and work together" with the federal government, and comply "with all Federal laws and requirements applicable to this project"—among other commitments. JA1186–87 (§§ (2), (4), (6), (9)); *see* JA1186–87 (§§ (3), (7), (8)). The Tolling Program then went into effect on January 5, 2025.

Weeks later, after the change in Administration, the Secretary of Transportation sent New York Governor Kathy Hochul a letter informing her that he had "reviewed the tolling authority granted under VPPP" given President Trump's concerns "about the impacts to working class Americans" and that he was "rescinding" approval and "terminating the Agreement." JA1206–10. After FHWA repeatedly extended the compliance and final rescission deadline, *see* JA1211–12, the Secretary sent another letter, once

again extending project sponsors' compliance deadline and providing plaintiffs the "opportunity to be heard" on termination and any potential compliance measures by May 21, 2025. JA1213–16. Depending on the agency's assessment of those written submissions, the letter outlined proposed compliance measures FHWA could implement on or after May 28, 2025. *See* JA1213–16.

### C. Prior Proceedings

The project sponsors and MTA, later joined by nonprofit intervenors, sued the Department.[4] As relevant here, the operative complaints bring APA claims alleging that the termination exceeded the Secretary's statutory authority, rested on flawed legal rationales, and was arbitrary and capricious. JA70–71; JA343–52. The complaints sought a declaration voiding the Secretary's termination and an injunction against compliance measures. JA73; JA363–64. Plaintiffs moved for a preliminary injunction, which the district court granted following a temporary restraining order entered

---

[4] Although the original complaint was brought by just TBTA and MTA, NYSDOT and NYCDOT intervened and later joined the operative complaint. *See* JA247. Intervenors Riders Alliance and Sierra Club maintained their own separate complaint. *See* JA44. For simplicity, this brief refers to the project sponsors and MTA collectively as plaintiffs and to the nonprofit intervenors as intervenors.

shortly before the compliance deadline, as extended. *See* JA1669–70; JA1220–1325; JA950–51. Defendants did not appeal after the court suggested the parties move expeditiously to final judgment and the parties promptly agreed to do so. *See* JA1389–90; Dkt. Nos. 139, 138.

Many months later, following further briefing, the district court granted partial summary judgment to plaintiffs and intervenors on their APA claims. JA1805. As relevant here, the court held that it had jurisdiction, rejecting defendants' argument that the Tucker Act channeled plaintiffs' claims to the Court of Federal Claims. JA1706–28. The court held that, even on the understanding that the VPPP Agreement was a contract, the Tucker Act did not apply because (i) the source of plaintiffs' rights was the APA, not the Agreement, (ii) plaintiffs' request to restore the Agreement was not a request for contractual relief, (iii) the Agreement is not "money-mandating," and (iv) the intervenors' inability to sue in the Court of Federal Claims proved that the case belonged in district court. JA1711–28.

The court also rejected other threshold arguments regarding intervenors' standing, final agency action, and ripeness. *See* JA1684–1705. On the merits, the district court held that termination was arbitrary and capricious on three grounds: errors of law regarding the Secretary's

authority to authorize the Tolling Program, JA1729–46, problems with the Secretary's reliance on asserted policy concerns regarding the Tolling Program (or with those concerns themselves), JA1746–55, and inadequate consideration of plaintiffs' reliance interests, JA1755–59. Additionally, the court held that the Secretary lacked authority to cancel the Agreement "even for non-arbitrary policy reasons" because nothing in the statute or regulations granted the Secretary that authority. JA1759–89. Indeed, it determined that the Agreement "gave only Plaintiffs and not the Secretary or the FHWA the right to terminate the agreement at will." JA1784–85.[5]

The district court dismissed or entered judgment in defendants' favor on the remaining claims. *See* JA1807.

As a remedy, the court vacated the termination letters, "restored" the Agreement, "reinstated" the pilot program, and issued a declaratory judgment "that the Secretary is permitted to terminate the VPPP Agreement only pursuant to the terms expressly stated therein" and *not* for

---

[5] Elsewhere, the district court suggested that defendants might at most have termination authority in the event of either "material breach" by plaintiffs, JA1767–68, or "a law" passed through Congress, JA1789. But, even as it ruled on other hypothetical circumstances in which defendants would *not* have authority to terminate, the court did not state plainly that even these scenarios would provide valid grounds for termination.

various reasons that defendants had invoked. JA1805; JA1797–98. The court declined plaintiffs' request for a permanent injunction. JA1803–05.

## SUMMARY OF ARGUMENT

**1.** The district court lacked jurisdiction because the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over this contractual dispute. The heart of plaintiffs' and intervenors' claims challenge a federal agency's termination of a contractual agreement and seek relief requiring the government to resume performance on the Agreement. Such claims are quintessentially contractual and fall within the exclusive jurisdiction of the Court of Federal Claims.

The APA's limited waiver of sovereign immunity does not apply where, as here, another statute impliedly forbids the relief sought. The Supreme Court has twice recently stayed district court orders that purported to void contract terminations in similar circumstances, concluding that the government was likely to succeed in demonstrating that the district court lacked jurisdiction over claims seeking such relief. *NIH*, 145 S. Ct. 2658 (2025); *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam).

Similarly, this Court has long held that plaintiffs may not transform the contractual nature of their dispute—and thus avoid the jurisdictional and remedial limitations of the Tucker Act—by recasting their claims as involving arbitrary-and-capricious decisionmaking or as involving agency action that is contrary to statute. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375–77 (2d Cir. 1999) (per curiam) (applying *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 & n.34 (D.C. Cir. 1982)). Here, as in that case, plaintiffs have brought claims to enforce a contractual obligation and the only source of plaintiffs' asserted rights to performance of that obligation is the contract itself. The district court's contrary conclusions, and its holdings that the VPPP Agreement is not "money-mandating" and that strangers to the contract have access to remedies not available to the contracting parties, are mistaken.

**2.** In the alternative, even if APA review of this contractual action were appropriate, the district court inappropriately cabined the agencies' inherent authority to reconsider the VPPP Agreement. Nothing in the statute suggests that programs must last indefinitely, which would be a highly unusual result even before taking into account that the statute contemplates the creation of "pilot projects." The irreversible federal

contract created by the court's decisions is foreign to administrative law. The court's judgment that defendants cannot reconsider the agreement under virtually *any* circumstances is overbroad both as a substantive matter and because any APA remedy should have been limited to vacatur and remand.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *E.g.*, *Sullivan-Mestecky v. Verizon Commc'ns Inc.*, 961 F.3d 91, 97 (2d Cir. 2020).

## ARGUMENT

### I. THE TUCKER ACT PRECLUDED JURISDICTION IN THE DISTRICT COURT.

The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). The APA provides "a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages,'" *id.*, but it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C.

§ 702). That important carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a plaintiff seeks to require the government to continue to perform its obligations under a contract, the proper remedy is a suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act thus "impliedly forbids" APA review "for actions that arise out of a contract with the United States." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) (per curiam) (alteration and quotation marks omitted).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead may proceed as an APA action, courts look at two factors: "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation marks omitted); *Up State Fed. Credit Union*, 198 F.3d at 375–77 ("[a]pplying the analysis from *Megapulse*").

Under that framework, the Supreme Court has recently emphasized the preclusive scope of the Tucker Act. Last spring, the Supreme Court stayed a district court order invalidating the termination under the APA of various grant agreements, holding that the federal government was "likely to succeed in showing the District Court lacked jurisdiction." *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam). Then, in August, the Supreme Court stayed another judgment vacating the federal government's termination of grant agreements. *NIH*, 145 S. Ct. 2658, 2660 (2025). Twice over, the Supreme Court has made clear that challenges to agency "decisions terminating existing" contracts—including challenges brought "under the [APA]"—"belong in the Court of Federal Claims." *Id.* at 2661 (Barrett, J., concurring in the partial grant of the application for stay); *see id.* at 2663–64 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part) (similar).

This Court has long recognized the same, holding that when an action "essentially arises from a contract with the [federal government], jurisdiction resides exclusively in the Court of Federal Claims." *Up State Fed. Credit*

*Union*, 198 F.3d at 373.[6] This conclusion holds even where the plaintiff "characterizes the case not as a contract dispute but rather as a challenge under § 702 of the [APA]." *Id.* at 375. And it holds even where a plaintiff seeks non-monetary relief, such as "specific performance" in the form of an order to "enforce an alleged agreement between the parties." *Id.* at 377; *see Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) (claims, "in essence, seeking specific performance of [an] Agreement . . . are also barred"); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727–28 (2d Cir. 1983) ("[A]n action seeking specific performance of a contract with the Government may not be brought in a district court to avoid the Tucker Act's limitation of relief to money judgments. As a leading commentary states, such efforts 'have uniformly failed.'" (quoting Hart and Wechsler's The Federal Courts and the Federal System, 346 (2d ed. Supp. 1981))).

---

[6] *See Watson's Est. v. Blumenthal*, 586 F.2d 925, 928–29 (2d Cir. 1978) ("[O]ur question in the first instance would be whether the present complaint is 'founded upon' a contract, in which case only the Court of Claims would have jurisdiction because the amount in controversy far exceeds $10,000 . . . ."), *overruled in other part as recognized by B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724 (2d Cir. 1983); *id.* at 934 (noting that permitting district court jurisdiction for breach-of-contract claims "would be destroying the jurisdiction of the Court of Claims").

Here, the district court assumed without deciding that a contract exists, and that is the only basis on which the United States could be understood to have any obligation relevant here. *See* JA1716 & n.17; *see* JA344 (asserting that the VPPP Agreement is binding because it is "valid" and "supported by consideration"). The formation of a contract with the government requires "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021) (reciting "traditional four-part test for the existence of a government contract"); *see* JA344. Plaintiffs' entire theory of this case is that the Agreement formed a binding obligation, which would require an intent to contract, offer and acceptance, and authority to bind the United States; and, as discussed above, there was ample consideration in the form of promises by plaintiffs to comply with various requirements and provide certain information to the federal government. *See supra* pp. 7–8.[7]

[7] Although the district court previously held that plaintiffs were likely to show that the VPPP Agreement was not a contract subject to the Tucker Act because it did not "confer a direct and tangible benefit on the United States," JA1673 (quoting *MTA v. Duffy*, 784 F. Supp. 3d 624, 667 (S.D.N.Y.

*Continued on next page.*

Nevertheless, the district court adopted four rationales for finding jurisdiction: (i) that plaintiffs' right to continued performance of the Agreement is based not on the Agreement but rather on the APA; (ii) that plaintiffs' request to compel the government to continue satisfying its obligations under the Agreement did not seek specific performance; (iii) that, notwithstanding the general principle that contracts are enforceable through damages actions, the Agreement was not "money mandating"; and (iv) that strangers to the contract would be entitled to obtain specific performance even if the contractual parties were not. None is correct.

### A. The Contract Is the Source of Plaintiffs' Asserted Rights.

As to the first of *Megapulse*'s two factors, the district court concluded that plaintiffs' asserted rights stem from "the APA and the VPPP [Statute] alone," not "the terms and conditions of [the] agreement." JA1717. That conclusion is irreconcilable with *California*, *NIH*, and this Court's precedents.

As an initial matter, it cannot be right that plaintiffs can evade the implied preclusion of review under the APA (5 U.S.C. § 702) simply by

---

2025) (JA1270)), at final judgment the court "assume[d], without deciding . . . that there is sufficient consideration such that the VPPP Agreement is a valid contract," JA1716 n.17.

invoking the APA, because that implied preclusion, by its terms, applies only to APA cases. Thus, it is unsurprising that the plaintiffs in *California* and *NIH* in the Supreme Court and in *Up State Federal Credit Union* were unsuccessful in invoking the APA to avoid the preclusive effect of the Tucker Act. In those cases, the substantive rights that the plaintiffs sought to vindicate arose from a contract.

The same analysis applies here. Neither the APA nor the Constitution even arguably grants plaintiffs the right to toll lower Manhattan. Nor does the VPPP Statute, which merely provides the Department discretion to enter into agreements authorizing individual projects and does not create an entitlement to any particular agreement or project. *See supra* pp.5–6 (discussing VPPP Statute). All of the rights at issue in this case stem from the VPPP Agreement.

In fact, throughout its opinion, the district court recognized the VPPP Agreement's centrality to plaintiffs' claims. As to the Tolling Program plaintiffs wish to preserve, the court observed (i) that it is "run pursuant to the VPPP Agreement," JA1666; *see* JA1720 ("the cooperative agreement pursuant to which they operate the CBDTP"); (ii) that "permission" to "implement" it is "confer[red]" by "the VPPP Agreement," JA1727; and

(iii) that the Agreement "gave the Plaintiffs the *right* to operate the CBDTP," JA1784 (emphasis added). That "right . . . stems from no independent, non-contractual source." *Up State Fed. Credit Union*, 198 F.3d at 376; *see id.* at 377 ("Had the parties not entered into the agreement at issue in this case, the Credit Union could have had no possible right to transfer title in the building to the Army, or to demand that the Army grant it a facility lease for that building.").

Similarly, the district court repeatedly recognized that plaintiffs' claims require it to interpret the VPPP Agreement's "terms," JA1667, even acknowledging "the Court must read the agreement itself to determine whether the agreement gives the agency the authority to terminate based on a conclusion that the award no longer effectuates program goals or agency priorities," JA1765; *see* JA1674 ("[T]ermination for failure to effectuate agency priorities was not included within the VPPP Agreement . . . ."); JA1674–75 (asking whether "authority [to terminate] was contained in the VPPP Agreement itself"); JA1767 (focusing on "[t]he agreement itself" and looking "within the four corners of the agreement").[8] "Because the

[8] Plaintiffs also repeatedly acknowledged below the need to interpret what the VPPP Agreement's terms mean. *See* JA349 ("[T]he VPPP

*Continued on next page.*

adjudication of this dispute requires an interpretation of the [VPPP Agreement], . . . the source of the right at issue here is the contract between the parties . . . ." *Up State Fed. Credit Union*, 198 F.3d at 377.[9]

### B. Plaintiffs Sought and the District Court Inappropriately Ordered Specific Performance of the Contract.

Turning to the second *Megapulse* factor, the district court concluded that plaintiffs did "not seek monetary relief or specific performance." JA1718. But plaintiffs sought to rescind the termination of the Agreement and thus to compel the government to continue abiding by its obligations under the Agreement. That is the contractual remedy of specific performance, which confirms that these are contract claims through and through.

---

Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally."); Dkt. 152 at 24 (similar assertion in plaintiffs' summary judgment brief); Dkt. 83 at 26 (similar assertion in plaintiffs' preliminary injunction brief).

[9] Defendants reserve their arguments that the VPPP Agreement authorized defendants to terminate it—including, for example, through incorporation of such authority as 2 C.F.R. § 200.340 or fundamental principles of federal contract law—for consideration in the Court of Federal Claims. Those contractual sources of authority, however, highlight why that is the only possibly appropriate forum for plaintiffs' claims. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

In particular, plaintiffs sought uninterrupted authorization to operate the Tolling Program "pursuant to the VPPP Agreement." JA1666; *see* JA363–64; Dkt. 151 at 2–3 (motion for partial summary judgment). An effort to require a contractual counterparty to continue honoring the terms of an agreement is a request for the contractual remedy of specific performance, and all contract claims are barred under the APA whether they seek money damages or not. *See* 28 U.S.C. § 1491(a)(1) (applying to claims based "upon any express or implied contract with the United States"); 5 U.S.C. § 702 (precluding review "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought").

This Court's precedents make that clear. In *Up State Federal Credit Union*, the plaintiff sought "an order directing the Army to enter into a facility lease." 198 F.3d at 377. This Court concluded that such an order "would be analogous to a contractual remedy for specific performance because it would enforce an alleged agreement between the parties." *Id.* Accordingly, the claim was precluded by the Tucker Act. Similarly, in *Presidential Gardens Associates*, this Court held that requests for "(1) a declaration that [the Department of Housing and Urban Development] violated [a] Settlement Agreement in conducting [an] auction sale . . . and

(2) a permanent injunction against the auction sale of Plaintiff-Appellants' loans, or an undoing of any auction sales already completed," were "in essence, seeking specific performance of the Settlement Agreement" and were thus "barred." 175 F.3d at 143.

The district court misconstrued the relevant inquiry when it stated that "[t]he question under the second *Megapulse* factor is whether Plaintiffs seek 'non-monetary relief that has "considerable value" independent of any future potential for monetary relief.'" JA1719 (quoting *Kidwell v. Department of Army, Bd. of Corr. Of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). That conclusion cannot be reconciled with the binding precedent cited above, which makes clear that remedies seeking specific performance of a contract are precluded without regard to any potential claim for monetary relief. And the D.C. Circuit case on which the court relied for that proposition (*Kidwell*) did not involve an argument that a claim was founded upon a contract or application of the *Megapulse* factors. There, the D.C. Circuit considered an argument not that the claim was premised on an "express or implied contract with the United States," but rather that the plaintiff sought "liquidated or unliquidated damages," a separate source of jurisdiction in the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1); *see*

*Kidwell*, 56 F.3d at 283. The court cited *Megapulse* for the general proposition that plaintiffs cannot plead around the Tucker Act's limitations, noting that plaintiffs cannot "convert[] complaints which 'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284 (quoting *Megapulse*, 672 F.2d at 968). That discussion, in a case that did not involve a contract at all but rather an argument that the government had improperly refused "to change [the plaintiff's] military files to indicate a 'medical' discharge rather than the general discharge they now reflect," *id.* at 281, does not suggest that a plaintiff can seek specific performance of a contract under the APA merely because the contractual performance does not involve the payment of money. Nor do the other cases cited by the district court. *See* JA1719; *Rudometkin v. Wormuth*, No. 23-5088, 2024 WL 5165697, at *2 (D.C. Cir. Dec. 19, 2024) (per curiam) (similarly concluding that an effort to alter military records was not precluded by the portion of the Tucker Act relating to monetary claims); *Crowley*, 38 F.4th at 1110 (noting that the plaintiff did not seek specific performance in a case in which the government had no contractual obligation to the plaintiff).

The relief the district court provided confirms that the second *Megapulse* factor is satisfied here. As the court observed, "reinstatement" of a contract for "continued" performance thereon constitutes contractual relief. JA1710 (quoting *Sustainability Inst. v. Trump*, 165 F.4th 817, 828 (4th Cir. 2026)). Yet that is precisely what the court ultimately ordered: "The VPPP Agreement is *restored* and the FHWA approval of the CBDTP pilot project is *reinstated*." JA1797–98 (emphasis added). And the court only compounded that error by also declaring that the Secretary could not terminate—*i.e.*, must continue performing on—the Agreement except "pursuant to the terms expressly stated therein." *See* JA1805. In combination with the court's determination that the Agreement "gave only Plaintiffs and not the Secretary or the FHWA the right to terminate the agreement at will," JA1784–85, that declaration will continue to operate as a judicial order for defendants to continue performing on the VPPP Agreement (except perhaps in narrow circumstances). *See supra* Note 5. Such relief is indistinguishable from the *California*, *NIH*, and *Up State Federal Credit Union* plaintiffs' efforts to compel performance of their terminated agreements.

The district court's assertion that "Plaintiffs seek nothing affirmative from the Secretary" is both irrelevant and wrong. JA1720. Even ordering specific performance of a negative contractual obligation (*e.g.*, to refrain from taking certain action forbidden by contract) is contractual relief. For example, as noted above, in *Presidential Gardens Associates*, this Court held that an injunction prohibiting the auction sales of certain properties was a contractual remedy that could not be pursued in district court. And, in any event, "restor[ing]" and "reinstat[ing]" the VPPP Agreement does impose affirmative obligations on defendants. JA1798. Under its terms, defendants must affirmatively authorize the Tolling Program (such that Title 23 funds continue flowing to project sponsors despite the general prohibition on tolling federal-aid highways), monitor and report on it to Congress, and cooperate with the sponsors. JA1186–87. There is no other way of conceiving the district court's judgment than as requiring continued performance on the VPPP Agreement.

### C. The Contract Is Money-Mandating.

The district court's conclusion that the VPPP Agreement is not "money-mandating," fares no better than its *Megapulse* analysis. JA1711–16. As the court recognized, claims based on contracts with the government

generally "fulfill[] the 'money mandating requirement for Tucker Act jurisdiction' because there is a 'presumption that money damages are available for breach of contract, with no further inquiry being necessary.'" JA1713 (quoting *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)).

The district court nonetheless stated, in a single sentence, that "assuming the VPPP Agreement is a contract, it is an unfunded one such that it rebuts the general contractual presumption that money damages are available." JA1715 (quotation marks omitted). That was error. A contract need not be "funded" to be money-mandating; rather, "damages are always the default remedy for breach of contract." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1367 (Fed. Cir. 2021) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion)). It is only in the unusual case in which some feature of the contract suggests that the parties sought to override that remedy that a contract claim would not properly be brought in the Court of Federal Claims.

There is no such unusual feature here, and the district court pointed to none. The contract does not disavow money damages or otherwise arise in a context, like a contract governing conduct in a criminal case, in which

damages would be implausible. *See Holmes*, 657 F.3d at 1314 (discussing these circumstances). Plaintiffs cannot demonstrate otherwise by invoking *Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008). *Rick's Mushroom* involved a cost-sharing agreement that the government had not terminated—to the contrary, the government had paid its share of the costs as contemplated by the agreement. The plaintiff sued the government on the theory that the government had provided defective conservation practice specifications that caused the plaintiff to be liable to a neighboring landowner based on environmental issues. *See id.* at 1341–42. The plaintiff alleged that the government "had breached its implied warranty of the specifications" and sought damages in the form of "attorneys' fees in defending the lawsuit," costs associated with the need to redesign and alter the relevant structure, and "liability for environmental impact." *Id.* at 1342. The Federal Circuit's conclusion that the unusual agreement at issue in that case did not provide a substantive right to those sorts of damages has little bearing on this case, which involves no similar claim.

To the extent the district court purported to extract from *Rick's Mushroom* a general principle that cooperative agreements cannot give rise to damages in the Court of Federal Claims, it was mistaken. The relevant

provision, 28 U.S.C. § 1491(a)(1), draws no distinction among various types of contractual arrangements (unlike its neighbor 28 U.S.C. § 1491(b), which applies only to procurement contracts). And the Federal Circuit's decision in *Columbus Regional Hospital*, this Court's decision in *Up State Federal Credit Union*, and the Supreme Court's recent decisions in *California* and *NIH*, make clear that there is no exception to the Tucker Act for particular types of contracts. The plaintiffs in *NIH* tried to contend otherwise, but the Supreme Court granted a stay nonetheless. *See APHA* Respondents' Opposition to Application for Stay at 26–29, *NIH*, 145 S. Ct. 2658 (No. 25A103), 2025 WL 2244206, at *26–29 (claiming a "distinction between grants and contracts").

Lastly, even on its own terms, the district court's conclusion that this action was not contractual because "no equitable relief entered by this Court pursuant to Plaintiffs' complaint would result in the Federal Government making a payment to the Plaintiffs" was incorrect. JA1711. Plaintiffs have not disclaimed any argument that if the VPPP Agreement is valid, the VPPP Statute requires that the "the Federal share payable . . . shall be 80 percent" and that the "Secretary shall fund" certain "preimplementation" and "start up costs" by virtue of the Agreement. VPPP Statute § 2. And it is

undisputed that the federal government must pay the tolls authorized under the Agreement for nonexempt travel in the Central Business District. JA1402 ¶ 6. Such an obligation is not necessary to render a contract money-mandating, but even if it were, that obligation exists here.

### D. Intervenors' Presence Does Not Change the Outcome.

The last hook on which the district court hung APA jurisdiction was the presence of the "Organizational Intervenors" who are not parties to the VPPP Agreement. JA1726–28. As the Ninth Circuit recently recognized, strangers to a contract are not entitled to seek specific performance that would be unavailable to parties to the contract. *See Thakur v. Trump*, No. 25-4249, 2026 WL 1466303, at *7 (9th Cir. May 26, 2026) (per curiam). That argument also would have been available to some of the plaintiffs in *NIH*, but the Supreme Court drew no such distinction. *See id.*

The district court drew the wrong inference from its conclusion that the intervenors, who were not parties to the contract, could not file a suit in the Court of Federal Claims. It would be nonsensical if APA review of identical claims were precluded for the parties with actual rights under a contract but not for third parties. When Congress creates "a cause of action enabling [some parties] (and not [others]) to seek judicial review . . .

[a]llowing [the others] to sue under the APA would . . . frustrate[] that scheme." *Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 239 n.8 (2025) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345–47 (1984)). That is particularly true when Congress strictly limits the venue and remedies available to the proper parties; others who are not authorized to sue cannot have access to a cause of action that would be entirely unavailable to the proper parties. *See Global Health Council v. Trump*, 153 F.4th 1, 18–20 (D.C. Cir. 2025) (holding that the Impoundment Control Act, which contemplates claims by Comptroller General, impliedly precludes APA claims by private plaintiffs), *reh'g en banc denied* (Aug. 28, 2025). As the Supreme Court has explained, the APA "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Patchak*, 567 U.S. at 215. When Congress has limited a category of claims to particular parties in a particular forum, there is no basis for concluding that those same claims can be brought outside the designated forum by the wrong parties. *See Thakur*, 2026 WL 1466303, at *14 (Christen, J., concurring) ("[T]he claim does not become non-contractual in nature merely because it is brought by a party that is not in privity with the government.").

Intervenors' presence in the case thus cannot salvage the APA claims that are precluded by the Tucker Act. And that is true even on the district court's own logic. The court determined that the intervenors need not establish standing because they "seek the same relief as Plaintiffs here." JA1684–85. That conclusion only holds to the extent that plaintiffs may pursue APA relief; if, as the district court erroneously held, the intervenors had some independent basis for seeking to force the government to comply with its contract with plaintiffs, they would also need to demonstrate their own standing. And they have not.

## II. EVEN IF APA JURISDICTION WERE PROPER, THE AGENCY MUST BE PERMITTED TO RECONSIDER APPROVAL OF THIS "PILOT PROGRAM."

As discussed, the district court's conclusion that defendants lacked authority to terminate the VPPP Agreement stemmed largely from its interpretation of the Agreement itself (highlighting the error of its Tucker Act holding). But even if the Agreement were considered in APA terms—not as a contract but as a "regulatory grant of approval to build toll infrastructure on a federal aid highway," JA1712, or perhaps as a similar agency action granting a benefit or establishing a federal program—the agency would have the inherent power to reconsider and revoke it. And even if the court could properly question the agency's determination to terminate

the Agreement, the only available remedy would be to vacate that decision and remand to the agency. The district court's order declaring the circumstances under which the government can or cannot terminate is improper on multiple grounds.

### A. The Agency Has Authority to Reconsider the VPPP Agreement.

**1.** The district court started from the premise that the Department could not cancel the Agreement absent express statutory, regulatory, or other authority. JA1759. That gets things backwards. "The power to reconsider is inherent in the power to decide." *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950); *see Dun & Bradstreet Corp. Found. v. USPS*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review."); *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion."). That principle applies with equal force to agency

actions granting federal regulatory authorization,[10] bestowing a federal benefit,[11] or establishing a federal program.[12]

That long-established rule makes good sense, as the government must be empowered to adjust to changing circumstances or to changed priorities. It would be extraordinary if the government were thought to lock itself into a permanent policy merely by entering into an unfunded agreement with a nonfederal party. Such permanent contracts would diminish political accountability, as newly elected leaders would be tied to their predecessors' policies, and would also impede the government's ability to react to new

---

[10] *E.g.*, *Belville Mining Co. v. United States*, 999 F.2d 989, 998 (6th Cir. 1993) (mineral rights determination could be reconsidered); *Trujillo v. General Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) (EEOC right-to-sue letter in employment discrimination case could be reconsidered); *Albertson*, 182 F.2d at 399 (federal construction permit could be reconsidered).

[11] *E.g.*, *Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (trademark registration could be reconsidered); *Macktal v. Chao*, 286 F.3d 822, 825 (5th Cir. 2002) (agency award of costs and fees could be reconsidered); *Dun & Broadstreet Corp. Found.*, 946 F.2d at 190, 193 (refunds to a postal patron could be reconsidered); *Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1367 (9th Cir. 1976) (action favorable to a patent application could be reconsidered).

[12] *E.g.*, *California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1183 (9th Cir. 2018), *as amended* (Apr. 18, 2018) (discretionary, experimental program could be reconsidered); *Pennsylvania v. Lynn,* 501 F.2d 848, 855–56 (D.C. Cir. 1974) (agency "has the discretion, or indeed the obligation, to suspend the [housing subsidy] programs' operation when [they have] adequate reason to believe that they are not serving Congress's purpose").

factual circumstances that might require reallocating resources or adjusting regulatory requirements.

No statutory or constitutional provision suggests that the decision to enter into the VPPP Agreement, unlike virtually every other agency action, cannot be reconsidered. To the contrary, the statute upon which the Agreement was premised underscores that it does not contemplate a permanent program that cannot be canceled. The Statute grants the Secretary discretionary authority to "establish" individual value pricing projects by cooperative agreement. VPPP Statute § 1. There is no obligation to create or maintain any project, let alone an obligation to create or maintain this Tolling Program in particular. And the Statute's use of the adjective "pilot" to describe the projects further underlines the point. *See Pilot*, The American Heritage Dictionary ("Serving as a tentative model for future experiment or development."), https://perma.cc/7QV7-EFJJ; *see Pilot*, Black's Law Dictionary (12th ed. 2024) ("A small test project or study to assess the feasibility of an idea, policy, product, etc."). The idea of a permanent pilot program (as the district court's judgment effectively established) is an oxymoron. At a minimum, these provisions do not compel

the government to adhere to the agreements for however long counterparties (or even third parties) may prefer.

The only provisions upon which the district court relied to conclude that the agency lacked authority to terminate the Agreement were provisions of the Agreement itself. As discussed above, the court's reliance on those terms underscores that, at bottom, the court was enforcing rights ostensibly premised on a contract rather than the sort of statutory right that could give rise to an APA action. *See supra* Part I.A. To the extent the agency decision at issue is treated as an agency action reviewable under the APA rather than through the lens of contract law, there is no authority whatsoever to support the court's decision.

And even as a matter of contract law, the district court's holding was extraordinary. Contracting parties are ordinarily not bound to hold up their end of the bargain, but merely to pay damages if they fail to do so. *See Winstar Corp.*, 518 U.S. at 919 (Scalia, J., concurring in the judgment) ("Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." (quotation marks

omitted)). The idea that the federal government, which as discussed above is less susceptible to a specific-performance remedy than a private party, can be compelled by injunction to continue to perform contractual obligations turns settled principles on their head.

### B. The District Court's Remedy Was Overbroad.

The district court's order also violates basic remedial principles even on the court's erroneous understanding that this case is properly considered under the APA rather than the Tucker Act. In APA cases, it is black-letter law that the courts should evaluate the agency's own rationale for its decision and, if that rationale is held to be lacking, to vacate the agency's decision and remand the case to the agency. *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."). That is "the ordinary remand rule." *Gonzales v. Thomas*, 547 U.S. 183, 187 (2006) (per curiam) (quotation marks omitted) (remanding based on court's failure to "appl[y]" that rule); *see Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) (per curiam) (same).

Here, the district court went much further, purporting to declare the circumstances in which defendants could or could not terminate the contract in the future—even on grounds that the agency had not yet invoked. Not only did the court declare that defendants may not terminate the Agreement except "pursuant to the terms expressly stated therein," JA1805, but it also determined that the Agreement "gave only Plaintiffs and not the Secretary or the FHWA the right to terminate the agreement at will," JA1784–85. And the last sentence of the declaratory judgment, in particular, precludes defendants from invoking rationales that were included in their briefing but *not* in the agency decision on review. JA1805–06 ("Defendants may not terminate the VPPP Agreement under 2 C.F.R. § 200.340(a)(4), the incorporation of that provision through the *Christian* doctrine, under the Secretary's powers contained within the VPPP itself, or the exercise of the Secretary's powers under the unmistakability doctrine.").

That declaration, which the district court welcomed the parties to enforce, *see* JA1804, requires defendants to perform on the Agreement (regardless of how deleterious the Tolling Program may become). And it requires performance despite the court's determination that a permanent injunction would not be justified, *see* JA1802–03, even though "the

discretionary relief of declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.).

* * *

The district court's holding, if allowed to stand, would create dangerous incentives for future Administrations to bind successors to favored policies simply by executing an unfunded cooperative agreement—*e.g.*, to extract natural resources, enforce immigration laws, or construct desired public works. Counterparties and even third parties could then enforce those commitments in court, in perpetuity. Rather than promote the VPPP Agreement to the status essentially of an enacted federal statute (revocable only by another enacted federal statute), this Court should either recognize its status as a federal contract under the Tucker Act or, at most, as any other federal agency action that can be appropriately reconsidered. That conclusion would avoid the current untenable situation whereby defendants can neither breach the contract and pay damages if found liable nor

terminate it based on valid policy concerns. There is no basis for indefinitely shielding this contractual pilot project from federal reconsideration.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the case should be remanded with instructions either to dismiss for lack of jurisdiction or, in the alternative, remand to the agency for reconsideration.

Respectfully submitted,

June 2026

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
*s/ Charles E.T. Roberts*
CHARLES E.T. ROBERTS
Attorneys
*Civil Division, Room 3617*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1141*
charles.roberts2@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,430 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in CenturyExpdBT 14-point font, a proportionally spaced typeface.

*/s/ Charles E.T. Roberts*
Charles E.T. Roberts

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

23 U.S.C. § 149 note .......... A1

23 U.S.C. § 301 .......... A4

28 U.S.C. § 1491 (excerpts) .......... A5

**23 U.S.C. § 149 note. Value Pricing Pilot Program**

(1) The Secretary shall solicit the participation of State and local governments and public authorities for one or more value pricing pilot programs. The Secretary may enter into cooperative agreements with as many as 15 such State or local governments or public authorities to establish, maintain, and monitor value pricing programs.

(2) Notwithstanding section 129 of title 23, United States Code, the Federal share payable for such programs shall be 80 percent. The Secretary shall fund all preimplementation costs and project design, and all of the development and other start up costs of such projects, including salaries and expenses, for a period of at least 1 year, and thereafter until such time that sufficient revenues are being generated by the program to fund its operating costs without Federal participation, except that the Secretary may not fund the preimplementation or implementation costs of any project for more than 3 years.

(3) Revenues generated by any pilot project under this subsection must be applied to projects eligible under such title.

(4) Notwithstanding sections 129 and 301 of title 23, United States Code, the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection.

(5) The Secretary shall monitor the effect of such programs for a period of at least 10 years, and shall report to the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives every 2 years on the effects such programs are having on driver behavior, traffic volume, transit ridership, air quality, and availability of funds for transportation programs.

(6) HOV passenger requirements.-Notwithstanding section 102(a) of title 23, United States Code, a State may permit vehicles with fewer than 2 occupants to operate in high occupancy vehicle lanes if the vehicles are part of a value pricing pilot program under this subsection.

(7) Financial effects on low-income drivers.-Any value pricing pilot program under this subsection shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers.

(8) Funding.-

(A) In general.-There are authorized to be appropriated to the Secretary from the Highway Trust Fund (other than the Mass Transit Account) to carry out this subsection-

(i) for fiscal year 2005, $11,000,000; and

(ii) for each of fiscal years 2006 through 2009, $12,000,000.

(B) Set-aside for projects not involving highway tolls.-Of the amounts made available to carry out this subsection, $3,000,000 for each of fiscal years 2006 through 2009 shall be available only for congestion pricing pilot projects that do not involve highway tolls.

(C) Availability.-Funds allocated by the Secretary to a State under this subsection shall remain available for obligation by the State for a period of 3 years after the last day of the fiscal year for which the funds are authorized.

(D) Use of unallocated funds.-If the total amount of funds made available from the Highway Trust Fund to carry out this subsection for fiscal year 1998 and fiscal years thereafter but not allocated exceeds $8,000,000 as of September 30 of any year, the excess amount-

(i) shall be apportioned in the following fiscal year by the Secretary to all States in accordance with section 104(b)(3) of title 23, United States Code;

(ii) shall be considered to be a sum made available for expenditure on the surface transportation program, except that the amount shall not be subject to section 133(d) of such title; and

(iii) shall be available for any purpose eligible for funding under section 133 of such title.

(C) [probably should be (E)] Contract authority.-Funds authorized to carry out this subsection shall be available for obligation in the same manner as if the funds were apportioned under chapter 1 of title 23, United States Code; except that the Federal share of the cost of any project under this subsection and the availability of funds authorized to carry out this subsection shall be determined in accordance with this subsection."

**23 U.S.C. § 301. Freedom from tolls**

Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds.

**28 U.S.C. § 1491. Claims against United States generally; actions involving Tennessee Valley Authority (excerpts)**

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 61 of that Act.

* * *