# 26-1213

## United States Court of Appeals for the Second Circuit

METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

*Plaintiffs-Appellees*,

RIDERS ALLIANCE, SIERRA CLUB, NEW YORK STATE DEPARTMENT OF TRANSPORTATION, NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

*Intervenor-Plaintiffs-Appellees*,

v.

SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, SEAN MCMASTER, in his official capacity as Administrator of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR APPELLEES
NEW YORK STATE DEPARTMENT OF TRANSPORTATION AND
NEW YORK CITY DEPARTMENT OF TRANSPORTATION**

STEVEN BANKS
*Corporation Counsel*
*City of New York*
Attorney for City Appellee
100 Church Street
New York, New York 10007
(212) 356-4378

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for State Appellee
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: September 16, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ISSUES PRESENTED ........ 3

STATEMENT OF THE CASE ........ 3

A. The Value Pricing Pilot Program (VPPP) ........ 4

B. Congestion Pricing in New York ........ 5

C. Defendants' Purported "Termination" of Congestion Pricing ........ 9

D. This Lawsuit ........ 9

STANDARD OF REVIEW ........ 13

SUMMARY OF ARGUMENT ........ 14

ARGUMENT ........ 16

POINT I

THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER THIS LAWSUIT ........ 16

A. The VPPP Cooperative Agreement Is Not a Money-Mandating Contract Implicating the Tucker Act. ........ 18

B. Plaintiffs Bring No Contractual Claims and Seek No Contractual or Monetary Relief. ........ 22

C. Any Doubt Must Be Resolved in Favor of District Court Jurisdiction to Permit Effective Judicial Review and Avoid Harm to the Federal-State Balance. ........ 25

**Page**

POINT II

DEFENDANTS MAY NOT RENEGE ON THE CRITICAL STATE PROGRAM APPROVAL AT ISSUE HERE .......... 29

CONCLUSION .......... 38

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abrahamson v. Board of Educ. of Wappingers Falls Cent. Sch. Dist.*,
374 F.3d 66 (2d Cir. 2004) ........ 37

*American Trucking Ass'ns, Inc. v. New York State Thruway Auth.*,
886 F.3d 238 (2d Cir. 2018) ........ 5

*Anemone v. Metropolitan Transp. Auth.*,
629 F.3d 97 (2d Cir. 2011) ........ 13

*Atterbury v. United States Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) ........ 17

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ........ 21

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........ 15, 24-25

*City of Chicago v. United States Dep't of Just.*,
822 F. Supp. 3d 873 (N.D. Ill. 2026) ........ 29

*Community Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ........ 28

*Department of Educ. v. California*,
604 U.S. 650 (2025) ........ 19

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 30

*Dun & Bradstreet Corp. Found. v. United States Postal Serv.*,
946 F.2d 189 (2d Cir. 1991) ........ 33

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ........ 18

**Cases** **Page(s)**

*Golb v. Attorney Gen. of N.Y.*,
870 F.3d 89 (2d Cir. 2017) ............................................................. 35

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ............................................................. 26, 35

*Gross v. Rell*,
585 F.3d 72 (2d Cir. 2009) ............................................................. 30

*Guertin v. United States*,
743 F.3d 382 (2d Cir. 2014) ............................................................. 37

*Housing Auth. of New Haven v. United States*,
140 Fed. Cl. 773 (2018) ............................................................. 18

*Larkin v. United States*,
177 Fed. Cl. 17 (2025) ............................................................. 27

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ............................................................. 32

*Lummi Tribe of the Lummi Rsrv., Wash. v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) ............................................................. 24, 27

*Maryland v. Corporation for Nat'l & Cmty. Serv.*,
785 F. Supp. 3d 68 (D. Md. 2025) ............................................................. 29

*Massachusetts v. National Insts. of Health*,
164 F.4th 1 (1st Cir. 2026) ............................................................. 20, 28

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ............................................................. 14, 22-23

*National Insts. of Health v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................. 19

*New Jersey v. United States Dep't of Transp.*,
824 F. Supp. 3d 416 (S.D.N.Y. 2026) ............................................................. 28-29

**Cases** **Page(s)**

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) .................................................. 18-19, 25

*Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*,
175 F.3d 132 (2d Cir. 1999) .................................................. 20, 24

*Rick's Mushroom Serv., Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) .................................................. 18

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) .................................................. 18

*Tootle v. Secretary of Navy*,
446 F.3d 167 (D.C. Cir. 2006) .................................................. 26

*United Aeronautical Corp. v. United States Air Force*,
80 F.4th 1017 (9th Cir. 2023) .................................................. 23

*United States v. Mitchell*,
463 U.S. 206 (1983) .................................................. 18, 24

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .................................................. 36-37

*Up State Federal Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) .................................................. 20, 22

**Federal Statutes**

Intermodal Surface Transportation Efficiency Act of 1991,
Pub. L. No. 102-240, 105 Stat. 1914 .................................. 4-5, 21, 31-32

Transportation Equity Act for the 21st Century of 1997,
Pub. L. No. 105-178, 112 Stat. 107 (1998) .................................. 4, 31

28 U.S.C. § 1491 .................................................. 14, 16

**State Statutes** **Page(s)**

Vehicle and Traffic Law
§ 1701 et seq. .......... 6
§ 1701 .......... 6, 26
§ 1704 .......... 6
§ 1704-a .......... 6

**Federal Regulation**

2 C.F.R. § 200.340 .......... 32

## PRELIMINARY STATEMENT

Plaintiffs-appellees Metropolitan Transportation Authority and its affiliate the Triborough Bridge and Tunnel Authority filed this lawsuit to block the federal defendants-appellants' efforts to shut down New York's congestion pricing program notwithstanding that no law provides for defendants' unilateral rescission of their earlier approval for the program. Intervenor-plaintiffs-appellees New York State Department of Transportation and New York City Department of Transportation intervened to support the continued operation of that duly enacted and highly successful program to advance the health, safety, and welfare of state and city residents and to raise vital public transportation funds.[1] Plaintiffs moved for summary judgment, and the U.S. District Court for the Southern District of New York (Liman, J.) granted the motion in relevant part. This Court should affirm.

*First*, the district court had jurisdiction over this lawsuit. Plaintiffs sued pursuant to the Administrative Procedure Act and the U.S. Consti-

---

[1] Intervenor-plaintiffs-appellees Riders Alliance and Sierra Club also intervened. This brief is filed only on behalf of the State and City. The other appellees are separately represented.

tution, seeking declaratory and equitable relief against defendants' unlawful rescission of their approval for the program and their threats to block other critical federal approvals and federal funds if plaintiffs did not end the congestion pricing program. Defendants are wrong to contend that this case can be heard only in the Court of Federal Claims. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims only over claims under money-mandating contracts, not cooperative regulatory agreements such as the one at issue here, which involve no transfer of federal funds at all. Moreover, the complaint does not raise contractual claims or seek contract remedies, and therefore is not the type of action subject to the Tucker Act. This is a challenge to an agency decision, not a claim for money damages.

*Second*, the district court correctly concluded that defendants may not renege on their approval of the congestion pricing program under governing law or the terms of the parties' cooperative agreement. Defendants' insistence that they have "inherent" authority to renege is both incorrect and raises substantial concerns for all regulated parties. If federal agencies had inherent authority to repudiate their own approval agreements merely because a new presidential administration has new

political preferences, then state, local, and other partners would face huge uncertainty that would strongly discourage entering such agreements in the first place. And in a case like this, where they did enter such an agreement, they would suffer massive detrimental reliance from the federal agency's sudden change of position after state and local governments had invested enormous financial resources in the relevant program.

## ISSUES PRESENTED

1. Did the district court have jurisdiction over plaintiffs' Administrative Procedure Act and constitutional challenges to the federal defendants' attempt to "terminate" the congestion pricing program?

2. Did the district court properly conclude that defendants had no right to renege on their approval for congestion pricing?

## STATEMENT OF THE CASE

Relevant background on this case is described in detail in the district court's summary judgment opinion on appeal (Special Appendix (S.A.) 113-136) and in the Metropolitan Transportation Authority (MTA) and Triborough Bridge and Tunnel Authority (TBTA)'s appellee brief. A summary of facts relevant to this brief is included below.

### A. The Value Pricing Pilot Program (VPPP)

Congress created the Value Pricing Pilot Program (VPPP)—originally called the Congestion Pricing Pilot Program—to grant the U.S. Secretary of Transportation authority to enter cooperative agreements with state and local project sponsors "to establish, maintain, and monitor congestion pricing projects." Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1012(b)(1), 105 Stat. 1914, 1938 (codified at 23 U.S.C. § 149 note). The statute specified that "the Secretary shall allow the use of tolls" for the VPPP, notwithstanding earlier statutory provisions limiting tolling on highways eligible for federal funds. *Id.* § 1012(b)(4), 105 Stat. at 1938. As a "pilot program," the VPPP limited participation to five, *id.* § 1012(b)(1), and later fifteen, Transportation Equity Act for the 21st Century of 1997, Pub. L. No. 105-178, § 1216(a)(2), 112 Stat. 107, 211 (1998), state or local governments or public authorities. And the Secretary was required to "monitor the effect of such projects for a period of at least 10 years, and . . . report to [Congress] every 2 years on the effects such programs are having." Pub. L. No. 102-240, § 1012(b)(5), 105 Stat. at 1938.

The statute that established the VPPP was intended to grant States "greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects." *American Trucking Ass'ns, Inc. v. New York State Thruway Auth.*, 886 F.3d 238, 242 (2d Cir. 2018). In enacting the statute, Congress explained that it sought to "develop a National Intermodal Transportation System" consisting "of all forms of transporttation in a unified, interconnected manner." Pub. L. No. 102-240, § 2, 105 Stat. at 1914. Thus, the VPPP specifically permits revenues generated by congestion pricing projects to fund other projects, such as public transportation capital projects. *See id.*, § 1012(b)(3), 105 Stat. at 1938.

### B. Congestion Pricing in New York

For many decades, dating back to a proposal by Nobel laureate and Columbia University economist William Vickrey in the 1950s, the State and the City of New York have considered charging vehicles a toll to drive into the center of the city, in order to reduce congestion and associated economic, environmental, and other harms. (Joint Appendix (J.A.) 248-249.) In 2007, New York City Mayor Michael Bloomberg proposed a congestion pricing plan, which was supported by the federal government through an urban partnership agreement. (J.A. 283.) New York State's Legislature

passed congestion pricing legislation several years later, in the MTA Reform and Traffic Mobility Act of 2019, N.Y. Veh. & Traf. Law § 1701 et seq. That statute authorizes a plan for congestion pricing in Manhattan's central business district, which plan involves tolling vehicles entering the district (south of 60th Street), and using tolling revenues beyond the costs of administering the program to fund capital projects for the MTA. *Id.* §§ 1704-1704-a.

The Legislature was explicit that the congestion pricing program "is found to be necessary and to be a matter of substantial state concern." *Id.* § 1701. Specifically, the Legislature found that the "crippling" traffic congestion in Manhattan's central business district was among the worst in the world, "and results in significant cost to the New York metropolitan area economy and in turn the state's economy at estimates exceeding one hundred billion dollars over the next five years"—as well as significantly worsened air quality, emergency response times, and bus service, among other things. *Id.* The program was intended "to protect the public health and safety of New York's residents," while at the same time generating funds "to ensure a safe and efficient mass transit system within the city of New York." *Id.*

Because the congestion pricing program would apply to certain federal-aid highways within the area to be tolled, the congestion pricing project sponsors—the State Department of Transportation (State DOT), the New York City Department of Transportation (NYCDOT), and the TBTA—sought approval for the program from the federal government. At the suggestion of the defendant U.S. Department of Transportation (USDOT), the project sponsors sought approval pursuant to the VPPP. (J.A. 177-180.) The project sponsors did not, however, seek any funding from the federal government. (J.A. 205.)

Following a lengthy collaborative planning and environmental review process, in 2023, the federal government approved a final environmental assessment and made a finding of no significant adverse environmental impact, allowing the project to proceed. (J.A. 179-183.) After further planning of program details, in November 2024, a USDOT component agency, the defendant Federal Highway Administration (FHWA), and the project sponsors signed a cooperative agreement pursuant to the VPPP, authorizing the congestion pricing program's collection of tolls from vehicles entering the central business district, with tolling revenues to be used to fund MTA capital projects. The cooperative agreement does not include

any provision for federal funding. The agreement also does not include any provision authorizing the FHWA to terminate the agreement unilaterally. (J.A. 120-128.)

In reliance on the federal government's longstanding support for the congestion pricing program, and ultimately the signing of the VPPP cooperative agreement, TBTA spent over $500 million to establish the program, including initial assessments and design, development, implementation, and testing of the program infrastructure and systems (J.A. 190), and issued over $1.3 billion in debt to be repaid by program revenue (J.A. 78-79).

After courts, including this one, rejected several attempts to stop congestion pricing from taking effect, the program began operation on January 5, 2025. (*See* J.A. 185.) The program has since proven a great success, decreasing traffic congestion and travel times for commuters, emergency vehicles, and buses, and substantially improving the quality of life for those living and working in the central business district (J.A. 185-189), while raising substantial funds for much-needed public transportation projects.

### C. Defendants' Purported "Termination" of Congestion Pricing

On February 19, 2025, shortly after taking office for his second term, President Trump declared in a social media post that "CONGESTION PRICING IS DEAD. … LONG LIVE THE KING," and he included a picture of himself wearing a crown in front of the New York City skyline. (J.A. 134.) Defendant USDOT Secretary Sean Duffy then asserted for the first time in a letter to Governor Kathy Hochul—contrary to the federal government's longstanding position—that the congestion pricing program is not consistent with the VPPP statute. (J.A. 137-138.) Secretary Duffy's letter further purported to rescind defendants' approval of the congestion pricing program and "terminate" the VPPP cooperative agreement. (J.A. 136-139.)

### D. This Lawsuit

Shortly thereafter, the MTA and TBTA commenced this action against Secretary Duffy, USDOT, and the FHWA and its Administrator, alleging that their purported rescission of their congestion pricing approval and termination of the VPPP cooperative agreement violated the Administrative Procedure Act (APA) and the Due Process Clause of the U.S.

Constitution, and seeking a declaratory judgment that the rescission and termination are unlawful, and vacatur of the rescission and termination. (ECF No. 1, at 39-50.[2]) State DOT, NYCDOT, Riders Alliance, and the Sierra Club moved to intervene as co-plaintiffs, and their motions were granted. (ECF Nos. 23, 30, 32, 36, 45, 55.)

Defendants then issued a series of threats against New York in an apparent attempt to coerce an end to the congestion pricing program before an opportunity for judicial review. In a March 20, 2025, social media post, Secretary Duffy threatened that Governor Hochul should know that federal funds New York receives "are not a blank check" and continuing to operate congestion pricing "will not be taken lightly." (J.A. 144.) In an April 8 post, USDOT added in another post, "Make no mistake—the Trump Administration and USDOT will not hesitate to use every tool at our disposal in response to non-compliance later this month." (J.A. 148.)

On April 21, Secretary Duffy sent a letter to Governor Hochul directing State DOT to "show cause" by May 21 that congestion pricing does not violate federal law. (J.A. 150.) Secretary Duffy stated that, if

---

[2] ECF references refer to the district court docket, No. 1:25-cv-1413 (S.D.N.Y.).

USDOT does not change its position that the State is violating federal law, USDOT will implement escalating "compliance measures" until "compliance is achieved." (J.A. 151.) The initial measures, to take effect as soon as May 28, were (a) no advance construction authorizations or National Environmental Policy Act (NEPA) approvals for any projects within Manhattan, except for projects determined by USDOT to be essential for safety, and (b) no approvals for certain other projects extending beyond Manhattan. (J.A. 151.) The Secretary added that if "noncompliance" continues, USDOT may impose additional measures, including blocking obligation of most FHWA funds for New York City, and expansion of the initial measures to other geographic areas in the State. (J.A. 151.) These measures posed an existential threat to the approximately $2.7 billion per year that the State receives in federal funding for road and bridge infrastructure projects—i.e., about 55% of the funding for such projects in the State. (J.A. 159.)

In light of this imminent threat, plaintiffs moved for a preliminary injunction to bar defendants from withholding federal project approvals and funding or other actions intended to coerce the end of the congestion pricing program while this litigation remained pending. (ECF Nos. 82, 88.)

The plaintiffs also filed the now-governing consolidated second amended complaint, asserting, in addition to the APA and due process claims, that defendants' threatened "compliance measures" violate the U.S. Constitution's Spending Clause, Tenth Amendment, and separation of powers. (J.A. 343-364.)

On May 27, 2025, the district court issued a temporary restraining order enjoining defendants from taking any actions to terminate the congestion pricing program or coerce plaintiffs to terminate the program, including through any of the "compliance measures" outlined in Secretary Duffy's April 21 letter. (S.A. 1-2.) The next day, the district court issued a preliminary injunction extending the same relief through final judgment in the litigation. (S.A. 110-111.) In a 109-page opinion (S.A. 3-111), the district court, as relevant here, rejected defendants' argument that the district court lacked jurisdiction pursuant to the Tucker Act (S.A. 51-57) and held that plaintiffs were likely to succeed on their merits arguments that defendants' belated determination that the congestion pricing program is inconsistent with the VPPP was incorrect and defendants' reneging on their approval of the congestion pricing program and the VPPP cooperative agreement was unlawful (S.A. 59-69).

Then, in March 2026, the district court issued a 149-page opinion that, as relevant here, confirmed the court's jurisdiction; granted summary judgment in favor of plaintiffs on several of their APA claims; entered a declaratory judgment that defendants' termination of the VPPP cooperative agreement was unlawful and that any attempt to enforce Secretary Duffy's February 19 and April 21 letters would be unlawful; vacated the letters and any actions taken through them; and dismissed certain additional claims as moot in light of the grant of summary judgment on the APA claims. (S.A. 112-260.)

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *See Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). Summary judgment is appropriate when "the movant is entitled to judgment as a matter of law" and "there is no genuine issue as to any material fact." *Id.* (quotation marks omitted).

## SUMMARY OF ARGUMENT

I. The district court correctly concluded that it had jurisdiction over this case because it is not a contractual damages suit over which jurisdiction would lie exclusively in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.

For one thing, the VPPP cooperative agreement on which defendants rely is not a money-mandating contract to which the Tucker Act could apply in the first place. The agreement merely sets the terms of defendants' approval of tolling on federal-aid highways in the congestion pricing program; it does not involve the expenditure of federal funds whatsoever. The fact that there is no money-mandating contract at issue here distinguishes the cases on which defendants rely.

And even if the VPPP cooperative agreement were a money-mandating contract, the Tucker Act would not apply under the test adopted by this Court from *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), because (1) plaintiffs' claims seeking to block defendants' unlawful rescission of their approval for the congestion pricing program and their coercive efforts to end the program are based on the APA and the

Constitution, not the VPPP agreement, and (2) the relief plaintiffs seek is not contractual or monetary, but only declaratory and equitable.

Moreover, any remaining doubt as to the district court's jurisdiction to review unlawful agency action would need to be resolved in favor of jurisdiction. *See Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988). That is especially so where, as here, relegating this case to the Court of Federal Claims—where declaratory and equitable relief is ordinarily unavailable—would have left plaintiffs both unable to obtain the relief they seek on final judgment, and, without access to a preliminary injunction, forcing them to choose between forgoing vital federal infrastructure approvals and funding, and abandoning the congestion pricing program before any opportunity for judicial review.

II. The district court also correctly rejected defendants' alternative contention that they could renege on their approval of congestion pricing and the VPPP cooperative agreement, for no reason other than new political preferences. As an initial matter, defendants did not contend that they could renege based on political preferences alone when they originally purported to rescind their congestion pricing approval; they cited other justifications for rescission that they have since abandoned, which fact

alone should defeat their belated contention now. Regardless, defendants' contention is not consistent with the statute or regulations governing the VPPP or the terms of the VPPP cooperative agreement. And their assertion of "inherent" executive authority to renege is both lawless and highly problematic in its implications. If federal agencies could renege on approvals and cooperative agreements at any time, States, cities, and other partners would face tremendous uncertainty that would chill cooperation with the federal government, and potentially crippling detrimental reliance if they did risk such cooperation.

# ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER THIS LAWSUIT

There is no merit to defendants' contention (Opening Br. (Br.) at 14-33) that the district court lacked jurisdiction because the Tucker Act, 28 U.S.C. § 1491, gives the Court of Federal Claims exclusive jurisdiction over plaintiffs' claims.

The APA waives sovereign immunity and thus gives federal district courts jurisdiction over claims for equitable relief to block unlawful, arbi-

trary, and capricious agency action. *See, e.g.*, *Atterbury v. United States Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015). An exception to that district court jurisdiction applies "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Id.* (quoting 5 U.S.C. § 702). And the Tucker Act's grant of consent to contractual suits for damages against the United States in the Court of Federal Claims has been construed to impliedly forbid district court jurisdiction over those contractual damages suits. *See id.*

Here, the district court correctly concluded (S.A. 160-182) that it had jurisdiction for two reasons. First, the VPPP cooperative agreement on which defendants rely is not a money-mandating contract to which the Tucker Act could apply in the first instance. And, second, even if the VPPP agreement were a money-mandating contract, the Tucker Act would not apply because plaintiffs' claims, exclusively for declaratory and equitable relief pursuant to federal law, are not contractual and do not seek damages or any contract remedies.

### A. The VPPP Cooperative Agreement Is Not a Money-Mandating Contract Implicating the Tucker Act.

The Tucker Act applies only to claims based on sources "mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 216-17 (1983) (quotation marks omitted). "[T]he absence of a money-mandating source" of plaintiffs' claims is "fatal" to the Court of Federal Claims' jurisdiction. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005).

The VPPP cooperative agreement is not money-mandating: It does not confer any federal funding at all; it merely sets out terms for the tolling it permits pursuant to the VPPP statute. (*See* J.A. 120-124.) Courts have repeatedly recognized that such "cooperative agreements are not money-mandating contracts" subject to Court of Federal Claims jurisdiction. *Housing Auth. of New Haven v. United States*, 140 Fed. Cl. 773, 786 (2018); *see also, e.g.*, *Pacito v. Trump*, 169 F.4th 895, 924-30 (9th Cir. 2026); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1342-44 (Fed. Cir. 2008); *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019).

Defendants misplace their reliance (Br. at 19-22) on recent interim orders of the Supreme Court and an earlier decision of this Court. The

Supreme Court orders concluded that challenges to termination of money-mandating federal grant agreements—i.e., challenges in which the plaintiffs were seeking to enforce "obligation[s] to pay money"—likely belonged in the Court of Federal Claims, not federal district court. *See Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quotation marks omitted); *National Insts. of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). But this case involves no such money-mandating agreement and does not seek to enforce any obligation to pay money.[3] Indeed, Justice Barrett's opinion in one of the Supreme Court orders emphasized that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge" to guidance governing the grants at issue, just as the district court here was correct that it had jurisdiction over plaintiffs' APA challenge to defendants' efforts to end the congestion pricing program. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring); *see also Pacito*, 169 F.4th at 929-30 (distinguishing

[3] Contrary to defendants' unsupported suggestion (Br. at 30), the Supreme Court's *Department of Education* and *NIH* orders did not address any argument that the Court of Federal Claims might have jurisdiction over cooperative agreements or any form of non-money-mandating agreement. *See Department of Educ.*, 604 U.S. 650; *NIH*, 145 S. Ct. 2658.

*Department of Education* and *NIH* on similar grounds); *Massachusetts v. National Insts. of Health*, 164 F.4th 1, 12 (1st Cir. 2026) (same).

Likewise, this Court's decision in *Up State Federal Credit Union v. Walker* involved a demand for "substantial monetary damages" pursuant to a lease agreement, and "no independent, non-contractual source" of rights. *See* 198 F.3d 372, 374, 376 (2d Cir. 1999) (per curiam). But this case involves no such payment demand, and it involves non-contractual sources of rights in federal law and the U.S. Constitution (see *infra* at 22-23). *See Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) (case belonged in Court of Federal Claims where some plaintiffs' requested relief "would necessarily entitle the . . . Plaintiffs to money damages," and the other plaintiffs' requested blocking of loan sales also was effectively seeking monetary relief and was structured to block sales only "to avoid the Tucker Act's limitation on money judgments").

Defendants further err in their reliance (Br. at 27-31) on a "presumption" that money damages are available for breach of contract. Even if plaintiffs were claiming breach of contract (they are not, as explained *infra* at 22-23), any presumption that damages are available is

rebuttable, as defendants' own cited cases make clear. And "[w]here," as in the case of the VPPP agreement, "relief for breach of contract could be entirely non-monetary," the burden shifts to the defendants to "demonstrat[e] that the agreement[] could fairly be interpreted as contemplating monetary damages in the event of breach." *See Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1365 (Fed. Cir. 2021) (quotation marks omitted).

Here, defendants have not come close to showing that the VPPP cooperative agreement provides for money damages, when the agreement does not refer to damages or money owed, and precedent establishes that cooperative agreements such as this one are not ordinarily money-mandating. Indeed, it is hard to imagine defendants ultimately agreeing that a plaintiff could seek expectation damages in the Court of Federal Claims based on this type of non-monetary agreement. And defendants' reference (Br. at 30) to the statutory provision that the federal government may pay certain costs for VPPP programs, *see* Pub. L. No. 102-240, § 1012(b)(2), only undermines their position by underscoring that no such payment by the federal government that could be the subject of a money damages claim was agreed to in the VPPP agreement here (J.A. 120-124).

### B. Plaintiffs Bring No Contractual Claims and Seek No Contractual or Monetary Relief.

Defendants' Tucker Act argument also fails for a second, independent reason: Even if the VPPP agreement were a money-mandating contract (and it is not, see *supra* at 18-21), the Tucker Act would not apply because plaintiffs' *claims* are not contractual. Under the test adopted by this Court from the D.C. Circuit's *Megapulse* decision, whether a lawsuit is in essence a contractual suit over which the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims "'depends both on [1] the source of the rights upon which the plaintiff bases its claims, and upon [2] the type of relief sought.'" *Up State Fed. Credit Union*, 198 F.3d at 375 (quoting *Megapulse*, 672 F.2d at 968). Both prongs cut against defendants' Tucker Act argument here.

Under the first prong of the *Megapulse* test, the source of the rights upon which plaintiffs base their claims are federal law and the U.S. Constitution. Plaintiffs bring no breach of contract claims, and their APA and constitutional claims are not based on contractual rights. The claims are based on the theory that "[d]efendants are not authorized by any law—statutory or constitutional"—to unilaterally rescind their approval of the congestion pricing program, and that the APA and the Constitution

prohibit arbitrary and capricious rescission and defendants' measures to coerce plaintiffs to abandon the program. (J.A. 343-363.)

Contrary to defendants' unsupported suggestion (*e.g.*, Br. at 13), plaintiffs do not seek in this lawsuit to enforce any right under the VPPP agreement. Rather, they seek to enforce their statutory and constitutional rights not to have the federal approval that resulted in the cooperative agreement arbitrarily rescinded and not to be coerced into accepting such rescission. While defendants contend that the court must review the VPPP agreement to address their defense that the agreement incorporates a rescission right (Br. at 21), "[t]he Tucker Act does not bar an APA action if the plaintiff's rights and remedies, as alleged, are noncontractual—even if . . . the government . . . raise[s] a contract provision as a defense," *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023).

The second prong of the *Megapulse* test—considering the type of relief sought—also undermines defendants' Tucker Act argument. Plaintiffs' claims seek no contractual or monetary relief, but only declaratory and equitable relief to stop the unlawful rescission of the federal approval for the congestion pricing program and defendants' coercive measures.

And a "claim must be one for money damages against the United States" to be "cognizable" under the Tucker Act. *Mitchell*, 463 U.S. at 216; *see also Bowen*, 487 U.S. at 905 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief."); *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017) (Claims Court may grant equitable relief only "ancillary" to claim for "actual, presently due money damages from the United States" (quotation marks omitted)).

Defendants err in contending (Br. at 22-27) that plaintiffs essentially seek specific performance of the VPPP cooperative agreement. As an initial matter, plaintiffs do not seek specific performance; they seek to block a federal policy change manifesting as the arbitrary rescission of the federal approval that resulted in the VPPP agreement, and defendants' measures to coerce acceptance of that policy change. In any case, a request for specific performance would be appropriate in the Court of Federal Claims only when that relief "'would be the equivalent of obtaining of money damages,'" which specific performance of the non-money-mandating cooperative agreement at issue here would not be. *See Presidential Gardens Assocs.*, 175 F.3d at 143 (quoting *B.K. Instrument, Inc. v. United*

*States*, 715 F.2d 713, 727 (2d Cir. 1983)); *see also Pacito*, 169 F.4th at 929 (rejecting similar federal government argument that APA claim that would block termination of cooperative agreement was seeking specific performance and so was subject to Court of Federal Claims jurisdiction).

### C. Any Doubt Must Be Resolved in Favor of District Court Jurisdiction to Permit Effective Judicial Review and Avoid Harm to the Federal-State Balance.

Finally, even if there were any doubt as to the district court's jurisdiction here (and there is not), "established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act." *Bowen*, 487 U.S. at 908-09 n.46 (quotation marks omitted). As *Bowen* recognized, "[t]he Court of Claims is a court of limited jurisdiction, because its jurisdiction is statutorily granted and it is to be strictly construed." *Id.* By contrast, district court review of agency action is "grounded in concerns about constraining the exercise of discretionary power by administrative agencies" and its importance cannot be overstated. *Id.*

Indeed, district court review is especially important where, as here, the federal agency action at issue would upend a state program embodied in duly enacted state law that the State's elected representatives expressly

found "to be a matter of substantial state concern." Veh. & Traf. Law § 1701. To strip the district court of jurisdiction to review such an action would raise serious federalism questions. And where, as here, the federal government's interpretation "would upset the usual constitutional balance of federal and state powers," "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides this balance." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation marks omitted). Congress should not be deemed to have foreclosed Article III jurisdiction for States or their instrumentalities absent explicit statutory language.

The stripping of federal district court jurisdiction is all the more inappropriate here because the Court of Federal Claims could neither address the noncontractual claims plaintiffs actually bring, nor provide the declaratory and equitable relief that plaintiffs actually seek. See *supra* at 18, 23-24. Courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Secretary of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

Relatedly, the Court of Federal Claims could not have ordered the temporary restraining order or preliminary injunction that plaintiffs obtained here, which have protected them from irreparable harm through this lengthy litigation. *See Lummi Tribe*, 870 F.3d at 1319; *see also, e.g.*, *Larkin v. United States*, 177 Fed. Cl. 17, 22 (2025) (denying preliminary injunction because such relief is not available in Court of Federal Claims). In this regard, it is worth underscoring that defendants threatened to block federal approvals and funding for vital infrastructure projects entirely unrelated to congestion pricing if plaintiffs did not acquiesce in shutting down congestion pricing before an opportunity for full judicial review. See *supra* at 10-11. Accordingly, without access to preliminary relief, the State would have had to either suspend the congestion pricing program while the litigation was pending, or else risk forgoing critical unrelated federal approvals and funding on which it was relying. And if the State was coerced to suspend the program, it would have lost its sovereign right to implement a state statute and all the economic, public health and safety, and public transit benefits that come with it, for years; indeed, this litigation has already been pending for a year and a half, with, at a minimum, months to go before this appeal is resolved.

Nor is the need to pursue such equitable relief in federal district court in order to protect important state and local interests anything unusual. States and municipalities regularly enter cooperative agreements with the federal government related to a broad range of often time-sensitive matters, from public health and infectious disease control to disaster relief. Defendants' suggestion that States and municipalities are effectively barred from obtaining declaratory or equitable relief, including preliminary relief, under the APA and the Constitution merely because their claims bear some relation to a cooperative agreement would substantially undermine the public interests served by those cooperative agreements. Indeed, the federal government's overzealous Tucker Act arguments pose a serious threat to effective judicial review of agency action well beyond the specific context of cooperative agreements.[4] Congress did not intend

---

[4] *See, e.g.*, *Massachusetts*, 164 F.4th at 10-12 (rejecting federal government's argument that district court lacked jurisdiction for States' and other plaintiffs' APA challenges to guidance capping reimbursement of costs associated with medical research grants); *Community Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937-39 (9th Cir. 2025) (same for legal service providers' APA challenge to termination of federal funding for such services); *New Jersey v. United States Dep't of Transp.*, 824 F. Supp. 3d 416, 422 (S.D.N.Y. 2026) (same for States' APA challenge to suspension of federal funding for

(*continued on the next page*)

such harm when it enacted the Tucker Act's limited exception to federal district court jurisdiction.

## POINT II

### DEFENDANTS MAY NOT RENEGE ON THE CRITICAL STATE PROGRAM APPROVAL AT ISSUE HERE

There is also no merit to defendants' alternative argument (Br. at 33-41) that if the district court had jurisdiction, it should have ruled for defendants on the ground that they could renege on their approval of the congestion pricing program. On appeal, defendants do not defend either their original justification for rescinding their approval (i.e., that the structure of the congestion pricing program and the use of its proceeds for public transportation were not lawful under the VPPP statute) or the post hoc policy justification to which they subsequently pivoted (i.e., purported adverse impacts the tolling might have on certain stakeholders). Those

---

Gateway rail tunnel project), *appeal docketed*, No. 26-282 (2d Cir. Feb. 9, 2026); *City of Chicago v. United States Dep't of Just.*, 822 F. Supp. 3d 873, 884-85 (N.D. Ill. 2026) (same for cities' APA and constitutional challenge to conditions on federal law enforcement grants); *Maryland v. Corporation for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 103-110 (D. Md. 2025) (same for States' APA and constitutional challenge to AmeriCorps program changes pursuant to Department of Government Efficiency cost efficiency initiative).

justifications are meritless for all the reasons explained in detail by the district court. (S.A. 183-209.)[5] Instead, defendants effectively contend that they needed no justification for rescinding their approval.

As an initial matter, "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action," *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quotation marks omitted). Accordingly, defendants' newfound argument cannot justify reversal.

In any event, defendants' contention that they could renege on the approval for no reason whatsoever is not consistent with the statute or regulations governing the VPPP or the terms of the VPPP cooperative agreement. Indeed, such power is not, and could not be, consistent with the reasoned agency decision-making that the APA requires and that is foundational to our legal system. As the district court correctly concluded (S.A. 213-230), the VPPP statute does not provide for unilateral rescission

---

[5] Defendants also do not pursue on appeal, and therefore waive, a number of other arguments they made below, for instance, regarding final agency action and prudential ripeness, and the purported lawfulness of their threatened "compliance measures." *See, e.g.*, *Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

of approval by the Secretary, much less, as in this case, shortly after the program takes effect, merely because a new presidential administration has new political preferences. To the contrary, the statute anticipates that "[t]he Secretary shall monitor the effect of [VPPP] projects for a period of *at least 10 years*"—far longer than any one presidential administration—"and shall report to [Congress] every 2 years on the effects such programs are having." Pub. L. No. 102-240, § 1012(b)(5), 105 Stat. at 1938 (emphasis added).

In maintaining that the VPPP statute permits them to rescind their VPPP approval at any time, defendants misplace their reliance (Br. at 36-37) on the statute's description of the VPPP as a "pilot" program. The "pilot" aspect refers to the limited number of permitted program participants (initially five, *id.* § 1012(b)(1), and later expanded to fifteen, Pub. L. No. 105-178, § 1216(a)(2), 112 Stat. at 211) and the required monitoring and reporting to inform future legislation. There is no indication that the word "pilot" impliedly permits unilateral termination by the Secretary at any time, and the longevity of the monitoring and the reporting by the Secretary required by the statute strongly suggest that unilateral termination shortly after the launch of the program is *not* permitted. *See* Pub.

L. No. 102-240, § 1012(b)(4), 105 Stat. at 1938. Moreover, there is a strong presumption that "Congress would not have delegated highly consequential power," such as the power to rescind federal approval at any time without a reason, "through ambiguous language" such as the mere reference to a "pilot" program. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (quotation marks omitted).

To be sure, general regulations governing some federal agency awards provide that such awards may, under certain circumstances, be terminated by the federal agency "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But such termination is permissible only "to the extent authorized by law" and "pursuant to the terms and conditions of the Federal award," *id.*, and any terms and conditions providing for such termination must be specified "clearly and unambiguously," *id.* § 200.340(b). Here, as explained, no law authorizes unilateral termination, and nor do the terms and conditions of the VPPP cooperative agreement (J.A. 120-124). Indeed, defendants make no argument on this appeal that any term of the VPPP agreement authorizes unilateral termination by the Secretary, much less clearly and unambiguously, as required.

Defendants' further contention, never clearly raised below, that they may renege on their agreement approving congestion pricing without any reason, based on some "inherent" executive authority, even in the absence of statutory, regulatory, or contractual authority (Br. at 34-35), is both incorrect and highly problematic in its implications (S.A. 239). Defendants cite no authority supporting that contention—presumably because there is none.

The inapposite cases on which defendants rely stand only for the proposition that an agency may engage in reasoned reconsideration of a decision, not a multiparty agreement, and only when consistent with governing law and when the agency reconsiders "within a reasonable time period and affords the claimant proper notice of its intent to reconsider." *Dun & Bradstreet Corp. Found. v. United States Postal Serv.*, 946 F.2d 189, 193 (2d Cir. 1991). But, here, defendants have abandoned their own original reasoning for reconsideration; have not shown that reconsideration is consistent with governing law; and have suddenly reconsidered only after years of consistently representing to plaintiffs—through multiple presidential administrations, including the first Trump Administration—that they were onboard with the congestion pricing program (see *supra*

at 5-8). In the interim, plaintiffs relied on defendants' representations in expending enormous resources to get congestion pricing off the ground (see *supra* at 8).[6] Those circumstances bear no resemblance to the cases on which defendants rely.

Defendants are wrong to assert (Br. at 35-36) that political accountability requires that newly elected leaders maintain inherent authority to reconsider existing agreements like the VPPP agreement. Even if this consideration were relevant to defendants' authority to renege (and they have not shown that it is), as the district court rightly noted (S.A. 243), the congestion pricing program "was the product of a democratic process" that extended over decades: The VPPP statute permitting congestion pricing programs on federal-aid highways was passed by Congress and signed by President George H.W. Bush in 1991; New York's MTA Reform and Traffic Mobility Act establishing its congestion pricing program was passed by the state Legislature and signed by Governor Andrew Cuomo in 2019; and the VPPP cooperative agreement

---

[6] As the district court rightly concluded (S.A. 209-213), and defendants do not dispute on appeal, defendants' failure to adequately consider these reliance interests provides an independent basis for finding the rescission of their congestion pricing approval unlawful.

for New York's congestion pricing program was approved by the FHWA, State DOT, NYCDOT, and the TBTA in 2024, following discussions across the first Trump and Biden presidential administrations, the Cuomo and Hochul gubernatorial administrations, and the de Blasio and Adams mayoral administrations. In other words, "[t]he democratic process worked." (S.A. 243.) Assuming that a new presidential administration may upend the product of that lengthy and painstaking political process without any reason would undermine, rather than support, political accountability.

Further, interpreting the VPPP statute to incorporate inherent federal agency authority to renege would, at a minimum, raise serious constitutional separation of powers and federalism questions that should be avoided. *See, e.g.*, *Gregory*, 501 U.S. at 460; *Golb v. Attorney Gen. of N.Y.*, 870 F.3d 89, 103 (2d Cir. 2017). Defendants do not—and could not—explain why Congress would have intended to allow the FHWA, on a whim, to scuttle a painstakingly negotiated cooperative agreement advancing the VPPP's goals, notwithstanding the massive reliance interests of the other state (State DOT), local (NYCDOT), and quasi-state-agency (TBTA) parties. Indeed, such inherent authority would create huge uncertainty

that would strongly discourage States and municipalities from participating in the VPPP program in the first place.

And defendants' inherent authority contention does not appear to be limited to the VPPP. Defendants appear to contend (Br. at 34-35) that federal agencies have inherent authority to renege on any cooperative agreement or approval based on a new administration's political preferences, regardless of the reliance interests involved. If that were so, the harmful uncertainty and detrimental reliance would extend across the vast range of regulatory matters as to which federal agencies regularly cooperate with state and local governments (not to mention private parties) from child welfare to crime prevention to hazardous waste remediation.[7]

Finally, defendants err in their contention (Br. at 38-40) that the district court should have ordered a remand to USDOT when vacating its unlawful agency action.[8] The district court did not abuse its equitable

---

[7] Nor is it tenable to respond, as defendants do, that the proper remedy for politically motivated reneging is a damages suit against a federal agency. As explained (*supra* at 18-21), the VPPP agreement and similar cooperative agreements are not money-mandating contracts under which damages are ordinarily available for breach.

[8] Defendants appear to correctly acknowledge (Br. at 38) that remand *without vacatur* would not be appropriate. *See, e.g.*, *United Steel v.*

(*continued on the next page*)

discretion in concluding that remand would be futile when defendants' reneging on their congestion pricing approval was infected by fundamental errors of law that could not be cured on remand—and that defendants do not even contest on this appeal (S.A. 252-253). *See Abrahamson v. Board of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 76 (2d Cir. 2004) ("We review a district court's fashioning of equitable relief for abuse of discretion."). In fact, defendants conceded below that this "might not be a situation where remand is needed." (Hr'g Tr. (Jan. 28, 2026), ECF No. 193, at 65:13-14.) And, on appeal, defendants offer no response to the district court's correct conclusion that remand would be futile.

---

*Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) (similar).

## CONCLUSION

For all these reasons, this Court should affirm the judgment of the district court.

Dated: New York, New York
September 16, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*City of New York*
*Attorney for City Appellee*

LETITIA JAMES
*Attorney General*
*State of New York*
*Attorney for State Appellee*

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*

By: */s/ MacKenzie Fillow*
MACKENZIE FILLOW
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
(212) 356-4378

By: */s/ Philip J. Levitz*
PHILIP J. LEVITZ
Senior Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-6325

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Cynthia, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,199 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Cynthia Yue*