# 26-1213

## United States Court of Appeals
*for the*
## Second Circuit

METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

*Plaintiffs-Appellees,*

RIDERS ALLIANCE, SIERRA CLUB, NEW YORK STATE DEPARTMENT OF TRANSPORTATION, NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

*Intervenor-Plaintiffs-Appellees,*

– v. –

SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF FOR PLAINTIFFS-APPELLEES

Mark A. Chertok
Elizabeth R. Knauer
SIVE, PAGET & RIESEL P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 421-2150

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, New York 10036
(212) 316-9500

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ........................................................................1

ISSUES PRESENTED........................................................................................5

STATEMENT OF THE CASE..........................................................................6

A. Congestion pricing and the federal program.......................................6

B. New York's adoption of the Program and FHWA's approval ............8

C. Implementation, other litigation, and reliance on federal approval..........................................................................11

D. The Secretary's attempted revocation and threatened enforcement..........................................................................13

E. The preliminary injunction...............................................................15

F. The summary judgment decision and remedy ..................................17

G. Defendants' attempt to circumvent the district court's declaratory judgment......................................................................22

STANDARD OF REVIEW ...............................................................................23

SUMMARY OF THE ARGUMENT ................................................................23

ARGUMENT ...................................................................................................25

I. The Tucker Act Does Not Apply ....................25

A. The VPPP Agreement Is Not a Money-Mandating Contract....................27

B. The MTA Plaintiffs' Claims Are Not Essentially Contractual....................33

1. The MTA Plaintiffs' claims enforce independent statutory and regulatory limits on agency action....................33

2. The judgment grants relief from unlawful agency action, not contractual remedies. ....................38

II. The District Court's Declaratory Judgment Was Proper ....................43

A. The District Court's Remedy Was Not Overbroad....................44

1. The district court did not abuse its discretion in entering the declaratory judgment....................44

2. Remand would not serve any purpose ....................47

B. Defendants' Inherent-Authority Argument Is Not a Basis for Reversal....................49

1. The inherent-authority argument was not preserved below and is not adequately developed on appeal....................49

2. Defendants do not have inherent authority to reconsider the VPPP Agreement....................52

3. Even if not foreclosed by the text of the VPPP Statute, reconsideration authority would not be available here....................57

CONCLUSION....................60

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .......... 26

*Admiral Ins. Co. v. Niagara Transformer Corp.*,
57 F.4th 85 (2d Cir. 2023) .......... 44

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) .......... 46

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
98 F.3d 25 (2d Cir. 1996) .......... 52

*Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*,
2025 WL 903331 (D. Alaska Mar. 25, 2025) .......... 53

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
816 F. Supp. 3d 27 (D.D.C. 2026) .......... 33

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*,
789 F. Supp. 3d 66 (D.D.C. 2025) .......... 41

*Am. Methyl Corp. v. EPA*,
749 F.2d 826 (D.C. Cir. 1984) .......... 59

*Anchorage v. United States*,
119 Fed. Cl. 709 (2015) .......... 31, 32

*Anemone v. Metro. Transp. Auth.*,
629 F.3d 97 (2d Cir. 2011) .......... 23

*Atl. City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002) .......... 52

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015)............................................................ 33, 35, 41

*B.K. Instrument v. United States*,
715 F.2d 713 (2d Cir. 1983)..........................................................................40

*Belville Mining Co. v. United States*,
999 F.2d 989 (6th Cir. 1993) ........................................................................51

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ............................................................... 30, 32

*Bogle-Assegai v. Connecticut*,
470 F.3d 498 (2d Cir. 2006)............................................................ 44, 49, 51

*Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*,
777 F. Supp. 2d 424 (E.D.N.Y. 2011) ...........................................................58

*Calcutt v. FDIC*,
598 U.S. 623 (2023).......................................................................................47

*California Sea Urchin Commission v. Bean*,
883 F.3d 1173 (9th Cir. 2018) .......................................................................56

*Chan v. U.S. Dep't of Transp.*,
2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) ...............................................12

*Chao v. Russell P. Le Frois Builder, Inc.*,
291 F.3d 219 (2d Cir. 2002)............................................................ 53, 54, 55

*Chen v. GAO*,
821 F.2d 732 (D.C. Cir. 1987) .......................................................................53

*China Unicom (Americas) Operations Ltd. v. FCC*,
124 F.4th 1128 (9th Cir. 2024) ......................................................................53

*City Club of New York v. Hochul*,
Index No. 156696/2024 (Sup. Ct. N.Y. Cnty.) ...............................................12

*Clear Channel Outdoor, LLC v. City of New Rochelle*,
2022 WL 17249412 (S.D.N.Y. Nov. 28, 2022)....................52

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025)....................34

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
181 F.4th 249 (2d Cir. 2026)....................13

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
No. 24A945 (S. Ct. Apr. 8, 2025)....................12

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
No. 24-3325 (2d Cir. Jan. 28, 2025)....................12

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
791 F. Supp. 3d 433 (S.D.N.Y. 2025)....................12

*ConocoPhillips Co. v. EPA*,
612 F.3d 822 (5th Cir. 2010)....................56

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022).................... 33, 39, 40

*Dayton Tire v. Secretary of Labor*,
671 F.3d 1249 (D.C. Cir. 2012)....................59

*Dep't of Edu. v. California*,
604 U.S. 650 (2025).................... 3, 29, 42

*Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*,
411 F.3d 384 (2d Cir. 2005)....................23

*Dun & Bradstreet Corp. Found. v. USPS*,
946 F.2d 189 (2d Cir. 1991).................... 50, 51, 57

*Dunne v. Metro. Transp. Auth.*,
No. 25 Civ. 18105 (D.N.J.)....................22

*Gonzales v. Thomas*,
547 U.S. 183 (2006)....................49

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994)....................51

*Guertin v. United States*,
743 F.3d 382 (2d Cir. 2014)....................47

*Hall v. McAleenan*,
2019 WL 5394627 (D.C. Cir. Oct. 3, 2019)....................37

*Hall v. Nielsen*,
2019 WL 250972 (D.D.C. Jan. 17, 2019)....................37

*Haus. Auth. of City of New Haven v. United States*,
140 Fed. Cl. 773 (2018)....................29

*Higbie v. United States*,
778 F.3d 990 (Fed. Cir. 2015)....................30

*Holmes v. United States*,
657 F.3d 1303 (Fed. Cir. 2011)....................29, 30

*Huff v. Vilsack*,
195 F. Supp. 3d 343 (D.D.C. 2016)....................47

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025)....................47

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985)....................38, 42

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014)....................52, 54

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
56 F.3d 279 (D.C. Cir. 1995)....................39

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................................................................................57

*Lummi Tribe of the Lummi Rsrv. v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) ....................................................................28

*Macktal v. Chao*,
286 F.3d 822 (5th Cir. 2002) .......................................................................58

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ....................................................................................26

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) .....................................................................58

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) ...................................................................34

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ............................................................. *passim*

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025) ...................................................9, 11

*Mulgrew v. U.S. Dep't of Transp.*,
No. 24 Civ. 1644 (S.D.N.Y.) .......................................................................12

*Nat'l Insts. of Health v. Am. Public Health Ass'n*,
145 S. Ct. 2658 (2025) ...................................................................... 3, 29, 35

*National TPS Alliance v. Noem*,
166 F.4th 739 (9th Cir. 2026) ......................................................................56

*National TPS Alliance v. Noem*,
150 F.4th 1000 (9th Cir. 2025) ....................................................................54

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004).........................................................................56

*Neuhaus v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 3983 (S.D.N.Y.) ....................12

*New Yorkers Against Congestion Pricing Tax* v. *U.S. Dep't of Transp.*,
No. 24 Civ. 367 (S.D.N.Y.) ....................12

*Normandy Apts., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
554 F.3d 1290 (10th Cir. 2009) ....................35

*Norton v. Sam's Club*,
145 F.3d 114 (2d Cir. 1998)....................51

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)....................27

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) .................... 29, 32

*Pennsylvania v. Lynn*,
501 F.2d 848 (D.C. Cir. 1974)....................56

*PPG Industries, Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995)....................49

*Presidential Gardens Assocs. v. United States*,
175 F.3d 132 (2d Cir. 1999)....................42

*Randall v. United States*,
95 F.3d 339 (4th Cir. 1996) ....................32

*Rick's Mushroom Srvs., Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) .................... 30, 31

*Riders Alliance v. Hochul*,
Index No. 156711/2024 (Sup. Ct. N.Y. Cnty.)....................12

*Rocky Mountain Helium, LLC v. United States*,
841 F.3d 1320 (Fed. Cir. 2016) ....................30

*Sanchez-Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) .......................................................................47

*Solenex LLC v. Bernhardt*,
962 F.3d 520 (D.C. Cir. 2020) .......................................................................59

*St. Bernard Parish Gov't v. United States*,
134 Fed. Cl. 730 (2017) .......................................................................31, 32

*St. Bernard Parish Gov't v. United States*,
916 F.3d 987 (Fed. Cir. 2019).......................................................................31

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) .......................................................................38, 43

*Texas v. Brooks-LaSure*,
2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ..........................................53, 57

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006) .......................................................................32

*Town of Hempstead v. Hochul*,
Index No. 450653/2025 (N.Y. Sup. Ct., N.Y. Cnty.) ........................................12

*Town of Hempstead v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 3263 (E.D.N.Y.) .......................................................................12

*Trucking Ass'n of N.Y. v. Metro. Transp. Auth.*,
No. 24 Civ. 4111 (S.D.N.Y.) .......................................................................12

*Ulstein Mar., Ltd. v. United States*,
833 F.2d 1052 (1st Cir. 1987).......................................................................47

*United States v. King*,
395 U.S. 1 (1969).......................................................................27

*United States v. Sherwood*,
312 U.S. 584 (1941).......................................................................27

*Up State Federal Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999)........................................................ 23, 38, 42

*Vollinger v. Merrill Lynch & Co.*,
198 F. Supp. 2d 433 (S.D.N.Y. 2002) ..........................................................54

*Wigdor v. United States*,
2015 WL 5439728 (Fed. Cl. Sept. 15, 2015)....................................................27

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 9, cl. 7..........................................................................27

**STATUTES**

5 U.S.C. § 702.........................................................................................26

5 U.S.C. § 703.........................................................................................44

23 U.S.C. § 149 note .................................................................................7

28 U.S.C. § 1346(a)(2)...............................................................................27

28 U.S.C. § 1491(a)(1)...............................................................................27

28 U.S.C. § 171(a) ....................................................................................27

28 U.S.C. § 2201(a) ..................................................................................44

28 U.S.C. § 2202 ................................................................................ 22, 23

31 U.S.C. § 6305(1) ..................................................................................30

2 C.F.R § 200.340 .............................................................................. *passim*

ISTEA § 1012(b)..........................................................................................7

Pub. L. No. 102-240, § 2 ..............................................................................6

Pub. L. No. 102-240, § 1012(b)(3), (b)(5) .......... 7

Pub. L. No. 102-240, § 1012(b), (b)(4) .......... 7

Pub. L. No. 105-178, § 1216(a) (1998) .......... 7

N.Y. Veh. & Traf. Law § 1701 .......... 8, 9

N.Y. Veh. & Traf. Law § 1704(3)(a) .......... 8

N.Y. Veh. & Traf. Law § 1704(2) .......... 9

**RULES**

Fed. R. Civ. P. 57 .......... 46

**OTHER AUTHORITIES**

*Dep't of Transp. & Related Agencies Appropriations for Fiscal Year 1993: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 102d Cong. 352 (1992) .......... 7

*Pilot Project*, *Random House Dictionary of the English Language* (1st ed. 1966) .......... 55

*Pilot*, *Black's Law Dictionary* (12th ed. 2024) .......... 55

## PRELIMINARY STATEMENT

This appeal presents the question of whether the federal government must comply with its constitutional, statutory, and regulatory obligations, or instead has free rein to upend major state and local government projects for any reason or no reason at all.[1]

More than three decades ago, the federal Value Pricing Pilot Program ("VPPP") authorized the Federal Highway Administration ("FHWA") to establish "congestion pricing" projects in coordination with state and local governments. The concept of congestion pricing originated in the 1950s with a Columbia University economist, who proposed charging motorists a fee to enter Manhattan as a way to reduce congestion. In 2019, after decades of debate, New York finally decided to move forward with the idea, and the first Trump Administration proposed the VPPP as the "best potential fit" for federal authorization. Five years and many millions of dollars of required environmental analysis later, FHWA approved New York's congestion pricing program (the "Program") under the VPPP and executed a cooperative agreement—the VPPP Agreement—memorializing that approval.

---

[1] Citations to "SA" refer to pages of the Special Appendix for Defendants-Appellants (Dkt. No. 39); to "JA" refer to pages of the Joint Appendix (Dkt. Nos. 31-38); to "Br." refer to Defendants-Appellants' Opening Brief (Dkt. No. 30); and to "ECF" refer to the district court's docket, unless otherwise noted.

Tolling began on January 5, 2025, and the Program has worked: traffic fell, buses moved faster, and revenue flowed for capital improvements to critical transit projects.

On February 19, 2025, the second Trump Administration abruptly changed course from the decisions made by the first Trump Administration. President Trump posted on social media that "CONGESTION PRICING IS DEAD," alongside a photo of himself wearing a crown. Secretary of Transportation Sean Duffy (the "Secretary") promptly followed suit, sending Governor Kathy Hochul a letter that purported to rescind approval under the VPPP Statute and terminate the VPPP Agreement because the VPPP Statute does not authorize "cordon pricing" (namely, tolling drivers to enter a specific geographic area) or because the Program's tolls are based in part on raising revenue for transit projects (including much-needed repairs to the New York City Subway system). When that didn't work, the Secretary shifted gears, arguing that the Program did not align with the Administration's policy preferences because it imposed undue burdens on low- and moderate-income drivers (a claim that was contrary to the Administration's findings).

The district court (Liman, J.) rejected every ground the Secretary had conjured up, reasoning that the VPPP Statute "clearly includes an area wide, or cordon, program within its ambit" and permits toll revenues to fund transit, noting that the Secretary's policy objections were "post hoc rationalizations which were themselves

arbitrary and capricious." SA185, 195, 209. Indeed, the court recognized that "[i]t is difficult to imagine more arbitrary and capricious decisionmaking than that at issue here." SA208. The court therefore vacated the Secretary's actions and entered a declaratory judgment delineating the limits of the Secretary's termination authority.

On appeal, Defendants do not attempt to defend the Secretary's actions on the merits. They argue, instead, that the Secretary's unlawful conduct is somehow legitimate, because the federal district court had no power to hear this case or declare the parties' rights. Defendants are wrong on both points.

First, although Defendants claim this case "hinges on a federal contract" and must be heard in the Court of Federal Claims under the Tucker Act, Br. 1, the case hinges on the federal statute that provided the foundation for the authorization that the Secretary later sought to rescind. The question here is whether the VPPP Statute authorizes the Program, which is paradigmatically a question for judicial review under the Administrative Procedure Act ("APA"). *See* JA137 (Secretary terminating approval because: "I have concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP"). The MTA Plaintiffs do not seek any funds under the VPPP Agreement, which does not provide for the payment of federal funds, nor do they seek specific performance by Defendants. Defendants' principal authorities, *Department of Education v. California*, 604 U.S.

650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), which involved orders compelling the payment of federal grant funds, are inapposite. The judgment here merely restores an approval that the Secretary withdrew and permits the MTA Plaintiffs to lawfully operate the Program.

Second, the district court's relief was appropriate. Its declaratory judgment resolved the termination theories Defendants asked the district court to adjudicate. Remand would have served no purpose, as Defendants' counsel conceded below.[2] SA252.

Defendants' remaining challenge to the district court's determination—that the Secretary has "inherent authority" to reconsider the VPPP Agreement—was never presented below, and Defendants stipulated that any defense omitted from their summary-judgment motion "shall be deemed waived." ECF 138 at 2. But that argument fails anyway. The United States Department of Transportation ("DOT") regulations require that authority to terminate for changed priorities be spelled out in the cooperative agreement, and this VPPP Agreement contains no such language.

Defendants warn that affirmance would let one Administration "bind its successors." Br. 4. But Congress directed the Secretary to monitor such projects

[2] The district court's concern that vacatur alone would invite a "redo," SA255, proved prescient, since five months after judgment, the government filed a Statement of Interest in another federal court, with notification to the district court here, again challenging the Program's statutory authorization. ECF 200.

"for a period of at least 10 years"—hardly the design of a program terminable at will. And the Program is not the policy of one Administration. Congress authorized it, New York's Legislature enacted it, and FHWA approved it after five years of review spanning two Administrations. The Secretary may not override those judgments by fiat. As the district court explained, here, "[t]he democratic process worked." SA243.

## ISSUES PRESENTED

1. Whether the district court properly exercised jurisdiction over the MTA Plaintiffs' APA challenge to the rescission of federal approval for New York's congestion pricing program and the termination of the VPPP Agreement, where the MTA Plaintiffs challenge the Secretary's purported exercise of statutory and regulatory authority, the MTA Plaintiffs' claims are not based in the cooperative agreement, and the cooperative agreement provides no federal funding.

2. Whether the district court properly entered declaratory judgment and vacated the Secretary's unlawful rescission and termination decisions without remanding for further agency proceedings, where Defendants do not defend the Secretary's decisions on their stated grounds, but contend for the first time on appeal that the Secretary retains inherent authority to terminate the VPPP Agreement based on changed policy preferences.

## STATEMENT OF THE CASE

### A. Congestion pricing and the federal program

Congestion pricing was first conceived by Columbia University professor and Nobel laureate William Vickrey as a solution to New York City's congestion problems in the 1950s. Vickrey proposed charging for scarce road space to reduce congestion, explaining to Congress that pricing should apply "to the street and highway system as a whole, and not merely to bits and pieces of it," because tolling selected facilities distorted traffic patterns. SA72; *see also* SA9; JA269–70. The idea soon gained traction in other cities around the world, with Singapore implementing it in 1975, and London and Stockholm later following suit. Second Amended Complaint ("SAC"), ECF 96 ¶¶ 54–58; SA10.

In 1991, Congress passed the Intermodal Surface Transportation Efficiency Act ("ISTEA") which, among other things, established the "Congestion Pricing Pilot Program." Pub. L. No. 102-240, § 2; *see also* SA7 n.5. The statute specifically authorized the creation of "congestion pricing" projects, notwithstanding a general restriction on the tolling of federally assisted highways, and directed the Secretary to "solicit the participation of State and local governments and public authorities" and enter into "cooperative agreements" to "establish, maintain, and monitor congestion pricing projects." SA113–14 (quoting Pub. L. No. 102-240, § 1012(b), (b)(4)); *see also* SA263, SA265. Congress permitted revenues collected as part of

such projects to be used to support any other projects eligible under Title 23, including public transit, and required monitoring for at least ten years with biennial reports addressing traffic, "transit ridership, air quality, and availability of funds for transportation programs." SA114 (quoting Pub. L. No. 102-240, § 1012(b)(3), (b)(5)). In 1998, Congress renamed the initiative the Value Pricing Pilot Program and expanded participation from five to fifteen state or local governments. SA114–15, SA189–90; SAC ¶ 78 (JA279–80); *see* 23 U.S.C. § 149 note (the "VPPP Statute").

As the agency charged with implementing and administering the VPPP, FHWA repeatedly encouraged projects that involved cordon, or area-wide, pricing. For instance, FHWA represented to Congress in 1992 that it defined "congestion pricing projects" to include "comprehensive area-wide road pricing strategies." SA74 (quoting *Dep't of Transp. & Related Agencies Appropriations for Fiscal Year 1993: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 102d Cong. 352 (1992)); JA279. FHWA's 1998 and 2001 notices similarly designated projects like area-wide pricing as the "highest priority for Federal support," and its 1999 guidance expressly described "[f]ees for entering an area, sometimes called cordon crossing charges" as an authorized congestion pricing program. SAC ¶¶ 79–81. FHWA funded area-pricing studies in Fort Myers, San Francisco, and Los Angeles. SAC ¶¶ 82, 88, 92.

In fact, FHWA specifically encouraged the use of congestion pricing in Manhattan, as was originally envisioned by Vickrey. In 2007, the DOT committed VPPP funding to Mayor Bloomberg's proposal to charge vehicles entering Manhattan below 86th Street, but the proposal failed to obtain legislative approval. SAC ¶ 86. In its 2009 report to Congress, FHWA continued to encourage broader experiments involving tolls on "all roads in a congested area," recognizing that such approaches "tend to take away the choice to drive alone for free in a congested area." SAC ¶ 91.

### B. New York's adoption of the Program and FHWA's approval

In 2019, after decades of debate, New York enacted the Traffic Mobility Act ("TMA"), N.Y. Veh. & Traf. Law § 1701 *et seq.*, which directed the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority ("MTA," and collectively, the "MTA Plaintiffs"), to "plan, design, install, construct, and maintain a central business district toll collection system and implement and operate the same to collect the central business district toll." TMA § 1704(3)(a). The toll was expressly designed to address Manhattan's severe traffic congestion, which ranked "third worst among cities in the world," and to provide recurring revenues to support $15 billion in MTA capital improvements. TMA §§ 1701, 1704-a. The objectives were complementary: better transit would provide alternatives to driving and help "ensure a safe and efficient mass transit

system within the city of New York." SA113 (quoting TMA § 1701); *see also* SA10–11; SA117. The Program would toll vehicles entering Manhattan south of and including 60th Street, excluding the FDR Drive, West Side Highway, and specified connecting roads. SA113; TMA § 1704(2).

TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") consulted with federal officials during the first Trump Administration about the best option for obtaining federal approvals. From the outset, they explained both the Program's cordon design and its transit-funding purpose. SA212 (quoting *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 683 (S.D.N.Y. 2025)); SA199; SA12–13, SA84–90; JA176–78 (C. de Cerreño Decl. ¶¶ 2, 4–6); JA197–201. In response, FHWA and DOT advised them to seek authorization through the VPPP. JA177–80; *see also* SA13; SA115; JA198–99.

The Project Sponsors' Expression of Interest for participation under the VPPP, dated June 17, 2019, specifically proposed charging vehicles entering Manhattan's Central Business District ("CBD"), listing as goals: "Reduce traffic congestion," "Create a sustainable funding source to repair and revitalize the MTA transit system," and "Increase transit ridership." SA83 (quoting ECF 91-2 at 6); *see also* SA13–14; JA207–08. On October 24, 2019, FHWA responded by confirming again that the VPPP appeared to be "the best potential fit" for federal authorization.

SA116 (quoting ECF 91-3 at 1); JA214, JA216. FHWA recognized the proposal was for an "area-wide congestion pricing system," explaining that upon approval and execution of a cooperative agreement, the Sponsors "could then implement the project and collect and use the toll revenues" consistent with Title 23. SA116; JA214–16.

Approval required years of work. FHWA authorized preparation of an Environmental Assessment ("EA") under the National Environmental Policy Act in March 2021 for what it acknowledged was an "important and potentially precedent-setting project." SA116–17 (quoting ECF 91-9 at 1); *see also* SA15–16; JA227–29 (July 2, 2020 letter); JA238–39 (Mar. 30, 2021 letter). The ensuing review examined seven tolling scenarios, included six public hearings, and considered thousands of comments. SA17; JA182–83 (C. de Cerreño Decl. ¶ 16); JA297–98. The final EA predicted reduced congestion, improved regional air quality, sufficient revenues to generate $15 billion for capital projects, economic benefits, and incorporated $155 million in mitigation commitments to offset potential impacts. SA117 (quoting *Duffy*, 784 F. Supp. 3d at 643); SA17–18; JA298–99 (SAC ¶¶ 111–13). FHWA approved the final EA in May 2023 and issued its Finding of No Significant Impact on June 23, 2023. SA116–17; JA179–83.

After further review, TBTA adopted a phased toll schedule beginning with a $9 peak-period passenger-vehicle E-ZPass toll, with even deeper overnight toll

reductions, low-income discounts, and crossing credits (for vehicles directly entering the CBD from already-tolled tunnels). SA19; JA125–27 (VPPP Agreement, Attach. A). FHWA completed environmental reevaluations, and on November 21, 2024 entered into the VPPP Agreement with the Project Sponsors. SA118; SA18–20; SAC ¶¶ 118–25; JA120–28.

The VPPP Agreement memorialized the Secretary's approval of the Program as a value pricing pilot project, stating that "TBTA may operate the Project as a toll Project" and use revenues for operating costs and eligible transportation projects. SA118; JA120–24 (VPPP Agreement). The Agreement further imposed auditing, performance-monitoring, and reporting requirements on TBTA, and addressed restoration of original operating conditions if TBTA discontinued tolling. SA118–19; JA121–23; JA128 (VPPP Agreement, Attach. B). It awarded no federal money and contained no provision permitting the federal government to unilaterally terminate because of changed policies. SA118–19, SA222.

### C. Implementation, other litigation, and reliance on federal approval

Before the Program launched, courts in the Southern District of New York rejected preliminary-injunction applications in six cases: two in related proceedings before Judge Seibel and four in related proceedings before Judge Liman. *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, 791 F. Supp. 3d 433 (S.D.N.Y. 2025) (Seibel, J.) ("*Rockland*"); *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945

(S.D.N.Y. Dec. 23, 2024) (Liman, J.) ("*Chan*").[3] This Court and Justice Sotomayor subsequently denied requests for an emergency stay of the Program's implementation, *Rockland*, No. 24A945 (U.S. Apr. 8, 2025) (Sotomayor, J., in chambers); *Rockland*, No. 24-3325 (2d Cir. Jan. 28, 2025), Dkt. No. 31 (per curiam). Throughout this litigation, FHWA and DOT defended their environmental review and authorization. SAC ¶¶ 132–36; ECF 83 at 12–13.[4]

Tolling went into effect on January 5, 2025. SA119. By the time of the summary-judgment proceedings below, the MTA Plaintiffs spent more than $500 million implementing the Program, and TBTA had incurred $1.378 billion in short-term debt in anticipation of Program revenues. "That is debt that will have to be repaid, regardless of the source." SA211.

Following implementation, the first evaluation report documented that the Program was succeeding: over 21 million fewer vehicles entered the CBD during January–October 2025 compared with the pre-tolling baseline (an 11% decrease).

---

[3] *Rockland*; *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y.); *Chan*; *New Yorkers Against Congestion Pricing Tax* v. *U.S. Dep't of Transp.*, No. 24 Civ. 367 (S.D.N.Y.) ("*NYACPT*"); *Trucking Ass'n of N.Y. v. Metro. Transp. Auth.*, No. 24 Civ. 4111 (S.D.N.Y.); *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644 (S.D.N.Y.).

[4] Additional cases were also litigated in the Eastern District of New York and in state court. *Town of Hempstead v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3263 (E.D.N.Y.); *Town of Hempstead v. Hochul*, Index No. 450653/2025 (N.Y. Sup. Ct.); *Riders Alliance v. Hochul,* Index No. 156711/2024 (N.Y. Sup. Ct.); *City Club of New York v. Hochul*, Index No. 156696/2024 (N.Y. Sup. Ct.).

JA1473. Since tolling began, through October 2025, bus speeds improved, public transit ridership rose by 7%, and average speeds on crossings entering into the CBD improved on average by 23% compared to 2024. JA1488–1505. At the same time, net revenues from the toll through October totaled $468 million. JA1466.

This Court subsequently affirmed dismissal of constitutional challenges to the Program, finding that the Program does not violate the constitutional right to travel or the Equal Protection, Due Process, or Excessive Fines Clauses. *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, 181 F.4th 249, 258 (2d Cir. 2026).

### D. The Secretary's attempted revocation and threatened enforcement

On February 19, 2025, Secretary Duffy sent Governor Hochul a letter purporting to rescind federal approval under the VPPP and terminate the VPPP Agreement (the "February Letter"), without providing any advance notice or opportunity to respond. SA120; SA28; JA136–39 (Feb. 19 Letter). Invoking the President's opposition to congestion pricing, the Secretary asserted two statutory defects: (1) the Program "provides no toll-free option for many drivers" and (2) the Program "appears to be driven primarily by the need to raise revenue for the [MTA] system as opposed to the need to reduce congestion." JA136–39; SA120. That same day, the White House announced: "CONGESTION PRICING IS DEAD. … LONG

LIVE THE KING!," accompanied by a photo of President Trump wearing a crown in front of the New York City skyline.[5] JA134.

The MTA Plaintiffs responded by filing this action that day, seeking vacatur and a declaration that the termination was unlawful under the APA. NYSDOT, NYCDOT, Riders Alliance, and Sierra Club intervened. SA121, SA123–24. Notwithstanding the pending litigation, Defendants proceeded to announce a series of shifting deadlines by which they demanded tolling "must cease": first March 21, and then April 20. SA104; *see also* SA31–32; JA142, JA146. Defendants were clear that non-compliance would come with consequences. On March 20, the Secretary warned in a public statement: "Know that the billions of dollars the federal government sends to New York are not a blank check." JA144; SA32. On April 8, DOT threatened to "use every tool at our disposal in response to non-compliance later this month." JA148; SA33.

On April 21, the Secretary sent a letter that escalated the threat of sanctions and supplied a new explanation for termination (the "April Letter"). SA122; JA150–53 (Apr. 21 Letter). The Secretary characterized his policy objections to the Program as "an independent basis for my decision to terminate the VPPP agreement," invoking 2 C.F.R. § 200.340(a)(4) on the theory that the Program no longer

---

[5] The White House (@WhiteHouse), X (Feb. 19, 2025 2:31 P.M.), https://x.com/WhiteHouse/status/1892295984928993698.

"effectuate[d] the program goals or agency priorities." JA150–53; SA122–23. In other words, a decision initially based on purported statutory limits was recast as a purported exercise of policy discretion. *See* SA201.

The April Letter demanded a response by May 21 and threatened "compliance measures" beginning May 28. SA122; SA123; SA34; JA150–51. Those measures included withholding advance-construction authorizations and environmental approvals for Manhattan projects (subject to an undefined safety exception), and withholding approval of specified transportation-plan amendments. SA34–35 & n.50. Continued tolling would trigger progressively broader measures, including "[n]o further obligations of FHWA funds . . . for projects within New York City" and expansion "to other geographic areas within the State of New York." JA150–53. The threatened action placed federal funding and approvals for projects unrelated to congestion pricing at risk while the legality of termination remained pending before the court. Defendants declined the MTA Plaintiffs' request for an enforcement standstill. SA257.

### E. The preliminary injunction

In response to the government's threats, the MTA Plaintiffs moved for preliminary relief on May 5, 2025. SA123–24. Following argument, the district court entered a temporary restraining order on May 27 and a preliminary injunction on May 28. SA1–2, SA110–11; JA1387–89. In its 109-page opinion, the court

found it had jurisdiction over the MTA Plaintiffs' claims; that the Tucker Act did not apply; that the MTA Plaintiffs were likely to succeed on the merits of their APA claims; and that the prospect of irreparable harm and balance of the equities favored preserving the Program and enjoining Defendants from unlawfully withholding transportation funding and approvals from New York. SA124–25. The court observed that Defendants did not offer a "full-throated defense" of their original cordon-pricing rationale and instead sought to justify termination "not on a lack of authority to permit cordon pricing but on shifting agency priorities," which the court explained was a "post hoc rationalization[]." SA69 & n.65. The court also catalogued the harm the threatened funding cutoff would inflict on projects having nothing to do with the Program. SA97–98.

The preliminary injunction barred Defendants from attempting to enforce the February Letter. SA110–11. Defendants did not appeal and the parties proceeded to expedited cross-motions for summary judgment. Br. 9–10; JA1389–90. To relieve Defendants of the burden of responding to the Second Amended Complaint, the parties agreed that "[a]ny avoidance or defense not raised in Defendants' cross-motion for summary judgment shall be deemed waived, as though Defendants had filed an answer and had failed to raise the avoidance or defense therein." ECF 138 at 2.

### F. The summary judgment decision and remedy

The MTA Plaintiffs sought partial summary judgment on their APA claims (Counts I–IV), vacatur of the February and April Letters, a declaration that the Secretary lacked authority to terminate the Agreement and that enforcing the letters would be unlawful, and a permanent injunction. SA251, SA253, SA256. Defendants moved for summary judgment on every count. They renewed their jurisdictional objections and defended the termination on grounds that for the most part were new: (1) that 2 C.F.R. § 200.340(a)(4) authorized termination for changed "agency priorities"; (2) that the *Christian* doctrine read that term into the Agreement by operation of law; (3) that the VPPP itself gave each Secretary implied statutory authority to terminate the Program; and (4) that the Executive's "sovereign authority" could be surrendered only in "unmistakable" terms. SA140, SA154, SA160, SA214–15, SA229, SA232, SA239. Defendants did "not object generally to the issuance of a declaratory judgment," SA256 n.44, but urged that relief be confined to "the classic APA remedy of vacatur," JA1641, opposing a permanent injunction. SA256–58.

The district court awarded partial summary judgment to the MTA Plaintiffs. First, the court again rejected Defendants' contention that the Tucker Act deprived it of jurisdiction. It reasoned that even assuming the VPPP Agreement is a contract, it is not a money-mandating agreement over which the Court of Federal Claims

("COFC") would have jurisdiction and the MTA Plaintiffs' "lawsuit neither rests on contractual rights nor seeks relief that the Court of Federal Claims could grant."[6] SA165. In addition to that "dispositive fact," SA170, the MTA Plaintiffs' claims did not sound in contract under the two-part *Megapulse* test because the source of the MTA Plaintiffs' rights was not the VPPP Agreement, but rather "the APA and VPPP alone," and the MTA Plaintiffs "do not seek monetary relief or specific performance." SA172–73 (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)).

On the merits, the court rejected both statutory grounds asserted by the Secretary in the February Letter, concluding that based on the VPPP's text, structure, history, and longstanding administration, the statute "clearly includes an area wide, or cordon, program within its ambit"; nothing required a toll-free route into the priced district. SA185. The statute also permitted revenues to finance eligible transit projects: "[t]he statute specifically envisions that the funds generated through a tolling program may be spent on means of transportation that offer alternatives to a congested roadway." SA195. Funding transit and reducing congestion were

[6] Noting that the Secretary's argument would deprive the Organizational Intervenors of any forum in which to bring their claims, the district court observed that "the Secretary's argument is tantamount to the claim that his conduct is immune from any legal scrutiny." SA181.

compatible purposes, and Congress expressly directed monitoring of both transit ridership and transportation revenues. SA182–200.

The April Letter's policy objections fared no better, as they were "post hoc rationalizations which were themselves arbitrary and capricious." SA209. The Secretary had not adequately explained his departure from the agency's prior conclusions or supported his asserted harms with the record. His claim that the Program disproportionately burdened low- and middle-income drivers lacked support. SA202–07. Neither letter grappled with the years of study underlying federal approval: "It is difficult to imagine more arbitrary and capricious decisionmaking than that at issue here." SA208.

Judge Liman separately held that the Secretary failed to address substantial reliance interests created by years of federal guidance and approvals. The Program's designation as a pilot did not make reliance unreasonable: it "referred to the scope, not duration, of the project." Nor did the change in administrations erase investments made long before the election. SA209–10. The court rejected Defendants' belated argument that reliance on anticipated toll revenues did not matter because much of TBTA's debt was backed by other revenues. That was a "distinction . . . without a difference": the obligations still had to be repaid, and the MTA Plaintiffs' expenditure of over $500 million implementing the program independently established substantial reliance. SA210–13.

The district court also rejected the Defendants' alternative sources of termination power. 2 C.F.R. § 200.340(a)(4) did not supply a right to terminate for changed priorities, nor did the *Christian* doctrine imply one by operation of law. SA213–43. Congress had authorized congestion pricing, New York's Legislature had enacted it, and federal officials had approved it: "The democratic process worked." SA243. The court granted judgment to Defendants on the MTA Plaintiffs' ultra vires and National Environmental Policy Act ("NEPA") claims and dismissed the remaining claims as moot. SA244–51, SA259.

As to remedy, the district court vacated the February and April Letters and the actions taken through them. SA251–52. It declined to remand because the statutory error was fit for judicial resolution and there was "no evidence of an agency deliberation that was in process that a remand can build upon." SA253. At argument, the court asked, if the Secretary's conclusion that he lacked authority to approve the Program was held to be an error of law, "what would I be remanding for?" Counsel for Defendants acknowledged: "That might not be a situation where a remand is needed." JA1641.

The court explained why vacatur alone would leave material uncertainty. Investors' concern about termination harmed the MTA Plaintiffs' ability to issue bonds based on Program revenues, thereby raising the cost of capital, and the Secretary continued to publicly promise to end the Program. SA254–55. The

argument transcript also exposed uncertainty about whether Defendants would regard the adjudicated issues as settled. Asked whether a final ruling against termination for changed agency priorities would be treated as "litigated and resolved and entitled to estoppel effect in subsequent litigation," counsel for Defendants responded: "I don't want to get ahead of my client." JA1640. Counsel assured the court that Defendants would "apply and comply with whatever order the Court issues," but did not commit that the legal issues would be treated as conclusively resolved. JA1641. The court accordingly found a "real risk" of a "redo" in which "the issues that have been thoroughly vetted by the parties will have to be reviewed again by this Court or another court." SA255.

To avoid that risk, the court entered a declaratory judgment that the Secretary could terminate "only pursuant to the terms expressly stated" in the VPPP Agreement, that the attempted termination was unlawful, and that "any attempt to enforce the February 19 Letter or April 21 Letter would be unlawful." SA259. It also identified the asserted regulatory and doctrinal grounds that supplied no termination authority. SA255–56, SA259–60. The court declined the MTA Plaintiffs' broader request to require Project Sponsor consent for every termination because it "sweeps too far," and left unresolved whether a material breach could justify termination. SA256.

Judge Liman declined to issue a permanent injunction, explaining that the Secretary had "provided no evidence that he will not abide by the Court's orders including the declaratory judgment," but that the court remained "open to provide '[f]urther necessary or proper relief'" under 28 U.S.C. § 2202 if needed. SA256–59.

### G. Defendants' attempt to circumvent the district court's declaratory judgment

On November 3, 2025, after the preliminary injunction was issued and while summary judgment was pending, President Trump publicly directed Secretary Duffy to "take a good, long look at terminating New York City Congestion Pricing." JA1437; SA257; *see also* JA1440 ("It's got to be ended, IMMEDIATELY!"). Four weeks later, a putative class action challenge to the Program was filed in the District of New Jersey by a group of named plaintiffs and attorneys with close ties to the Administration. *Dunne v. Metro. Transp. Auth.*, No. 25 Civ. 18105 (D.N.J.); *see also* ECF 210 at 4. On August 14, 2026, while this appeal was pending, attorneys representing Defendants here filed a Statement of Interest in *Dunne* urging the District of New Jersey to hold that the Program is not authorized by the VPPP. The filing acknowledged that the theories argued therein were "contrary to positions previously taken by DOT." ECF 210 at 3–6 (quoting *Dunne*, ECF 64 at 2).

On August 17 and 28, the MTA Plaintiffs moved in the district court for further relief under 28 U.S.C. § 2202, arguing that the Statement of Interest violated

the declaratory judgment and warranted a permanent injunction. ECF 201, 210. They also requested limited discovery into possible coordination between Defendants and the *Dunne* plaintiffs to "obtain by proxy what the Court's orders bar them from seeking." ECF 210 at 1–6, 11–15. In their opposition dated September 10, 2026, Defendants do not deny coordinating with the *Dunne* plaintiffs, but argue that any such coordination did not violate the declaratory judgment or the preliminary injunction previously in effect. ECF 211.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). The district court's legal conclusion that it possessed subject-matter jurisdiction is likewise reviewed de novo. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir. 1999) (per curiam). The district court's discretionary decision to grant declaratory relief is reviewed for abuse of discretion, while the underlying legal conclusions are reviewed de novo. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005).

## SUMMARY OF THE ARGUMENT

Defendants seek reversal of the judgment below, but they do not even attempt to defend the Secretary's stated reasons for terminating the Program. They do not challenge the district court's conclusion that the Secretary's statutory objections

were wrong, that his policy rationales were arbitrary and capricious, or that he failed to adequately consider the MTA Plaintiffs' substantial reliance interests. Defendants argue only that the district court lacked jurisdiction under the Tucker Act, and that the declaratory judgment is improper because the government has inherent authority to rescind approval and terminate the VPPP Agreement. Neither argument withstands scrutiny.

First, the Tucker Act does not displace APA review. The VPPP Agreement is an unfunded cooperative agreement conveying tolling authorization, with no right to money damages against the United States. Its regulatory conditions do not create the commercial exchange from which damages are ordinarily presumed. And unlike the federal-grant cases on which Defendants rely, this case involves no entitlement to federal payment and the MTA Plaintiffs do not seek any. That alone means this case does not belong in the COFC.

The Tucker Act also does not apply because the MTA Plaintiffs' claims are not essentially contractual under *Megapulse*. The MTA Plaintiffs are enforcing statutory and regulatory limits on the Secretary's authority. Vacatur and declaratory relief enforce those limits and preserve benefits, including reduced congestion, that damages cannot replace. Neither restoration of the VPPP Agreement nor the Secretary's reliance on its terms as a defense converts these APA claims into claims for contractual performance.

Second, the district court properly and correctly declared the parties' rights. The declaration resolved termination powers Defendants themselves placed at issue, alleviating uncertainty that had hindered the ability to issue bonds backed by Program revenue while the Secretary continued to threaten termination. As the government conceded below, remand would serve no purpose: further deliberation cannot supply the legal authority the Secretary lacks.

Defendants' latest justification for rescission and termination fails. Defendants did not argue a freestanding inherent-authority theory below—their reconsideration argument in the district court rested on a different doctrine, and that is what the district court addressed. In any event, DOT's regulations require termination for changed priorities to be authorized by the Agreement, which contains no such provision. Congress's requirement of at least ten years of monitoring likewise refutes the premise that the Program is terminable at will.

# ARGUMENT

## I. THE TUCKER ACT DOES NOT APPLY

This action under the APA challenges the Secretary's rescission of federal tolling authority. FHWA approved the Program's toll schedule, authorized TBTA to commence tolling, and entered into the VPPP Agreement memorializing that approval, all without awarding federal funds. SA166. The Secretary then purported to rescind that approval—and terminate the cooperative agreement memorializing

it—based on his conclusion that FHWA lacked statutory authority to authorize the Program. SA171. The MTA Plaintiffs sought review of that agency action based on the VPPP and governing regulations.

The APA provides a "general waiver" of sovereign immunity, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 221 (2012), and "embodies the basic presumption of judicial review" over claims challenging federal agency action, *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). The Secretary invokes an exception to that waiver for relief that another statute "expressly or impliedly forbids," 5 U.S.C. § 702, arguing that the Tucker Act displaces APA review here because the tolling authorization was memorialized in an agreement with the United States.

The district court properly rejected that argument for two independent reasons. First, the VPPP Agreement is not a money-mandating contract within the jurisdictional reach of the Tucker Act: it conveys regulatory approval and creates no right to money damages against the United States. SA165–70. Second, even if the VPPP Agreement were such a contract (and it is not), the MTA Plaintiffs' claims are not "at [their] essence" contract claims under *Megapulse*, 672 F.2d at 968. Rather, the MTA Plaintiffs' claims arise from statutory constraints on the Secretary's authority, and the relief they obtained—vacatur of his unlawful decisions and a

declaration of the limits on his authority—enforces those constraints rather than any contractual promise. SA170–78.

### A. The VPPP Agreement Is Not a Money-Mandating Contract

The Tucker Act provides a waiver of sovereign immunity for claims seeking money damages arising from contracts with the United States. 28 U.S.C. § 1491(a)(1). It channels claims exceeding $10,000 to the COFC, an Article I court established by Congress to adjudicate claims for payment from the federal Treasury. *See United States v. Sherwood*, 312 U.S. 584, 588 (1941).

The Tucker Act's history confirms that focus. Congress alone may authorize payments from the Treasury. U.S. Const. art. I, § 9, cl. 7. It initially adjudicated individual money claims itself through private bills; when the inefficiency of this approach became obvious, it assigned categories of those claims to adjunct courts through statutes like the Tucker Act. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430–31 (1990). The traditional jurisdiction of the Court of Claims was accordingly "limited to actions asking for money judgments." *United States v. King*, 395 U.S. 1, 2 (1969). That makes sense, as the COFC can generally award only monetary relief; it "cannot grant equitable relief except under very narrow circumstances." *Wigdor v. United States*, 2015 WL 5439728, at *2 (Fed. Cl. Sept. 15, 2015).

Judge Liman correctly held that the VPPP Agreement falls outside the COFC's jurisdictional limits. SA165–70. The Federal Circuit has long required a

party invoking Tucker Act jurisdiction to identify a "separate source of substantive law that creates the right to money damages." *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017). The VPPP Agreement supplies no such right. It is an unfunded cooperative agreement conveying federal authorization to operate the Program. SA166. No funds were awarded as part of the VPPP Agreement, and FHWA's own New York Division Administrator confirmed that "FHWA does not anticipate receiving any funding for the [VPPP]." ECF 159 ¶ 5; *see also* SA170 n.16 ("[T]he Federal Government is not obligated to provide any funds to support the [Program].").

The Secretary nevertheless suggests that the MTA Plaintiffs "have not disclaimed" an argument that the VPPP Statute provides for an 80-percent federal contribution and payment of certain pre-implementation and start-up costs. Br. 30. That overlooks both the language of the VPPP Agreement and the MTA Plaintiffs' counsel's express representation to the contrary: "We have no right to money. It's an unfunded cooperative agreement." JA1586. As Judge Liman explained, "no equitable relief entered by this Court pursuant to Plaintiffs' complaint would result in the Federal Government making a payment to the Plaintiffs, or to any other entity." SA165.

The Secretary places great weight on *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), and *Department of*

*Education v. California*, 604 U.S. 650 (2025), and asserts that those decisions are "irreconcilable" with Judge Liman's ruling. Br. 19. But both involved efforts to compel the payment of substantial federal grants. The Secretary quotes the Court's statement in *California* that the government was "likely to succeed in showing the District Court lacked jurisdiction," Br. 16, but omits the words that immediately follow: "to order the payment of money under the APA." 604 U.S. at 651. Likewise, in *NIH*, the district court had "ordered the Government to pay plaintiffs sums due under the agreements 'forthwith.'" 145 S. Ct. at 2661–62 (Barrett, J., concurring).[7] Those cases concerned enforceable obligations to disburse federal money.

The Secretary also invokes the "presumption that money damages are available for breach of contract." Br. 27–28 (quoting *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)). But "[c]ooperative agreements, unlike procurement contracts, are not presumed to provide money damages." *Pacito v. Trump*, 169 F.4th 895, 926 (9th Cir. 2026); *accord Hous. Auth. of City of New Haven v. United States*, 140 Fed. Cl. 773, 786 (2018) ("[C]ooperative agreements are not money-mandating contracts."); *Boaz Hous. Auth. v. United States*, 994 F.3d 1359,

[7] The Secretary neglects to mention that *NIH* left undisturbed the vacatur of NIH's guidance documents, while staying relief concerning individual grant terminations. 145 S. Ct. at 2661–62 (Barrett, J., concurring).

1367 (Fed. Cir. 2021) (citing *Rick's Mushroom Srvs., Inc. v. United States*, 521 F.3d 1338, 1342 (Fed. Cir. 2008)).

While agreements for "mutually beneficial commercial exploitation" fall within the "core of the strong background rule" allowing contract damages, the same is not true for cooperative agreements. *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327–28 (Fed. Cir. 2016). The distinction reflects the public nature of cooperative agreements, which the federal government uses to transfer something of value to a recipient "to carry out a public purpose," rather than acquiring property or services for the Federal Government's own use. 31 U.S.C. § 6305(1); *see* SA166 & n.14.[8]

The COFC looks to the substance of a cooperative agreement to determine whether it is a commercial agreement that warrants the presumption. In *Rick's Mushroom*, the government provided financial and technical assistance for conservation improvements through a cooperative agreement. After considering the agreement, the Federal Circuit held it "d[id] not provide a substantive right to recover money-damages" and rejected jurisdiction under the Tucker Act. 521 F.3d

[8] Defendants' authorities do not address cooperative agreements. *Holmes* involved employment settlements intended to protect the plaintiff's future employment and compensation. 657 F.3d at 1315–16. *Higbie* involved a mediation agreement contemplating exclusion of improperly disclosed statements as a nonmonetary remedy. 778 F.3d 990, 993–95 (Fed. Cir. 2015).

at 1341–43. In *St. Bernard Parish Gov't v. United States*, the COFC explained "damages cannot be implied" from a cooperative agreement absent a "specific provision mandating a monetary recovery," and dismissed because the agreement contained no such provision. 134 Fed. Cl. 730, 734–35 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019). In *Anchorage v. United States*, by contrast, the government received a service fee; the COFC accordingly concluded the agreements "are not cooperative agreements, and thus money damages can be presumed." 119 Fed. Cl. 709, 713–14 (2015).

Congress expressly selected "cooperative agreements" to authorize participation in the VPPP. VPPP, cl. 1; SA166. The VPPP Agreement conveys tolling authorization: "TBTA may operate the Project as a toll Project." JA1185–88 (§ 1). No federal funds were awarded. SA166. Nor did the Project Sponsors undertake obligations similar to a commercial contract, for example, by agreeing to pay FHWA for services or furnish goods or facilities for the Federal Government's direct use. *Cf. Anchorage*, 119 Fed. Cl. at 713–14 (holding that agreements under which the government received significant value in exchange for its services were not cooperative agreements). The Project Sponsors' obligations concerning highway maintenance, audits, and reporting prescribe the statutorily grounded conditions under which they may exercise tolling authority. JA1186–88 (§§ 2–9). FHWA's commitments to cooperate, monitor the Program, and report to Congress—

which the Secretary emphasizes, Br. 27—are features of the VPPP Statute and of the cooperative relationship it authorizes, just as the agencies in *Rick's Mushroom* and *St. Bernard* undertook to provide technical assistance.

Although the government urges this Court to apply the ordinary damages presumption, it has acknowledged elsewhere that cooperative agreements fall outside the presumption. *See, e.g.*, *St. Bernard*, 134 Fed. Cl. at 734 (government argued "cooperative agreements, unlike procurement contracts, are not presumed to provide money damages"); *Anchorage*, 119 Fed. Cl. at 713 (government argued "money damages are not presumed in a cooperative agreement"). As the Ninth Circuit has explained: "The Government cannot have its cake and eat it too by insisting that cooperative agreements are not Tucker Act contracts when it does not want to litigate in the [COFC] but that they are Tucker Act contracts when—as in this case—it would rather be there." *Pacito*, 169 F.4th at 927 (emphases omitted).

Here, because the Tucker Act does not apply, it cannot displace the APA's waiver of sovereign immunity. *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996).[9]

---

[9] Notably, the Secretary does not commit to the COFC's jurisdiction, describing it as "the only *possibly* appropriate forum for plaintiffs' claims." Br. 22 n.9 (emphasis added). At oral argument, Defendants maintained that, even if the MTA Plaintiffs were sent to the COFC, they would continue asserting threshold objections, JA1653, prompting Judge Liman to note: "It seems like you're holding inconsistent positions," JA1653–54. The Secretary also maintains that the Organizational

### B. The MTA Plaintiffs' Claims Are Not Essentially Contractual

Even if the VPPP Agreement were a money-mandating contract, this action would still not belong in the COFC because it is not "at its essence" a contract claim. *Megapulse*, 672 F.2d at 968. Under the *Megapulse* framework that this Court adopted in *Atterbury v. United States Marshals Service*, 805 F.3d 398, 406 (2d Cir. 2015), courts examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." *Megapulse*, 672 F.2d at 968. The test is conjunctive, meaning that Defendants must satisfy both prongs to defeat jurisdiction. *See Atterbury*, 805 F.3d at 408; *see also Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 47 (D.D.C. 2026).

#### 1. *The MTA Plaintiffs' claims enforce independent statutory and regulatory limits on agency action.*

In identifying the source of the rights asserted, courts consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). As the D.C. Circuit has explained, claims arising under a federal program are not contractual where they "turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the

---

Intervenors' claims are not within the jurisdiction of the district court, leading Judge Liman to conclude that "[i]f [his position were] accepted, it would protect his action from challenge by anyone in any court." SA182.

parties." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985).

That describes the MTA Plaintiffs' claims here: the legality of the Secretary's withdrawal of approval turns on the meaning of the VPPP Statute and the requirements governing lawful agency decision-making. *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025) ("Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction."). The MTA Plaintiffs challenge the Secretary's purported determination that the VPPP Statute does not authorize the Program and his subsequent attempt to justify withdrawing approval through unsupported policy rationales. In making these arguments, the MTA Plaintiffs rely on the APA, the text of the VPPP Statute, and DOT's regulations.

As Judge Liman explained, the Secretary did not "invoke any of the Agreement's terms in his purported revocation." SA171. The February Letter instead asserted that Congress had not authorized cordon pricing or the use of toll revenues for public transportation—an argument that was necessarily non-contractual to the extent it invoked the Secretary's statutory authority to enter into the VPPP Agreement in the first place. *See* JA138. The district court rejected that interpretation of the statute, held that the policy rationales advanced in the April Letter were impermissibly post hoc and independently arbitrary, and determined that

the Secretary failed to consider the MTA Plaintiffs' reliance interests. SA183–213. None of those determinations depended on a promise by FHWA to pay money or perform a bargained-for service.[10]

The fact that there is an agreement between the parties does not "magically 'transform [the] action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have.'" *Normandy Apts., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) (alterations in original) (quoting *Megapulse*, 672 F.2d at 968); *see also NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). The question is whether the claim "is validly based on grounds other than a contractual relationship with the government." *Atterbury*, 805 F.3d at 407 (quoting *Megapulse*, 672 F.2d at 968). In *Atterbury*, this Court allowed a court security officer's APA challenge to his removal because he asserted due-process rights independent of the contract. *Id.* at 407–08. This Court reached that conclusion even though the contract also governed his termination, which is not the case here where the Secretary's power to terminate is instead governed by the statute and

[10] Defendants assert that "[t]he only provisions upon which the district court relied to conclude that the agency lacked authority to terminate the Agreement were provisions of the Agreement itself." Br. 37. That is incorrect. The district court examined the text and structure of § 200.340, the VPPP Statute, and the Secretary's asserted doctrinal grounds for termination. SA213–43. As the district court explained, "[e]ven the Secretary's arguments that termination of the Agreement was permitted turn on the meaning of the VPPP and federal regulations." SA172.

regulations. *Id.* Likewise, in *Crowley*, the D.C. Circuit permitted a contractor's statutory challenge to GSA's authority to audit invoices under its contract with another federal agency. Although the "claim presupposes the existence of a contract," the court explained, "the right Crowley seeks to vindicate is not a contract right." 38 F.4th at 1109–10.

The Secretary responds to this by arguing that neither the APA nor the VPPP Statute independently entitles the MTA Plaintiffs to toll lower Manhattan, and that the VPPP Agreement therefore must be the source of their rights. Br. 20–21. But the MTA Plaintiffs are challenging the *withdrawal* of approval already granted, and invoke the statutory and regulatory limits governing that withdrawal. They do not seek to enforce any contractual obligations of the federal government. SA171–72.

The Secretary's reliance on the VPPP Agreement's terms as a defense does not change the source of the MTA Plaintiffs' claims. Br. 21–22. In *Megapulse*, the government likewise invoked a contract to justify the disclosure challenged under the Trade Secrets Act. The D.C. Circuit explained that "[i]t is actually the Government, and not Megapulse, which is relying on the contract," rejecting the contention that those contract issues converted the suit into a contract action. 672 F.2d at 969. *Hall* applied that reasoning even where the plaintiff anticipated a settlement defense and expressly sought to have the agreement declared invalid. The Court noted that "while [it] may need to pass on certain questions about a contract,

. . . it would do so in the context of the Government's defense of the action, not Plaintiff's independent requests for relief." *Hall v. Nielsen*, 2019 WL 250972, at *3 (D.D.C. Jan. 17, 2019), *aff'd sub nom. Hall v. McAleenan*, 2019 WL 5394627 (D.C. Cir. Oct. 3, 2019).

Here, the Secretary invoked § 200.340(a)(4), arguing that the VPPP Agreement's general federal-law compliance clause incorporated authority to terminate it. SA214–15. The district court therefore examined the Agreement to determine whether the government had reserved the authority to terminate based on policy changes, applying the regulatory requirement that agencies "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." SA218–22 (quoting 2 C.F.R. § 200.340(b)). As Judge Liman explained, "[e]ven the Secretary's arguments that termination of the Agreement was permitted turn on the meaning of the VPPP and federal regulations." SA172.[11]

Defendants' authorities involved materially different rights. In *Up State Federal Credit Union v. Walker*, the credit union sought to require the Army to accept title to its building and grant it a leaseback. 198 F.3d 372, 374, 376–77

---

[11] Although Judge Liman held that 2 C.F.R. § 200.340(a)(4) was not incorporated into the VPPP Agreement, SA214-29, the Secretary still relies on that provision to argue that this is a contract case. *See* Br. 22 n.9. Defendants fail to explain how a provision that is not in the contract could somehow make this a contract case. And even if it were in the contract, the Secretary's invocation of it as a defense would not change the nature of Plaintiffs' claims.

(2d Cir. 1999). The regulation it invoked did not supply a right independent of the lease: "the Credit Union's right in this case stems from no independent, non-contractual source." *Id.* at 376. Likewise, *Ingersoll-Rand Co. v. United States* involved the government's termination of an air-compressor procurement contract under its termination-for-convenience clause. 780 F.2d 74, 75 (D.C. Cir. 1985). The regulatory challenge could be resolved as a dispute "entirely contained within the terms of the contract." *Id*. at 78. And in *Sustainability Institute v. Trump*, the plaintiffs identified "no source of law, besides their grant agreements, guaranteeing them the relief they seek." 165 F.4th 817, 827 (4th Cir. 2026). Here, the Secretary's assertion that Congress never authorized the Program, and the lawfulness of the agency's explanations for withdrawing approval, cannot be resolved by determining what the parties promised one another. SA176–78.

*2. The judgment grants relief from unlawful agency action, not contractual remedies.*

The relief sought and awarded independently confirms that this is an APA action. Judge Liman vacated the February and April Letters and declared the legal limits on the Secretary's asserted termination authority. SA251–56, 259–60. Vacatur confirmed that the prior federal approval remained valid and relieved the MTA Plaintiffs of any asserted obligation to cease tolling. SA251–52. These remedies fall at the core of an APA claim.

Under the second prong of *Megapulse*, the "crux of the … inquiry" is whether the plaintiff "effectively seeks to attain monetary damages." *Crowley*, 38 F.4th at 1108; *see Megapulse*, 672 F.2d at 971 (asking whether the plaintiff asserts a "disguised claim for monetary relief"). The answer to that question here is clearly "no." The VPPP Agreement awards no federal funding, the MTA Plaintiffs have disclaimed any right to payment under it, and the judgment awards only vacatur and declaratory relief. JA1586; SA165–66, 259–60. As the district court recognized, "no equitable relief entered by this Court pursuant to Plaintiffs' complaint would result in the Federal Government making a payment to the Plaintiffs, or to any other entity." SA165.

The relief awarded by the district court has substantial value independent of any hypothetical monetary recovery. "[A]s long as the sole remedy requested is declaratory or injunctive relief that is not 'negligible in comparison' with the potential monetary recovery—[courts] respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284–85 (D.C. Cir. 1995) (internal citation

omitted).[12] Confirming the continued validity of the federal authorization permits the MTA Plaintiffs to operate the Program, pursue its congestion-reduction and environmental objectives, and collect valuable pilot-project data. JA1185–87; SA178. As Judge Liman explained, "the purpose of the program—to reduce congestion in the CBD and thereby create knock-on beneficial economic and environmental effects—cannot . . . be adequately compensated with damages," SA178, nor do the MTA Plaintiffs seek any.

Defendants attempt to equate vacatur with the contractual remedy of specific performance, arguing that by reinstating TBTA's tolling authority and issuing a declaratory judgment, the district court essentially compelled the government to continue performing under the VPPP Agreement. Br. 22–27. But *Megapulse* rejected that same argument: "[t]he mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available." 672 F.2d at 971. This Court adopted that reasoning in *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 728 (2d Cir. 1983), and subsequently rejected an effort to characterize reinstatement as specific performance where the

[12] While Defendants attempt to distinguish *Kidwell* as involving the correction of military records, Br. 24–25, *Crowley* expressly applied *Kidwell* "under the second prong of *Megapulse*," 38 F.4th at 1107–08 & n.6.

plaintiff asserted an independent constitutional right. *Atterbury*, 805 F.3d at 408; *see also Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 92 (D.D.C. 2025).

The VPPP Agreement itself confirms this distinction. Section 1 provides that "TBTA may operate the Project as a toll Project . . . and as a value pricing project" consistent with federal law. JA1185–87. Vacatur of the Secretary's unlawful withdrawal of that authorization permits the MTA Plaintiffs to continue operating the Program. Contrary to the Secretary's claims, the judgment does not direct FHWA to perform on any cooperation, monitoring, or reporting commitments. Br. 27; JA1186–88. As Judge Liman explained, "Plaintiffs' relief would be complete without the Secretary taking any further action." SA175.

The declaratory judgment resolves the legal limits on the Secretary's authority and does not order performance of a contractual promise. Defendants emphasize the declaration that any termination must proceed "pursuant to the terms expressly stated" in the Agreement. Br. 26. But once again, that declaration does not require any action by the Secretary. And it resolves the grounds the Secretary invoked to justify withdrawing approval both in the February and April Letters and in litigation: § 200.340(a)(4), incorporation through the *Christian* doctrine, implied statutory authority under the VPPP, and the unmistakability doctrine. SA255–56. As Judge Liman explained, "[w]hen the issue presented is whether Congress did or did not

grant the agency power to take administrative action, it falls to the federal courts generally under the APA and not to the Federal Court of Claims specifically to resolve that issue." SA177. The court declined the MTA Plaintiffs' request to declare that Defendants could terminate the Program only with the Project Sponsors' approval, explaining that would "sweep[] too far." SA256.

The non-monetary nature of the relief at issue here distinguishes this case from those cited by Defendants, which all sought to enforce a contractual entitlement to public funds. *See California*, 604 U.S. at 650 (plaintiffs sought "to enforce a contractual obligation to pay money"); *Up State*, 198 F.3d at 374 (government contractor sought "substantial monetary damages, of which $20 million would serve as an alternative to equitable relief"); *Ingersoll-Rand*, 780 F.2d at 79-80 (government contractor sought reinstatement of procurement contract and "equitable remedy for the identical contract rights redressable by money damages"). In *Presidential Gardens Associates v. United States*, the plaintiffs sought declarations that HUD had violated a settlement agreement and an injunction preventing mortgage auctions inconsistent with that agreement. 175 F.3d 132, 143 (2d Cir. 1999). This Court held that the claims were barred because the plaintiffs were "in essence, seeking specific performance of the Settlement Agreement." *Id.* Here, the judgment restores federal approval and defines the statutory and regulatory limits on

the Secretary's authority to withdraw it; it does not compel performance of any contractual promises. SA175–77.[13]

## II. THE DISTRICT COURT'S DECLARATORY JUDGMENT WAS PROPER

On the merits, the district court held: (a) the Program is authorized by the VPPP Statute, rejecting the Secretary's arguments to the contrary; (b) the April Letter's policy rationales were impermissible post hoc justifications and independently arbitrary and capricious; (c) Defendants failed to adequately consider the MTA Plaintiffs' substantial reliance interests; (d) 2 C.F.R. § 200.340(a)(4) did not authorize termination based on changed agency priorities absent an authorizing provision in the Agreement; (e) the *Christian* doctrine did not incorporate such a provision into the Agreement by operation of law; (f) the VPPP Statute did not confer authority to reconsider federal approval; and (g) the unmistakability doctrine supplied no independent authority to terminate. SA200, 209–13, 259–60.

Defendants do not challenge these determinations on appeal. They instead argue that the district court's chosen remedy—a declaratory judgment describing the

---

[13] Defendants attempt to obscure this distinction when paraphrasing Judge Liman's discussion of *Sustainability Institute*. They attribute to the district court the proposition that "'reinstatement' of a contract for 'continued' performance thereon constitutes contractual relief." Br. 26. But the cited passage actually addressed "reinstatement of their grants" and "continued *payments* on those grants." SA164 (emphasis added) (quoting *Sustainability Inst.*, 165 F.4th at 828).

rights of the parties—is overbroad and impermissibly curtails their "inherent authority to revisit their prior decisions." Br. 34. These arguments were not only waived below, but also lack merit.

### A. The District Court's Remedy Was Not Overbroad

#### *1. The district court did not abuse its discretion in entering the declaratory judgment.*

To the extent Defendants challenge the district court's decision to award declaratory relief, that argument is waived. Br. 33–34, 38–40. Having failed to contest the issue below, Defendants cannot now object for the first time on appeal. *See* SA256–57 & n.44; *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006).

Moreover, the district court appropriately exercised its "broad discretion" in choosing to resolve the parties' continuing uncertainty over the Secretary's authority. *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99 (2d Cir. 2023) (internal citations omitted). The Declaratory Judgment Act authorizes courts to "declare the rights and other legal relations" of interested parties, "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The APA expressly contemplates declaratory relief against federal officials and agencies. 5 U.S.C. § 703. Relevant considerations include whether a declaration would assist in "clarifying or settling the legal issues involved" and "offer relief from uncertainty." *Admiral Ins. Co.*, 57 F.4th at 99–100.

The district court carefully applied these considerations here. SA254–56. Investors uncertainty about the circumstances permitting termination had "depressed the value of the bonds," while "[t]he Secretary has vowed publicly to continue to fight it." SA254. A declaration would therefore "serve a useful purpose in clarifying the circumstances under which the Secretary can terminate the program and can offer some relief from uncertainty." SA254–55.

Defendants themselves confirmed that need. At argument, they "refused to commit that this Court's rulings would definitively settle the issues with respect to those doctrines," even if affirmed on appeal. SA255; *see* JA1639–41. Vacatur alone thus presented a "real risk that the Court will set the dispute up for a 'redo.'" SA255. That concern has been proven correct in light of Defendants' efforts to contest the Program's authorization in other forums. *See supra* at 22–23.

The district court acted within its discretion by declaring the invalidity of four defenses raised and litigated by Defendants in this action, namely: (i) 2 C.F.R. § 200.340(a)(4); (ii) the *Christian* doctrine; (iii) statutory reconsideration authority; and (iv) the unmistakability doctrine. Br. 39; SA259–60. Count I of the Complaint sought declaratory relief resolving Defendants' termination authority, and the MTA Plaintiffs moved for a declaration that "Defendants lack the authority to terminate the VPPP Agreement or rescind federal approval for the Program" except as the Agreement allows. ECF 151 ¶ 7(a). Defendants responded by moving for summary

judgment on the ground that "[t]he Secretary and FHWA have authority to terminate the Agreement." ECF 158 at 23–33; *see* ECF 171 at 27–34; SA245. In seeking judgment in their favor, Defendants advanced each of the defenses identified in the declaration and maintained that they "have always had the ability to terminate the VPPP Agreement based on agency priorities or goals." ECF 171 at 42.[14]

The district court's decision to enter a declaratory judgment on the Secretary's authority and his asserted defenses was an "adjudication of present right upon established facts" and furthered the Declaratory Judgment Act's purpose of providing guidance as to the parties' legal rights. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937); *see also* Fed. R. Civ. P. 57 advisory committee's note to 1937 adoption ("The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity . . . may be declared."). Having asked the court to adjudicate the Secretary's powers as a basis for judgment in their favor, Defendants can hardly object that the declaratory judgment addressed those same powers.

Defendants also misconstrue the declaratory judgment in claiming that it "g[ives] only Plaintiffs and not the Secretary or the FHWA the right to terminate the agreement at will." Br. 39. The Secretary repeatedly describes the judgment as foreclosing termination "under virtually any circumstances." *Id.* at 2, 3, 14.

[14] Defendants raised 2 C.F.R. § 200.340(a)(4) as a basis for termination for the first time in the April Letter. *Compare* Br. 39, *with* JA150–53.

Although the MTA Plaintiffs did seek a declaration that Defendants "may not terminate [the VPPP Agreement] except with the Project Sponsors' approval," SA256, the court refused, explaining: "As Defendants argue, that declaration sweeps too far." *Id.*; *see* ECF 171 at 49.[15]

2. *Remand would not serve any purpose.*

The district court correctly declined to remand to the agency. SA252–53. Although Defendants present the "ordinary remand rule" as a categorical requirement, it is not. *Contra* Br. 38. This Court has recognized that remand is unnecessary in circumstances where the existing record compels the outcome. *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014); *see also Huff v. Vilsack*, 195 F. Supp. 3d 343, 363–64 (D.D.C. 2016). Even Defendants' authority acknowledges an exception where there is "not the slightest uncertainty as to the outcome" on remand. *Calcutt v. FDIC*, 598 U.S. 623, 629–30 (2023).

---

[15] Defendants are wrong to claim that the declaratory judgment is "the practical equivalent of specific relief such as [an] injunction[]." Br. 39–40. A declaratory judgment "states the law," and "does not compel an affirmative action like an injunction does." *Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025); *accord Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987). Defendants recognized as much in a recent filing in the district court, in which they argued that the declaratory judgment "does not, in itself, coerce any party or enjoin any future action." ECF 211 at 3–4. Defendants' reliance on *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985), is misplaced because that decision withheld discretionary relief that would interfere with sensitive foreign affairs and military operations.

This is one of those situations. The February Letter asserted that Congress had not authorized the Secretary to approve the Program. The district court rejected the Secretary's statutory interpretation, which Defendants do not defend on appeal. SA252. As the court explained, "[n]o amount of further agency deliberation is necessary to decide Congress's authority. That question belongs to the courts." SA252–53. Defendants themselves acknowledged the point. When asked what remand would accomplish if the Secretary's statutory arguments failed as a matter of law, counsel for Defendants responded: this "might not be a situation where a remand is needed." SA252; JA1641. The court called that concession "well-advised." SA252.

The April Letter's policy rationale likewise supplied no reason for remand. The district court held the Secretary lacked authority to terminate the Agreement because the Program no longer aligned with agency policies and priorities. SA253. Defendants do not challenge this holding on appeal either, and further deliberation could not cure that absence of authority. Nor was there an unfinished agency process to resume: "[t]here is no evidence of an agency deliberation that was in process that a remand can build upon." *Id.* As the court observed, "[i]t is not clear, and the Secretary has not made clear, what the DOT would do in light of that conclusion if the Court was to remand the case." *Id.*

Even now on appeal, Defendants have not explained what purpose a remand would serve. *See* Br. 38. That distinguishes this case from Defendants' authorities, each of which involved determinations that remained for the agency under the corrected legal standard or the resolution of factual questions entrusted to agency expertise. *PPG Industries, Inc. v. United States*, 52 F.3d 363, 365–66 (D.C. Cir. 1995); *Gonzales v. Thomas*, 547 U.S. 183, 186–87 (2006).

### B. Defendants' Inherent-Authority Argument Is Not a Basis for Reversal

#### *1. The inherent-authority argument was not preserved below and is not adequately developed on appeal.*

Defendants invoke an inherent freestanding power to reconsider agency decisions—distinct from the question of whether the VPPP Statute authorized termination. Br. 33–36. But they did not present that defense to the district court and cannot raise it now for the first time on appeal. *Bogle-Assegai*, 470 F.3d at 504. Not only is Defendants' new defense foreclosed by basic principles of appellate preservation, Defendants affirmatively waived the argument by agreeing that "[a]ny avoidance or defense not raised in Defendants' cross-motion for summary judgment shall be deemed waived, as though Defendants had filed an answer and had failed to raise the avoidance or defense therein." ECF 138 at 2.

Although Defendants argued below that the text of the VPPP Statute grants the Secretary a right to "disestablish" the Program, implicit in the statutory grant to

"establish," they were clear that this authority arose from the statute, rather than any inherent authority. ECF 158 at 30. Their motion identified the relevant theory under the heading "Termination is authorized by the VPPP Statute" and explained: "[t]hat authority stems from both statutory text and context." *Id.* Defendants contended that the VPPP Statute's grant of discretionary authority to "'establish' programs" necessarily implied "a power to disestablish" them. *Id.* at 30–31 (citing VPPP cl. 1); *see also* ECF 171 at 32–33. The district court accordingly addressed the asserted implied authority to terminate projects "by terms of the statute itself," SA232, and held that if there was an implication from the statutory power to "establish" it was "not the one that the Secretary would draw," SA236–37. The district court then declared that Defendants could not terminate the VPPP Agreement "under the Secretary's powers contained within the VPPP itself." SA 256–62.

On appeal, Defendants advance a new basis for reversal. Despite having themselves relied only on the statute, their opening brief faults the district court for requiring "express statutory, regulatory, or other authority," asserting that "[t]hat gets things backwards." Br. 34. Defendants now invoke a general presumption applicable to regulatory authorizations, federal benefits, and federal programs alike—a "long-established rule" they argue comes from the government's need to "adjust to changing circumstances or to changed priorities." Br. 34–35. But as their own cases establish, statutory reconsideration and inherent-authority reconsideration

are separate doctrines. *Dun & Bradstreet Corp. Found. v. USPS*, 946 F.2d 189, 193 (2d Cir. 1991) (analyzing agency's inherent authority to reconsider separately from authority pursuant to a statute or regulation); *Belville Mining Co. v. United States*, 999 F.2d 989, 998–1001 (6th Cir. 1993) (same).

Unlike statutory reconsideration, an agency asserting inherent-authority reconsideration must satisfy several preconditions, including timely action and proper notice. *Dun & Bradstreet*, 946 F.2d at 193–94. Defendants did not address those preconditions below, underscoring once again that they pursued a separate and distinct defense in the district court.[16] Moreover, Defendants also do not make any effort to satisfy the preconditions on appeal. Defendants' opening brief quotes *Ivy Sports*' timeliness qualification but never applies it and does not even mention the notice requirement. Br. 34–36 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)). Aside from Defendants' failure to preserve this issue below (and affirmative waiver), the lack of developed argument on appeal is sufficient

---

[16] Defendants' passing citation to *Albertson* below does not establish otherwise. They cited that decision to support their contention that the VPPP Statute's grant of authority to "establish" programs necessarily implied authority to disestablish them, expressly identifying "statutory text and context" as the source of that power. ECF 158 at 30. A single citation or a conflated argument is not enough to preserve an issue in any event, *Bogle-Assegai*, 470 F.3d at 504–05, particularly where Defendants did not develop an independent defense under the default reconsideration doctrine or address its fact-based inquiries of adequate notice and timeliness. *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994).

grounds for this Court to reject this argument. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

Defendants cannot avoid the consequences of their litigation choices by presenting their new defense as an objection to declaratory relief. Any objections must have been presented below. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir. 1996). The MTA Plaintiffs brought this action seeking a declaratory judgment addressing the Secretary's termination authority, and Defendants moved for summary judgment on that issue. SA245, 255–56. Defendants therefore had every opportunity—and, under the parties' agreement, an express obligation—to identify the independent defenses on which they intended to rely. ECF 138 at 2; *Clear Channel Outdoor, LLC v. City of New Rochelle*, 2022 WL 17249412, at *4 (S.D.N.Y. Nov. 28, 2022). The purpose of a declaratory judgment is to resolve the rights of the parties. Litigants cannot hold back additional defenses with the intention of raising them later in a different lawsuit or in a different forum. *See* ECF 200.

2. *Defendants do not have inherent authority to reconsider the VPPP Agreement.*

Even if it had been preserved, Defendants' inherent-authority argument fails. A federal agency is a "creature of statute." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002). While agencies have a limited "inherent authority to revisit their prior decisions," *Ivy Sports Med.*, 767 F.3d at 86, "that authority may also be sharply

limited, or even foreclosed, when the statutory structure negates that assertion of implied authority," *China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024). This Court has recognized that any inherent authority is withdrawn when there is "contrary legislative intent or other affirmative evidence." *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002) (quotation marks omitted). Agency regulations can also restrict reconsideration authority. *Chen v. GAO*, 821 F.2d 732, 737–38 (D.C. Cir. 1987) (rejecting asserted reconsideration authority inconsistent with the agency's regulations).

DOT has promulgated regulations that foreclose the termination authority Defendants now claim. *See Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, 2025 WL 903331, at *7 (D. Alaska Mar. 25, 2025); *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *9 (E.D. Tex. Aug. 20, 2021). Section 200.340(a)(4) permits termination based on changed program goals or agency priorities only "pursuant to the terms and conditions of the Federal award." SA219. And subsection (b) requires the agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." SA220.

Judge Liman held—and Defendants do not dispute on appeal—that 2 C.F.R. § 200.340 required the Secretary to include any right to terminate for changed priorities in the VPPP Agreement, which contains no such provision. SA218–21. As the district court explained, "[t]he agency cannot sit silent, permit the award

recipient to rely upon the grant, and only after the fact rely on the provision." SA221; *see Ivy Sports Med., LLC*, 767 F.3d at 86–87 (where there is a prescribed statutory process, agency may not rely on inherent authority); *see also Vollinger v. Merrill Lynch & Co.*, 198 F. Supp. 2d 433, 439 (S.D.N.Y. 2002) (holding EEOC lacked inherent authority to reconsider statute of limitations determination where the Commission's regulations provided for reopening of such decisions in specified circumstances only).

The statutory text independently forecloses Defendants' asserted authority. *See Chao*, 291 F.3d at 229 n.9. Congress authorized the Secretary to "enter into cooperative agreements" with state and local governments "to establish, maintain, and monitor value pricing programs." VPPP, cl. 1; SA236. Those projects necessarily contemplate sustained long-term commitments. Congress provided for funding development and startup costs for "a period of at least one year," capped federal funding at three years, and directed the Secretary to "monitor the effect of such projects for a period of at least 10 years" and report to Congress "every 2 years." VPPP, cl. 5; SA233–34. As the district court held, the statute "reflects that the congestion pricing projects the Secretary may approve will be of some duration." SA233; *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1021 (9th Cir. 2025).

Congress limited the Secretary's role to facilitating the start of these programs, followed by monitoring and reporting. Its three-year funding cap further

curtailed the Secretary's involvement once the projects were established. Nothing in the VPPP Statute authorizes the Secretary to reevaluate or withdraw approval based on monitoring or reporting results. These provisions supply the "affirmative evidence" that Congress did not intend to leave the Secretary any "inherent" authority to terminate the Program. *Chao*, 291 F.3d at 229 n.9.

The term "pilot" does not alter that conclusion. A "project is designated a pilot by virtue of its scope and not by its duration," and "[m]any pilot projects are of long duration because that duration is necessary to determine whether the project can achieve its goal." SA234. As the district court noted, Black's Law Dictionary defines "pilot project" as a "small-scale advance study conducted to gauge the advisability of conducting a full-scale research project by first evaluating its design, time commitment, costs, and feasibility, plus the effects of potential adverse events." *Pilot*, Black's Law Dictionary (12th ed. 2024). The Random House Dictionary of the English Language defines "pilot project" as "an experimental or trial undertaking prior to full-scale operation or use." *Pilot Project*, Random House Dictionary of the English Language (1st ed. 1966). Congress expressly limited the duration of federal funding while requiring at least ten years of monitoring. SA233–34. It did not similarly require the projects themselves to expire or remain terminable at will. SA234.

Defendants' authorities do not establish a freestanding power to terminate a lawful program for policy reasons despite the legal restrictions governing termination. *See* Br. 35 n.12. In *Natural Resources Defense Council v. Abraham*, this Court rejected reliance on cases recognizing reconsideration "in individual cases by agencies in the course of exercising quasi-judicial powers" to establish authority to revise efficiency standards contrary to the governing statute. 355 F.3d 179, 202–03 (2d Cir. 2004). Those cases included *Dun & Bradstreet* and *Trujillo*, which Defendants invoke here. *Id.*; Br. 34–35. Similarly, *National TPS Alliance v. Noem* rejected the government's reliance on *Albertson*, *Belville*, *Macktal*, and other reconsideration decisions to justify a policy reversal that the statutory framework did not permit. 166 F.4th 739, 763–65 (9th Cir. 2026).[17]

---

[17] In *California Sea Urchin Commission v. Bean*, 883 F.3d 1173, 1179, 1182–83 (9th Cir. 2018), the agency established specific failure conditions when it created the program and later terminated the program after determining that one of these conditions had been satisfied. As the district court explained, that decision supports the authority to establish termination conditions and exercise them when satisfied. SA237–39. It supplies no authority to disregard the terms under which an existing program was approved. And *Pennsylvania v. Lynn* concerned suspension of new commitments; the court expressly noted that the suspension "did not purport to dishonor commitments already made." 501 F.2d 848, 851 n.6 (D.C. Cir. 1974).

### 3. *Even if not foreclosed by the text of the VPPP Statute, reconsideration authority would not be available here.*

Even if the Court were to find the VPPP Statute left the Secretary some degree of inherent authority to reconsider his decision, that authority is "not without limits." *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 832 (5th Cir. 2010). "Any such reconsideration must (1) be made within a reasonable time after the original decision; (2) be preceded by notice to the parties of the agency's intent to reconsider; and (3) not be arbitrary, capricious, or an abuse of discretion." *Brooks-LaSure*, 2021 WL 5154219, at *8 (citing *Dun & Bradstreet*, 946 F.2d at 193). Defendants' actions pursuant to this "inherent" authority fail for each of these three reasons.

Defendants have failed to identify a lawful basis for termination that would withstand APA review under the district court's decision. SA182–209. The court held that Congress authorized the Program and granted summary judgment on the MTA Plaintiffs' argument that the VPPP Agreement "could not be canceled even for non-arbitrary policy reasons." SA199–200, SA213. Those holdings foreclose Defendants' new asserted basis for termination that some intangible policy against "permanent contracts" provided the Secretary with an inherent authority to reconsider. What's more, the Secretary did not adequately consider the MTA Plaintiffs' substantial reliance interests, including more than $500 million spent establishing the Program and debt incurred in anticipation of its continuing revenues.

SA209–13; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 410–11 (2024). Defendants do not challenge those determinations on appeal.

The Second Circuit requires that agencies give "the claimant proper notice of its intent to reconsider." *Dun & Bradstreet*, 946 F.2d at 193. Courts have interpreted this to require that the agency give "an opportunity for comment, in addition to mere notice." *Brooks-LaSure*, 2021 WL 5154219, at *10. Here, the FHWA did not give the MTA Plaintiffs notice of any intent to reconsider its interpretation of the VPPP Statute, much less an opportunity to comment. The district court held that the February 19th letter was a "final agency action," in part because the letter made clear that the Defendants' "deliberation over whether to terminate the VPPP Agreement and whether New York is in violation of the law is at an end." SA140 (internal quotation marks omitted). While Defendants argued that the April 21 Letter invited the MTA Plaintiffs and other Project Sponsors to engage in dialogue with them about the legality of the Program, that was an "empty invitation, considering the Secretary had already reached his final determination that the VPPP Agreement was terminated and FHWA approval rescinded." SA147. *Cf. Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002) (finding agency acted pursuant to its inherent authority to reconsider when it notified the parties of intent to do so and allowed additional briefing from the affected parties).

Defendants did not reconsider federal approval for the Program in a reasonable amount of time. *See Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 444 (E.D.N.Y. 2011) (collecting cases). "What is a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). Some courts have considered the agencies' "inherent power to correct their mistakes by reconsidering their decisions" as available within the same time period "available for taking an appeal," or thirty days. *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984). As the D.C. Circuit explained, "[w]hat matters . . . is not the prolongation itself"; "[r]ather, it is the actual 'consequences of the delay that dictate whether corrective action is needed.'" *Solenex LLC v. Bernhardt*, 962 F.3d 520, 527 (D.C. Cir. 2020) (quoting *Dayton Tire v. Secretary of Labor*, 671 F.3d 1249, 1253 (D.C. Cir. 2012)). Defendants purported to terminate authority for the Program several months after signing the VPPP Agreement with the Project Sponsors and over a month after the Program had already started. But Defendants' reconsideration really came five years too late, as the parties had been working together since the spring of 2019 to implement the Program. SA115–16. As early as October 24, 2019, the FHWA advised that the VPPP would be "the best potential fit" for obtaining federal approval for the Program. SA116. Relying on the FHWA's longstanding policy and these

communications, the MTA Plaintiffs spent years and hundreds of millions of dollars planning and then executing the Program and issued $1.378 billion in debt intended to be repaid with Program revenues. SA210.

*       *       *

Congestion pricing is the solution chosen by New York's elected representatives to address Manhattan's traffic congestion, regional air quality, and aging mass transit infrastructure. SA112–16. Congress enacted the VPPP Statute, New York's elected Legislature authorized the Program, and a Presidentially-appointed, Senate-confirmed Secretary approved it. As the district court explained: "The democratic process worked." SA243.

The Program has been a success. The initial results documented in the record include a significant reduction in vehicle miles traveled within the CBD, shorter commutes, and faster, more reliable bus trips. SA25–26. Allowing Defendants to override the choices of New York's representatives would be the opposite of democratic accountability.

## CONCLUSION

The judgment should be affirmed.

Dated: September 16, 2026
New York, New York

Respectfully submitted,

*<u>/s/ Roberta A. Kaplan</u>*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas,
Suite 1500
New York, New York 10036
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*<u>/s/ Mark A. Chertok</u>*
Mark A. Chertok
Elizabeth Knauer
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com

*Attorneys for Plaintiffs-Appellees Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length requirements of Fed. R. App. P. 32(a) and L. R. 32.1(a)(4) because this brief contains 13,903 words, excluding those portions pursuant to Fed. R. App. P. 32(f).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated: New York, New York
September 16, 2026

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan

# CERTIFICATE OF SERVICE

I, Roberta A. Kaplan, counsel for Plaintiffs-Appellees and a member of the Bar of this Court, certify that on September 16, 2026, copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.

Dated: New York, New York
September 16, 2026

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan