# No. 26-1213

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Metropolitan Transportation Authority, Triborough Bridge and Tunnel Authority,

Plaintiffs-Appellees,

Riders Alliance, Sierra Club, New York State Department of Transportation, New York City Department of Transportation,

Intervenor-Plaintiffs-Appellees,

v.

Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Sean McMaster, in his official capacity as Administrator of the Federal Highway Administration, United States Department of Transportation, Federal Highway Administration,

Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of New York

## REPLY BRIEF


GREGORY ZERZAN
*General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

ERIN D. HENDRIXSON
*Attorney*

*U.S. Department of Transportation*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
CHARLES E.T. ROBERTS
*Attorneys*
*Civil Division, Room 2613*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 856-2140*
charles.roberts@usdoj.gov

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........ 1

ARGUMENT ........ 2

I. THE TUCKER ACT PRECLUDED JURISDICTION IN THE DISTRICT COURT ........ 2

A. The Contract Is the Source of Plaintiffs' Asserted Rights ........ 3

B. Plaintiffs Sought and the District Court Inappropriately Ordered Specific Performance of the Contract ........ 9

C. The Contract Is Money-Mandating ........ 13

D. Intervenors' Presence Does Not Change the Outcome ........ 19

II. EVEN IF APA JURISDICTION WERE PROPER, THE AGENCY MUST BE PERMITTED TO RECONSIDER APPROVAL OF THIS "PILOT PROGRAM" ........ 22

CONCLUSION ........ 29

CERTIFICATE OF COMPLIANCE

**TABLE OF AUTHORITIES**

**Cases:** **Page(s)**

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) .......... 7

*B.K. Instrument, Inc. v. United States,*
715 F.2d 713 (2d Cir. 1983) .......... 12

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) .......... 19

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .......... 6, 15

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 11

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (D.C. Cir. 2021) .......... 8, 14

*Crowley Gov't Servs., Inc. v. General Servs. Admin*,
38 F.4th 1099 (D.C. Cir. 2022) .......... 10

*Department of Educ. v. California*,
604 U.S. 650 (2025) .......... 9

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) .......... 19

*Holmes v. United States*,
657 F.3d 1303 (Fed. Cir. 2011) .......... 13, 16

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) .......... 6, 12

*Kidwell v. Department of Army, Bd. for Corr. of Military Recs.*,
56 F.3d 279 (D.C. Cir. 1995) .......... 10

*Macktal v. Chao*,
286 F.3d 822 (5th Cir. 2002) .......... 26

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .......... 20

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........ 2

*Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*,
474 U.S. 494 (1986) ........ 27

*National Insts. of Health v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ........ 9

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) ........ 17

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) ........ 23

*Presidential Gardens Assocs. v. United States ex rel. Secretary of Hous. & Urb. Dev.*,
175 F.3d 132 (2d Cir. 1999) ........ 9, 10, 12

*Rick's Mushroom Serv., Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) ........ 15, 16

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) (per curiam) ........ 19

*United States v. Jones*,
131 U.S. 1 (1889) ........ 13

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) ........ 2, 3, 4, 9, 10

*Woonasquatucket River Watershed Council v. USDA*,
186 F.4th 25 (1st Cir. 2026) ........ 19

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 702 ........ 11
5 U.S.C. § 704 ........ 11

Federal Grant and Cooperative Agreement Act of 1977:
31 U.S.C. §§ 6304–6305 ........ 14
31 U.S.C. § 6304 ........ 15

31 U.S.C. § 6305 ........................................ 15

Intermodal Surface Transportation Efficiency Act of 1991,
Pub. L. No. 102-240, 105 Stat. 1914 (amended by
Transportation Equity Act for the 21st Century,
Pub. L. No. 105-178, 112 Stat. 107 (1998)
(codified as amended at 23 U.S.C. § 149 note)........................................ 3
§ 1 ........................................ 3
§ 2 ........................................ 26
§ 5 ........................................ 27

Tucker Act,
28 U.S.C. § 1491(a)(1) ........................................ 1, 7, 8, 9, 14, 21
28 U.S.C. § 1491(a)(2) ........................................ 16
28 U.S.C. § 1491(b) ........................................ 17

23 U.S.C. § 301 ........................................ 4

28 U.S.C. § 2409a(d)........................................ 20

**Regulation:**

2 C.F.R. § 200.340 ........................................ 27

## INTRODUCTION AND SUMMARY

In attempting to escape the Tucker Act, plaintiffs' briefs make a range of arguments but cannot overcome the basic facts and principles that should be beyond dispute. First, plaintiffs identify no statute, regulation, or other source of law, apart from a contractual agreement, that would entitle them to continue their tolling program. Second, the Tucker Act can preclude not only actions seeking money damages but also "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Third and relatedly, that explicit statutory language overcomes any concerns about federalism, special rules of statutory construction, and the presumption of judicial review. Congress determined that contract claims belong in a specialized court without the power to order specific performance as a remedy. Everything about plaintiffs' claims inappropriately seeks to evade or undermine that determination, as well as precedents from this Court and the Supreme Court upholding it.

That is enough to dispose of this appeal. But plaintiffs also fundamentally misunderstand the government's alternative contention that if this case is considered—as plaintiffs urge—under the Administrative Procedure Act (APA), the district court's judgment cannot be reconciled with basic principles of administrative law. In APA cases, courts are empowered to

determine whether agencies acted lawfully, and if not, allow the agency to take a new action consistent with the court's decision. There is no basis for prejudging a future dispute about a hypothetical future agency action that might terminate the contract at issue here on a different basis. Nor, even apart from that dispositive procedural defect, is there any substantive basis for determining that the Department of Transportation has entered into an agreement that it has no means to reconsider.

The district court's judgment should be vacated.

## ARGUMENT

### I. THE TUCKER ACT PRECLUDED JURISDICTION IN THE DISTRICT COURT.

This Court has applied the two-part test set out in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), to determine whether a claim is precluded by the Tucker Act. *See Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375–77 (2d Cir. 1999) (per curiam). This Court considers (i) whether the claim is premised on a contract, and (ii) whether plaintiffs seek in essence contractual relief. Here, there is no source of relevant rights other than the Value Pricing Pilot Program (VPPP) Agreement (VPPP Agreement or Agreement). And there is no way to conceive of the district court's order "restor[ing]" that Agreement than as a contractual remedy (namely, specific performance). JA1797–98.

Plaintiffs' contrary contentions are meritless. There is no basis to overcome the presumption that the Agreement is money-mandating. And there is no valid reason why strangers to the Agreement should be permitted to enforce its terms in district court. Contrary to plaintiffs' inflated fears, none of these arguments forecloses judicial review or remedy; it merely channels any such review to the forum that Congress mandated (the Court of Federal Claims) by the parties that Congress authorized to seek review (the parties to the contract) and limits the remedy to that which Congress mandated (damages).

### A. The Contract Is the Source of Plaintiffs' Asserted Rights.

As to the first *Megapulse* factor, the argument that the asserted rights here are statutory and regulatory rather than contractual has no basis in any actual statute or regulation. Instead, all roads lead to the VPPP Agreement.

The relevant statute authorizes the Secretary of Transportation to "enter into cooperative agreements."[1] *See* VPPP Statute § 1. On its face, it does not confer any rights on anyone. Instead, the ensuing cooperative agreement is the sole source of plaintiffs' asserted legal right to impose tolls

---

[1] Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1012(b), 105 Stat. 1914, 1938 (amended by Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1216(a), 112 Stat. 107, 211 (1998)) (codified as amended at 23 U.S.C. § 149 note (VPPP Statute)).

on lower Manhattan; that is the right at issue and it "stems from no independent, non-contractual source." *Up State Fed. Credit Union*, 198 F.3d at 376. Indeed, there is a general ban on tolling federal-aid highways. 23 U.S.C. § 301. Without the Agreement, plaintiffs "could have had no possible right to" continue tolling lower Manhattan "or to demand that the [Federal Highway Administration (FHWA) continue to] grant" them authority to do so. *Up State Fed. Credit Union*, at 377. And plaintiffs' assertion that the APA provides the relevant rights does not distinguish this case from *Up State Federal Credit Union* or the recent Supreme Court cases on this subject. *See* MTA Br. 35–36; NY Br. 23.

To the extent that plaintiffs suggest that there is some other federal action at issue here apart from the termination of the VPPP Agreement, they fail to cite any source for it. To the contrary, New York asserts a right "not to have the federal approval that resulted in the cooperative agreement arbitrarily rescinded." NY Br. 23. There is no meaningful difference between rescinding the "approval that resulted in the cooperative agreement" and

terminating the agreement itself; otherwise any contract case could be converted to an APA case.[2]

Plaintiffs get matters backward when they suggest that the VPPP Agreement only enters into this case "as a defense." MTA Br. 36–37. As discussed, the Agreement is the only plausible basis for any right asserted by plaintiffs here. And even now, plaintiffs continue to invoke the Agreement's content in support of their claims that it was unlawfully terminated. *See, e.g.*, MTA Br. 4 ("this VPPP Agreement contains no such language"); *id.* at 41 (invoking the language of "[t]he VPPP Agreement itself"); *id.* at 45 (characterizing relief sought as declaration that defendants lack authority to terminate "except as the Agreement allows"); NY Br. 2 ("[T]he district court correctly concluded that defendants may not renege on their approval of the congestion pricing program under . . . the terms of the parties' cooperative agreement."); *id.* at 32 (invoking "the terms and conditions of the VPPP cooperative agreement"). As noted, nothing in the statute purports to limit the Secretary's authority to terminate a cooperative agreement, so plaintiffs'

[2] Plaintiffs also offer no response to the point that the APA itself cannot provide a wholesale exception to the implied preclusion of review because that would render the implied preclusion, which only applies in APA cases, a nullity. Opening Br. 19–20.

argument must be that they have a right to continued performance under the contractual agreement itself. That is a contract claim.

To the extent anyone is attempting to treat a potential defense as controlling for jurisdictional purposes, it is plaintiffs. Plaintiffs note that the decision to terminate the agreement was premised, in part, on the Secretary's views about the agency's authority to enter into the VPPP Agreement in the first place. *See* MTA Br. 33–34; Intervenors Br. 13; JA1723. But the government's reasons for terminating a contract do not alter the source of rights on which plaintiffs are relying, and it is well established that the interplay with "governing regulations does not make [contractual] obligations any less contractual in nature." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1367 (Fed. Cir. 2021); *see also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77–78 (D.C. Cir. 1985) (action still contractual even though regulations were implicated). Disputes about whether a contract was properly formed in the first place present a classic contractual issue within the expertise of the Court of Federal Claims, to which the United States is prepared to present its merits arguments. *See* Opening Br. 22 n.9.

Intervenors further underscore the error of their argument by highlighting a case in which, as they describe it, a different set of plaintiffs "sued the federal government under the APA to argue that Congress did not

authorize the Secretary to enter an agreement allowing 'cordon pricing.'" Intervenors Br. 25–26 (quoting JA138). That is not a contract case, as it is not an effort to enforce any contractual obligation, but rather a statutory claim about the scope of the Secretary's authority. Here, by contrast, plaintiffs are trying to enforce a contractual obligation.

Plaintiffs' reliance on *Atterbury v. U.S. Marshals Service*, 805 F.3d 398 (2d Cir. 2015), highlights the point. The plaintiff in that case was employed by a government contractor as a court security officer, and asserted a right to continued employment based on his collective bargaining agreement with his employer and on the Fifth Amendment's Due Process Clause. *Id.* at 406–07. The only relevant "contract with the United States," 28 U.S.C. § 1491(a)(1), was the government's contract with the plaintiff's employer, which gave the United States the right to dismiss the plaintiff under certain circumstances. *Atterbury*, 805 F.3d at 406. The plaintiff's claim did not arise out of that contract—which conferred rights only on the United States, not on the plaintiff—and therefore the claim was not contractual. Plaintiffs' rights here, by contrast, arise entirely from the VPPP Agreement, and *Atterbury* is relevant only insofar as it reaffirms that it is the source of the plaintiff's rights, and not the government's defenses, that matters.

Plaintiffs' remaining arguments as to the first *Megapulse* factor stall out on the statutory language. Plaintiffs emphasize that this case does not involve a promise by the federal government to pay money. But that is not relevant to whether their claim is "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); *see Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (D.C. Cir. 2021) (indicating that the "traditional four-part test for the existence of a government contract" includes "consideration," but not necessarily in the form of federal funds). An effort to enforce a contractual right to payment and an effort to enforce a contractual right to some other form of valuable consideration—here, authority only the federal government can confer—are equally claims founded on a contract. *See* Opening Br. 7–8 (identifying ample consideration on both sides of Agreement); JA344 (plaintiffs' own assertion that VPPP Agreement is "supported by consideration"). *Contra* MTA Br. 37. Here too, *Up State Federal Credit Union* confirms defendants' view: The claimed right at issue there was, in plaintiffs' words, "to require the Army to accept title to [the plaintiff's] building and grant [the plaintiff] a leaseback," MTA Br. 37–38, not to the payment of money. Yet this Court channeled that claim to the Court of Federal Claims. The relevant point is that there is "no source of law, besides their

grant agreement[], guaranteeing them the relief they seek." MTA Br. 38 (quotation marks omitted).

### B. Plaintiffs Sought and the District Court Inappropriately Ordered Specific Performance of the Contract.

As to *Megapulse*'s second element, the relief that plaintiffs sought and obtained was an order requiring that the federal government continue to fulfill the promise in the VPPP Agreement to maintain its authorization of the Tolling Program. That is textbook specific performance, and indistinguishable from the *National Institutes of Health v. American Public Health Ass'n* (*NIH*), 145 S. Ct. 2658 (2025), *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam), *Up State Federal Credit Union*, 198 F.3d 372, and *Presidential Gardens Associates v. United States ex rel. Secretary of Housing & Urban Development*, 175 F.3d 132 (2d Cir. 1999), plaintiffs' failed efforts to compel performance of their various government contracts. *See* Opening Br. 23–24.

Plaintiffs misunderstand the relevant inquiry when they emphasize that the specific performance contemplated in this case is not the payment of money. *See* MTA Br. 39. While the Tucker Act applies to claims "for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1491(a)(1), that is not the portion of the Tucker Act that is relevant here. Instead, the

relevant point is that this is a "claim against the United States founded . . . upon any express or implied contract with the United States," *id.*, a clause that would be entirely unnecessary if only relief that was tantamount to money damages were covered. Plaintiffs highlight their confusion by continuing to cite *Kidwell v. Department of Army, Board for Correction of Military Records*, 56 F.3d 279 (D.C. Cir. 1995), which, as the government explained, concerned the "liquidated or unliquidated damages" clause and not the "express or implied contract" clause of the Tucker Act. *See* MTA Br. 39; Opening Br. 24–25.

Beyond that textual point, *Up State Federal Credit Union* and *Presidential Gardens Associates* held that the Tucker Act applied to claims seeking, respectively, "an order directing the Army to enter into a facility lease," 198 F.3d at 377, and "a permanent injunction against the auction sale of Plaintiff-Appellants' loans, or an undoing of any auction sales already completed," 175 F.3d at 143, pursuant to the agreements in those cases. Both times, this Court identified such non-monetary relief as "specific performance" and therefore contractual. *Up State Fed. Credit Union*, 198 F.3d at 377; *Presidential Gardens Assocs.*, 175 F.3d at 143; *see also Crowley Gov't Servs., Inc. v. General Servs. Admin*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) (noting that the plaintiff sought "neither the prototypical contract remedy of damages, nor the classic contractual remedy of specific performance" (citation and quotation marks

omitted)). Plaintiffs provide no principled basis to distinguish the district court's order restoring the VPPP Agreement from those holdings.

For similar reasons, plaintiffs' reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), is misplaced. That case involved neither a contract claim nor the APA provision that bars suits "expressly or impliedly forbid[den]" by another statute. 5 U.S.C. § 702. Instead, *Bowen* held that a state's APA claim for adjusted reimbursement rates under the Medicaid Act was not a "money damages" claim under 5 U.S.C. § 702 just because it might result in the payment of money. 487 U.S. at 891–901. The Court added that a Tucker Act suit was not an alternative "adequate remedy" for the state's Medicaid reimbursement-rate suit so as to preclude review under 5 U.S.C. § 704. *Id.* at 904 (quotation marks omitted). But nothing in *Bowen* addresses the expressly-or-impliedly-forbidden-by-statute bar in § 702 at issue here.

In any event, the government explained and neither plaintiffs nor intervenors dispute that restoring the VPPP Agreement *does*, as a factual matter, result in at least some federal payments. *See* Opening Br. 30–31.

Plaintiffs' last effort to artificially limit the Tucker Act's plain language fares no better. This is the novel suggestion that relief must impose *affirmative* obligations in order to be contractual. *See* MTA Br. 41–42. But an effort to enforce a contractual obligation to refrain from doing something is no

less a claim founded upon a contract than an effort to enforce a contractual obligation to do something. This Court's precedent confirms the point; as plaintiffs recognize, this Court has held that "an injunction preventing . . . auctions inconsistent with [the operative] agreement" constitutes specific performance. MTA Br. 42 (citing *Presidential Gardens Assocs.*, 175 F.3d at 143). Thus, an order preventing actions deemed inconsistent with the VPPP Agreement (*i.e.*, preventing its termination and "restor[ing]" it, JA1798) constitutes specific performance as well.

Intervenors are similarly mistaken to suggest that "vacatur" of a decision to stop performing on a contract is somehow different from a specific-performance remedy. *See* Intervenors Br. 15. The Supreme Court rejected that same argument by *NIH* plaintiffs, as have other courts. *E.g.*, *Ingersoll-Rand Co.*, 780 F.2d at 80 (cannot "avoid[]" Tucker Act's intent "to foreclose specific performance of government contracts" through artful pleading (quotation marks omitted)).[3]

[3] *B.K. Instrument, Inc. v. United States* is not to the contrary. 715 F.2d 713 (2d Cir. 1983). That case addressed a claim by a disappointed bidder against the award of a contract to another, so the plaintiff had "never entered into a contract with the Government" and there was "no contract which the district court could order the Government to perform." *Id.* at 728. The decision makes clear, moreover, that "an action seeking specific performance of a contract with the Government may not be brought in a district court to avoid the Tucker Act's limitation of relief to money judgments." *Id.* at 727–28.

In the end, plaintiffs and intervenors offer no valid way of conceiving the district court's judgment other than as requiring continued performance of the VPPP Agreement. That triggers the Tucker Act and the APA bar. While plaintiffs may be dissatisfied that a claim for money damages is the only available cause of action, they are not entitled to bypass that deliberate congressional choice. *See United States v. Jones*, 131 U.S. 1 (1889) (holding, shortly after the Tucker Act was enacted, that Congress intended to authorize only claims for damages and thus dismissing claims seeking for specific performance).

### C. The Contract Is Money-Mandating.

Plaintiffs fare no better in suggesting that the Court of Federal Claims would lack jurisdiction over this dispute because a monetary remedy would be unavailable. As the Federal Circuit has confirmed, "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

Nothing about this case suggests that it falls outside the normal rule. Plaintiffs' contrary contention is premised on their erroneous view that there is a categorical exception for contracts that happen to be labeled "cooperative

agreements." MTA Br. 29–30, 30 n.8. This approach finds no support in the statute, and relevant caselaw forecloses it.

To begin, cooperative agreements and grant agreements are indistinguishable for purposes of determining Tucker Act jurisdiction. Both instruments serve the same statutory purpose: "to carry out a public purpose of support or stimulation authorized by a law of the United States." 31 U.S.C. §§ 6304–6305 (enacted by Federal Grant and Cooperative Agreement Act of 1977). Their only difference lies in the degree of federal involvement: grants apply where "substantial involvement is not expected between the executive agency and the . . . recipient," *id.* § 6304, while cooperative agreements apply where "substantial involvement is expected." *Id.* § 6305. Both types of instruments may constitute "contract[s]" for purposes of the Tucker Act for the simple reason that the statute draws no categorical distinctions amongst "contract[s]." 28 U.S.C. § 1491(a)(1). Nothing about the standards for identifying a federal contract turn on the instrument's label or degree of federal involvement. *Columbus Reg'l Hosp.*, 990 F.3d at 1340. Nor did the Supreme Court's analysis in *NIH* and *California*.

In no uncertain terms, the Federal Circuit has counted the "types of contracts [that] are exempt from the presumption that damages are available upon the breach of a contract" and that universe is limited to "three":

> (1) contracts that expressly disavow money damages;
>
> (2) agreements that are entirely concerned with the conduct of parties in a criminal case and that lack an unmistakable promise to subject the United States to monetary liability; and
>
> (3) [“special” or “unique”] cost-sharing agreements with the government.

*Boaz Hous. Auth.*, 994 F.3d at 1365 (citations and quotation marks omitted); *see id.* at 1370 (asking whether the contracts at issue “fall into any of [these] three categories of contracts”). Cooperative agreements do not make the list.[4]

And none of the categories covers the VPPP Agreement. Plaintiffs and intervenors fail to identify any special feature of the Agreement that could suggest the parties intended to override the default remedy of damages (*e.g.*, a disclaimer or provision for another type of remedy for breach), and the agreement here has nothing to do with a criminal case. This case also does not fall into the third category. That category originated with *Rick’s Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008), and the Federal Circuit subsequently explained its limits in *Holmes*. As the court explained, the

[4] Although the federal government previously advocated a narrower view of what contracts could qualify as money-mandating, *see* MTA Br. 32, the Federal Circuit rejected that view in *Boaz Housing Authority*.

fact that the agreement in *Rick's Mushroom Service* was a cooperative agreement was relevant to the Federal Circuit's conclusion that it was "not a procurement contract" and thus that the Court of Federal Claims did not have jurisdiction under 28 U.S.C. § 1491(a)(2), which applies only to a limited set of contracts. *See Holmes*, 657 F.3d at 1314–15. The court also stated that the "unique cost-share agreement" at issue in *Rick's Mushroom Service* did not provide a substantive right to money damages, a holding with no evident relevance here because this Agreement does not concern such a cost-share arrangement. *Id.* at 1315.

Plaintiffs cannot rebut the presumption that money damages are available by conflating whether a contract itself conveys funds (*i.e.*, mandates paying money) with whether a contract is "money-mandating" for purposes of Tucker Act jurisdiction. *See* MTA Br. 27–29; NY Br. 19. The relevant mandate that courts look for is not a promise to pay funds as consideration but rather the commitment to pay damages as remedy for breach. The latter commitment is presumed in all but the few types of cases identified by the

Federal Circuit above. So there is no requirement for direct payment or "commercial" obligations in the contract itself. *Contra* MTA Br. 31.[5]

The Ninth Circuit's decision in *Pacito v. Trump*, 169 F.4th 895 (9th Cir. 2026), on which MTA principally relies, cannot be reconciled with these principles. To the contrary, *Pacito* relied substantially on the government's previous position that cooperative agreements did not give rise to money damages, from before *Boaz Housing Authority* and *Columbia Regional Hospital* from the Federal Circuit clarified the breadth of the presumption. *See id.* at 927. The panel majority also fixated on the distinction between cooperative agreements, procurement contracts, and grants in the Federal Grant and Cooperative Agreement Act, which is relevant only to 28 U.S.C. § 1491(b)—a separate provision that applies only to procurement contracts—but not to the Tucker Act provision at issue here. *Pacito*'s emphasis on the plaintiffs' broader interest in "see[ing] the refugee resettlement program [at issue] continue, whether or not [the] specific organizations continue to be funded" further distinguishes that case. *Pacito*, 169 F.4th at 929 n.16. That

---

[5] To the extent the Court disagrees and imposes such a requirement, FHWA's acquisition of what MTA admits is "valuable pilot-project data," MTA Br.40, "for the Federal Government's own use," MTA Br. 30, should qualify. So too for the statutory obligation to provide funds and the undisputed obligation for the federal government to pay plaintiffs the tolls imposed under the VPPP Agreement. *See* Opening Br. 30–31.

observation was relevant because the statute, according to the plaintiffs, compelled the government to continue to operate a refugee resettlement program regardless of any contract. Here, as noted above, there is no plausible argument that anything other than the VPPP Agreement compels the government to authorize the tolling program.

Lastly, plaintiffs do not gain traction through their half-hearted gestures at Justice Barrett's controlling concurrence in *NIH*. MTA Br. 29 n.7; NY Br. 28 n.4. Although that opinion stated that a plaintiff can challenge agency guidance with prospective effect under the APA, it also concluded that plaintiffs could not undo actual grant agreement terminations, as plaintiffs acknowledge. *See* MTA Br. 29 n.7 (noting that the Court "stay[ed] relief concerning individual grant terminations"). What plaintiffs received here was relief concerning their individual agreement termination that is precluded under *NIH*.[6]

---

[6] Plaintiffs fault the government for being equivocal about jurisdiction under the Tucker Act, MTA Br. 32 n.9, but the footnote they cite merely reserved the governments' merits arguments for presentation in the Court of Federal Claims, *see* Opening Br. 22 n.9. The government could not and would not, of course, argue in this Court that plaintiffs' claims should be channeled to the Court of Federal Claims and then argue in that court that it is the wrong forum based on the nature of the Agreement—though, as discussed below, intervenors have no valid cause of action in any court.

### D. Intervenors' Presence Does Not Change the Outcome.

Intervenors offer no valid authority or justification for the radical rule they press: that "noncontracting parties" may sue and obtain an order requiring the government to continue performing on a contract independent of any other party to the contract. Intervenors Br. 7. Instead, at every turn, their arguments for such a rule provide only additional reasons to reject it.

To start, intervenors offer no response to the Supreme Court's repeated recognition that allowing outside parties to sue under the APA in addition to or in lieu of parties Congress specifically identified would frustrate congressional intent. Opening Br. 32 (citing *Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 239 n.8 (2025); *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345–47 (1984)). No doubt it would frustrate, if not destroy, the Tucker Act's carefully crafted limitations on jurisdiction and remedies to permit nonparties to seek specific performance of government contracts in district courts. And multiple courts of appeals have recently so held. *Thakur v. Trump*, 176 F.4th 1187, 1199 (9th Cir. 2026) (per curiam); *Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25, 50 (1st Cir. 2026) ("That the Nonprofits do not bring contract claims here thus does not cure the likely problem with the District Court's remedy for their APA claims." (quotation marks omitted)).

It would be passing strange if, even though the contractual counterparty were not entitled to specific performance of a contract, a stranger to the contract could obtain that remedy (or even "thousands of" strangers, Intervenors Br. 2). Plaintiffs' analysis of the issue stems not from a case about contracts but from a case involving the Quiet Title Act. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012). That case is relevant only insofar as it confirmed that "a plaintiff cannot use the APA to end-run the [Quiet Title Act]'s limitations." *Id.* at 216. Substituting the Tucker Act for the Quiet Title Act, that is the principle that applies here.

Otherwise, the Supreme Court's analysis of the Quiet Title Act has little bearing on this case. The *Patchak* Court held, in particular, that the Quiet Title Act did not apply to an action in which the plaintiff was not claiming title to the relevant property. That was true, among other things, because in such an action "the plaintiff 'shall set forth with particularity the nature of the right, title, or interest which [he] claims,'" *Patchak*, 567 U.S. at 221 (alteration in original) (quoting 28 U.S.C. § 2409a(d)). The intricacies of what sorts of actions that relate generally to the title to real property are properly denominated as quiet-title actions have little to do with the straightforward issue presented here: whether a claim that the United States must comply

with its contractual obligations is a claim "founded . . . upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1).

Intervenors' claims are independently precluded because they have not demonstrated that they have standing. Their principal response is to assert that they need not establish standing because they do not seek relief different from plaintiffs, but that argument only works if plaintiffs' claims are allowed to proceed, and thus could not provide an independent ground for affirmance. *See* Intervenors Br. 22 n.4. Apart from that, they do not even attempt to establish that they have standing but state that they would be "prepared to furnish the district court with new declarations that would establish standing on their claim." *Id.* The district court's judgment cannot be affirmed based on a promise that standing could be established on a second lap.

Lastly, intervenors' parade of horribles about judicial review of "consequential agency actions" that might involve contracts arises only from their mistaken understanding of the proper Tucker Act analysis. Intervenors Br. 26. Intervenors insist, in particular, that "courts have not found that the fact that a contract might create a right in contracting parties deprives nonparties of an otherwise existing APA claim." *Id.* at 27. But the entire point here is that intervenors do not have an "otherwise existing APA claim." Rather, the only rights that can be asserted here are contractual rights, and it

is unremarkable that the parties to the contract, rather than strangers to the contract, are the proper parties to enforce that right, and that they must do it in the appropriate forum. It is inconceivable that the *Up State Federal Credit Union* Court that channeled the credit union's claim for a leaseback from the Army for its building would nonetheless entertain that same claim from a nonparty to that lease. Yet that is precisely intervenors' theory: Where even the leaseholder could not sue, any third party with an interest in seeing performance of that lease (perhaps a customer of the credit union who would be harmed by the on-base location's closure or a supplier of the credit union whose business would be harmed by the closure) could. That cannot be right.

## II. EVEN IF APA JURISDICTION WERE PROPER, THE AGENCY MUST BE PERMITTED TO RECONSIDER APPROVAL OF THIS "PILOT PROGRAM."

Plaintiffs do not even attempt to defend the declaratory judgment that the district court entered. The district court not only vacated the termination decisions, but also entered a declaratory judgment "that the Secretary is permitted to terminate the VPPP Agreement only pursuant to the terms expressly stated therein." JA1801; JA1805; JA1807. There is no plausible ground on which that was appropriate, either procedurally or substantively.

If the Tucker Act applies, this Court can vacate the district court's judgment for lack of jurisdiction and stop there. But if the APA applies, the

district court's remedy is equally inappropriate. As explained, "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995); Opening Br. 38 (quotation marks omitted). If the APA applied here, the district court could evaluate the grounds on which the agency relied and, if it rejected them, conclude that the decision was invalid and then allow the agency to determine how to proceed consistent with that determination. But it could not declare once and for all the only conditions under which the agency could take future action.

Plaintiffs miss the point when they describe the government's arguments as "defense[s]," MTA Br. 49, or assert that a remand would be futile, *id.* at 47–49. The government is not urging here, if the APA applies, that the agency action should be upheld. As noted, the government is prepared to litigate the validity of its action in the Court of Federal Claims, and accordingly has not presented merits arguments in this Court. Nor is the government quarreling with a narrower order merely invalidating the specific rationales in the termination letter, to the extent this case is properly considered under the APA. But the district court went much further, foreclosing the government

from terminating the VPPP Agreement for any reason other than pursuant to the contractual terms (and seemingly "only [by] Plaintiffs and not the Secretary or the [agency] . . . at will," JA1784–85). Plaintiffs provide essentially no defense of that aspect of the court's ruling.

Plaintiffs' discussion of inherent authority is instructive. According to plaintiffs, the government did not properly preserve this argument in the district court. *See* MTA Br. 49–52. If that were correct, it would only prove the government's point. Although the issue was not litigated, the district court's declaratory judgment would prohibit the government from relying on that authority in the future, should the government elect to do so. The proper course, under the APA, would have been to allow the agency to develop that rationale in the first instance, and then for a court to evaluate it.

And the government cannot plausibly be described as having forfeited an objection to the declaratory judgment that the district court ultimately issued. On the contrary, the government sought to limit any relief under the APA to "vacatur" and "remand." JA1641; Dkt. 171, at 45 (summary judgment opposition). Plaintiffs had not proposed the declaratory judgment that was ultimately entered, and the government had no opportunity to review its language before it was issued. The government cannot be faulted for failing to predict that the district court would craft a declaratory judgment that

prejudges hypothetical future agency determinations in a manner that is so out of line with fundamental principles of administrative law.

The government's opening brief in this Court provided the government's first opportunity to respond to the district court's extraordinary contention that the VPPP Agreement is the unusual contract that remains in effect in perpetuity and that the government can neither terminate it for any reason—other than possibly material breach by plaintiffs—or breach it and pay any damages that might result. To the extent that this case is erroneously viewed in APA terms, rather than contractual terms, that would plainly be the wrong result on the merits in addition to being procedurally wrong, as the government's opening brief explained.

Plaintiffs' response, once again, largely confirms the government's point. The MTA plaintiffs concede that agencies have some "inherent authority to revisit their prior decisions," MTA Br. 52 (quotation marks omitted), and then quibble about whether the prerequisites to exercising that authority have been met here. That concession should be sufficient to vacate the declaratory judgment, which declares in perpetuity that the government lacks authority to terminate the contract unless the contract expressly so provides. The details of whether a hypothetical particular termination can be justified can and should be left for another day.

New York's position on this score largely contends that the government cannot prevail on the merits on this APA theory (which the government is not arguing before the agency has had an opportunity to take further action). NY Br. 30. New York goes on to reinforce the Tucker Act error by insisting that everything turns on "the terms and conditions of the VPPP cooperative agreement," *id.* at 32.

None of this provides a basis to uphold the district court's overbroad declaratory judgment. To the contrary, MTA concedes, and New York barely discusses, that as a general matter agencies have authority to reconsider their decisions, absent a contrary statutory mandate. *See, e.g.*, *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002); *Midlantic Nat'l Bank* v. *New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 501 (1986). Plaintiffs fail to establish such a mandate. On the contrary, the VPPP Statute and governing regulations confirm there is no such thing as a permanent value pricing pilot project.

The funding provision (which plaintiffs argue elsewhere has no application here because they claim to have waived it) applies to "preimplementation," "project design," and "start up costs," "for a period of at least 1 year." VPPP Statute § 2. And it caps funding at three years. *Id.* That mandates nothing about how long a program must operate once a cooperative agreement is executed. Preimplementation and project design have been

going on here for years. *See* MTA Br. 8–13. And the Tolling Program has been in operation for over a year. Meanwhile, the monitoring and reporting requirements apply to "programs," *plural*. VPPP Statute § 5. They do not set any minimum term for any individual program, let alone this particular Tolling Program. And plaintiffs offer no compelling reason to redefine a "pilot program" to mean a "permanent one." Indeed, their own definitions ("small-scale advance study" and "trial undertaking") hardly capture the massive and permanent program that they convinced the district court to enact. *See* MTA Br. 55. Meanwhile, New York's invocation (at 32) of the major-questions doctrine gets matters reversed: it would be extraordinary for Congress to create an irrevocable program through this statute—not for this Court to adhere to the ordinary default rule that agencies can reconsider their decisions.

Plaintiffs' arguments about regulations are either beside the point or self-defeating. *See* MTA Br. 53–54. They point to no regulation withdrawing authority to reconsider VPPP authorizations. And the regulation they do identify is about the terms and conditions of federal award contracts. 2 C.F.R. § 200.340. Arguing that that regulation applies here confirms the contractual nature of the VPPP Agreement and that any arguments founded thereon must be brought in the Court of Federal Claims. *See supra* Part I. The cited

regulation does not enact a permanent Tolling Program simply by virtue of the VPPP Agreement's purported silence as to termination.[7]

* * *

Plaintiffs do not dispute the perverse incentives that permanent policymaking by unfunded cooperative agreements would wreak. *See* Opening Br. 40–41. And the uncertainty they worry could result from applying the normal rule of contracts (and especially government contracts) that specific performance is not an available remedy can be remedied by negotiating other terms regarding consideration, process for termination, or remedy. Here, plaintiffs rushed into a barebones agreement (silent as to duration) that they knew an incoming administration opposed. Their radical view that such an action by one agency official could bind all federal officials to follow is as foreign to the law as it is unsound as a matter of policy.

[7] Although somewhat beside the point, since the agency should be permitted to reconsider on new grounds regardless of whether there is an explicit "remand" to it, the government did not concede remand would be inappropriate here. *Contra* MTA Br. 48. Plaintiffs both overread counsel's statement that remand only to reconsider the agency's two statutory bases for termination "might not be . . . needed" and take it out of context. JA1641. The statement leaves open the possibility that remand "might" still be needed. And in any event, the district court's question addressed remand for further consideration of specific statutory questions raised in the agency actions at issue; counsel's answer in no way forfeited an argument that remand would be appropriate for further consideration of new and different agency actions.

## CONCLUSION

The district court's judgment should be reversed, and the case should be dismissed for lack of jurisdiction or, in the alternative, remanded to the agency for reconsideration.

Respectfully submitted,

October 2026

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
*/s/ Charles E.T. Roberts*
CHARLES E.T. ROBERTS
Attorneys
*Civil Division, Room 2613*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 856-2140*
charles.roberts@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,416 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in CenturyExpdBT 14-point font, a proportionally spaced typeface.

*/s/ Charles E.T. Roberts*
Charles E.T. Roberts